### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. A-21-CR-223-LY** |
| | § | |
| **MATTHEW NELSON TUNSTALL,** | § | |
| | § | |
| **Defendant.** | § | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned attorneys, hereby submits the following memorandum setting forth the Government's position at the sentencing of defendant Matthew Nelson Tunstall.

### INTRODUCTION

As described in the Plea Agreement, Statement of Facts (SOF), Presentence Report (PSR), and this Memorandum, the charges in this case reflect the defendant's scheme to defraud thousands of victims in a nationwide, political fundraising scam that tricked small donors into contributing millions of dollars to sham political action committees ("PACs") controlled by the defendant, Liberty Action Group PAC ("LAG") and Progressive Priorities PAC ("PPP"). The defendant intentionally misrepresented to victims that these PACs would use their contributions to support the leading candidates and their campaigns in the 2016 Presidential Election. Rather than use the donations to support these and other causes, the defendant misappropriated nearly every cent of those contributions for his own personal benefit, the benefit of his co-conspirators, the benefit of his PACs and preferred vendors, and the benefit of his companies and business ventures unrelated to the PACs. The defendant also laundered the fraudulently generated proceeds through one of his vendors, manipulated mandatory reports to the Federal Election Commission ("FEC") to cover his tracks, and provided false and highly misleading information to federal and state authorities, to

vendors, and even to those in his employ to conceal his fraudulent, criminal conduct.

The defendant's actions show calculated and callous disregard to exploit the democratic political process, to conceal his actions, and to evade the enforcement of federal laws. The Government recommends that the Court sentence the defendant to a sentence within the Guidelines range of 188 to 235 months. The Government also asks the Court to impose a term of supervised release of three years and a special assessment of $200.00. Additionally, considering the defendant's significant financial frauds, the Government recommends the imposition of a fine in line with the applicable Guidelines. The government also requests that the defendant be ordered to forfeit $789,818.00 to the United States, consistent with the unopposed motion for forfeiture judgment filed before this Court. Dkt. No. 110 (Mot. for Money Judgment).

## PROCEDURAL BACKGROUND

On December 20, 2022, the defendant pleaded guilty to Count One of the Indictment, charging him with conspiracy to commit wire fraud and to cause false statements to the FEC, in violation of 18 U.S.C. § 371, and Count Five of the Indictment, charging him with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. The Indictment also included a wire fraud forfeiture allegation, and in a pre-sentencing motion for forfeiture, which the defendant did not oppose, the government sought a forfeiture money judgment in the amount of $789,818.00, which constituted the defendant's personal proceeds of his fraud. Dkt. No. 110. While the parties did not agree on the loss amount, the parties stipulated that LAG received approximately $3.11 million in contributions, while PPP received approximately $856,813 in contributions. SOF at ¶ 16.

## FACTUAL BACKGROUND

In July 2016, FBI initiated an investigation in response to a complaint from Hillary for America, the authorized Presidential campaign committee for Hillary Clinton, alleging fraudulent activity by PPP, a registered SuperPAC that purported to support Clinton's candidacy. The investigation revealed that defendants Matthew Tunstall, Robert Reyes, and Kyle Davies operated PPP as well as LAG, a registered SuperPAC that purported to support Donald Trump and other Republican candidates. The investigation further revealed that PPP and LAG used robocalls, radio advertisements, and mailers to solicit donations on the pretense that the funds would be used to support the candidates, their campaigns, and political causes. In reality, the defendants used the money obtained from victims to enrich themselves, to fund their unrelated business ventures, and to purchase additional fraudulent solicitations. In total, the two PACs raised approximately $4 million over the course of the charged scheme.

The defendant was the mastermind behind the scheme and its undisputed leader. Beginning in at least 2012, the defendant worked, at least intermittently, in the political fundraising arena in California for a conservative-affiliated political action committee, Restore America's Voice PAC, where he gained experience in using political fundraising using robocalling platforms to solicit political contributions. At some point, the defendant left that organization and focused on online marketing.

In late 2015, the defendant began preparing to launch a new PAC to fundraise off the upcoming 2016 Presidential Election. He recruited his friend and occasional business associate, Robert Reyes. The defendant and Reyes agreed that they would be the principals operating the PAC and would split profits 50/50. The defendant also recruited Davies, his 25-year-old cousin

who had dropped out of Texas Tech University.  Unlike the defendant and Reyes, Davies would be paid a fixed fee of approximately $4,000 per month, plus commissions for soliciting additional contributions from "VIP donors."  Over the following weeks and months, the defendant and his co-conspirators recruited additional employees, including nominal PAC executives and an accountant to handle the PAC's fundraising, and reporting to the FEC.

Tunstall caused LAG to be registered with the FEC in January 2016 and PPP in May 2016. The two PACs operated in identical fashion.  They used a robo-dialing platform to call potential victims.  Victims who picked up the phone would be played a pre-recorded message featuring a clip of the candidate's voice followed by an urgent solicitation of money, purportedly to support that candidate's campaign.  The message urged victims to press 1 to donate.  Those who pressed 1 would be transferred to a live agent at a call center who would follow a script created jointly by the defendants and the call center managers.  The script included high-pressure sales tactics to encourage the victim to donate as much as possible.  The agent would pressure the victim to give over their credit card information over the phone.  Victims who declined to pay by credit card would be sent a mailer reminding them of their "pledge" and asking them to mail a check.

The defendant was responsible for the overall strategy of the PACs and for the contents of the solicitations and the public-facing PAC information, including the PAC websites.[1]  The defendant created the pre-recorded messages that were played over the robo-dialer and edited the scripts used by the call center agents.  The defendant was also responsible for providing the call data, meaning the lists of phone numbers to be fed into the robo-dialer, and "testing" it to identify

---

[1]      *See* Attachment A (Screenshot of the webpages for LAG and PPP, which both describe each PAC as "mak[ing] contributions to federal and state candidates and committees.").

the most vulnerable victims.

The defendant controlled the PACs' finances, oversaw the salaries and payments made to its employees and vendors, and exercised the ultimate decision-making authority and oversight of the PACs' operations and the individuals he recruited to work for him. All the while, the defendant avoided public identification or association with LAG or PPP. The defendant supervised the installation of nominal directors of both the LAG and PPP and specifically directed that his name be omitted from the PACs' publicly available FEC filings at the scheme's outset. In public communications, the defendant relied on others – oftentimes using their names and email addresses without their knowledge – to correspond with various federal and state officials, media representatives, and others. For example, the defendant drafted responses to legal and regulatory inquiries from federal and state authorities, including the 2016 civil action brought by the state of Indiana against LAG and its nominal and unwitting director, J.C., individually, for unauthorized robocalls made to Indiana residents.[2] The defendant responded to Indiana's Civil Investigative Demand, caused J.C's name to be signed in correspondence provided to Indiana authorities, and made false representations to Indiana authorities, all without J.C.'s knowledge.[3]

Finally, the defendant devised and directed the scheme to launder the proceeds of the fraud through one of the PACs' robo-dialing vendors. He directed the vendor to overbill the PACs by a total of $353,000 and then pass the overpayments on to his and Reyes's shell companies. The defendant thereby caused the PACs to falsely report the disbursements to the FEC as payments to

---

[2]     *See* Attachment B (transmittal letter and Civil Investigative Demand (CID) of the state of Indiana related to LAG's autodialing to Indiana residents).

[3]     *See* Attachment C (an email authored by the defendant, posing as J.C., to Indiana State authorities in response to the LAG civil investigative demand); *see also* Attachment Q (email exchange between the defendant, posing as J.C., and Indiana state authorities).

the vendor for services rendered, concealing their true nature from regulators, law-enforcement authorities, and the public.

Reyes was responsible for many of the day-to-day operations of the PACs.  He supervised the operations of the call centers and managed relationships with other vendors.  Although Reyes was nominally in charge of the relationships with call centers, the defendant frequently ghost-wrote emails for Reyes to send to his contacts there.  Reyes was also responsible for coordinating the PACs' filings with the FEC, which included various false statements.

Davies was responsible for handling the PACs' on-the-ground logistics in Austin.  He worked out of the PACs' two rented shared office spaces.  His primary responsibilities were opening the PACs' mail, depositing checks into the PACs' accounts, and sending mailers to victims who had pledged donations by phone.  He mailed out bumper stickers and framed photographs of the candidates to victims who donated at certain levels.  Davies also, at the defendant's direction, called "VIP donors," meaning those who had donated more than $500, to solicit additional donations.  The defendant paid him 10% of any additional donations he solicited. Finally, he recruited his ex-girlfriend and a friend of his wife to serve as the nominal directors of PPP and caused them to open bank accounts for the PAC, also at the defendant's direction.

By 2018, with waning contributor interest, critical media reporting, pending investigative demands and inquiries from the FEC stemming primarily from LAG and PPP's failure to accurately file and account for their operations, and several civil lawsuits, the defendant wound down LAG and PPP.  LAG was administratively terminated in October 2018 and as of December 2019, PPP reported to the FEC no cash on hand and ceased soliciting contributions.[4]  However,

---

[4]     Progressive Priorities never filed a notice of administrative dissolution with the FEC and

with Reyes, the defendant created two new scamPACs, Support American Leaders and Campaign to Support the President, which raised contributions during the 2018 and 2020 election cycles. These scamPACs took in an additional $3.7 million in contributions from unwitting victims using the same techniques previously employed by LAG and PPP.

## LEGAL ANALYSIS

Although the Sentencing Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process," *Gall v. United States*, 552 U.S. 28, 50 n.6 (2007); *see Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (stating that "even in an advisory capacity the Guidelines serve as a meaningful benchmark in the initial determination of a sentence and through the process of appellate review") (citation and internal quotation marks omitted).

On April 13, 2023, the U.S. Probation Office ("Probation") issued its final Presentence Investigation Report ("PSR") for Tunstall.  As to Counts 1 and 5, Probation calculated the defendant's base offense level to be 6 under USSG and then applied the following Guideline adjustments:

1. an 18-level enhancement based on loss amount greater than $3,500,000 pursuant to USSG § 2B1.1(b)(1)(J);

2. a 2-level enhancement for an offense that involved 10 or more victims or mass-marketing pursuant to USSG §2B1.1(b)(2)(A)(i) and (ii);

3. a 2-level enhancement for misrepresentation that the defendant was acting on behalf of a political organization pursuant to §2B1.1(b)(9)(A);

---

remains an "active, unauthorized PAC" according to the FEC. *See* Federal Election Commission Candidate Committees and Profiles, *available at* https://www.fec.gov/data/committee/C00616987/ (last visited April 7, 2023).

4. a 2-level enhancement for an offense that otherwise involved sophisticated means pursuant to USSG § 2B1.1(b)(10)(C);

5. a 2-level enhancement pursuant to USSG § 2S1.1(b)(2)(B) for a conviction pursuant to 18 U.S.C. § 1956;

6. a 2-level enhancement for role in the offenses as an organizer, leader, or supervisor in any criminal activity pursuant to USSG §3B1.1(c); and

7. a 3-level reduction for acceptance of responsibility pursuant to USSG §3E1.1(a)-(b).

(PSR ¶¶ 60-74). Accordingly, Probation calculated the defendant's adjusted and total offense levels to Counts 1 and 5 to be 31 and determined the resulting Guidelines range to be 108 to 135 months. *Id.* at ¶ 74. For separate reasons, the parties disagree with Probation's advisory Guidelines calculations.

A. Base Offense Level

The government respectfully submits that the starting base offense level should be 7, rather than the starting base offense level of 6 identified by Probation under USSG §2B1.1(a)(2). USSG § 2X1.1 provides that, for a conspiracy offense, the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Application Note 2 defines "substantive offense" as "the offense that the defendant was convicted of . . . conspiring to commit." Application Note 2 makes plain that, "Under § 2X1.1(a), the base offense level will be the same as that for the substantive offense."

In this case, the "substantive offense" envisioned in Application Note 2 is wire fraud. The guideline for wire fraud is found in USSG § 2B1.1. USSG § 2B1.1(a)(1) provides for a base offense level of 7 if "(A) the defendant was convicted of an offense referenced to this guideline;

8

and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more." Because wire fraud meets both those criteria, the base offense level of 7 applies. *See United States v. Allen*, 533 F. App'x 406, 409 (5th Cir. 2013) (applying a base offense level of 7 where defendant was convicted of conspiracy to commit wire fraud); *see also United States v. Barrington*, 648 F.3d 1178, 1195 (11th Cir. 2011) ("The district court correctly set the Base Offense Level at 7 pursuant to U.S.S.G. § 2B1.1(a)(1), since the substantive offense Barrington was convicted of conspiring to commit, wire fraud, carries a maximum statutory penalty of 20 years.").

All of this supports the base level calculation for the defendant beginning at 7.

B. <u>Loss Amount (§ 2B1.1(b)(1)(J))</u>

The government agrees with the Probation Office that the defendant should receive an 18-level adjustment pursuant to USSG § 2B1.1(b)(1)(J) because the total loss exceeded $3,500,000 but was less than $9,500,000. PSR ¶ 29. The PSR lists the total loss as approximately $7.65 million, which includes the $3.96 million raised under false pretenses through LAG and PPP, as well as the additional $3.69 million raised through fraudulent pretenses by subsequent PACs founded and operated by the defendant, Support American Leaders and Campaign to Support the President. *Id.* at ¶¶ 54, 56.

The defendant objects to the 18-level enhancement, arguing that defendant instead qualifies for a 16-level enhancement. First, the defendant argues that because the number of victims has not been determined and cannot be determined, combined with the position that at least some of LAG and PPP's expenditures qualify as *bona fide* "independent expenditures," the actual or intended loss cannot be reasonably determined. As a result, the defendant encourages the Court

calculate the loss amount as the amount that the defendant, Reyes, and Davies cumulatively gained from their involvement in the scheme. The defendant identifies this amount as between $1,500,001 and $3,500,000, which corresponds with a Guidelines enhancement of 16, not 18, levels.

Second, the defendant also argues that he should receive a loss-adjustment credit because he maintains that his PACs did, in fact, deliver some of the services promised. The defendant argues that some of the expenditures by the defendant's PACs spent on advertisements, media campaigns, and direct-dial ad campaigns were effective propaganda for candidates and campaigns and that, as such, these costs constitute independent expenditures subject to exclusion from the loss-amount calculation. The defendant argues that the costs of running this propaganda campaign should be deducted from the PACs' gross proceeds. The effect of this credit, the defendant argues, lowers the loss amount, which would thus permit the Court to adopt the lesser loss amount enhancement of 2B1.1(b)(1)(I), which also corresponds with 16-level Guidelines enhancement.

The Court should reject the defendant's argument and accept the calculation of the loss amount as between $3,500,000 and $9,500,000. As the Probation Office wrote in response to the defendant's objection to this enhancement, "[i]t should be noted that the defendants incurred expenses in order to continue their criminal activity; that is, to continue to raise money based on false and misleading representations. These expenditures were essential for the scheme to continue to operate." PSR Addendum at 2A.

In calculating loss amount, the government must show, "by a preponderance of the evidence, only that the actual loss amount was a 'reasonably foreseeable pecuniary harm that resulted from the [fraud].'" *United States v. Ayika*, 837 F.3d 460, 467 (5th Cir. 2016). A district court, in making this determination, "need only make a reasonable estimate of loss." *United States*

*v. Murray*, 648 F.3d 251, 255 (5th Cir. 2011). Here, the loss amount equals at least the total amount

raised by LAG and PPP which the parties have stipulated is approximately $3.97 million. SOF at

¶ 16.[5] Every dollar raised by LAG and PPP constitutes pecuniary harm to the victims, as none of

it was used for its promised purpose, namely, political advocacy. The PACs' sole purpose was to

generate profits for the defendants. The robocalls and advertisements they aired did not advocate

for political candidates and causes—they misappropriated political figures' words, identities,

causes, tone, style, and rhetoric to solicit money from unwitting victims. Those victims believed

that their money would be used to express their political views and support their chosen candidates.

Instead, it was used to enrich the defendants and to further the fraud. Thus, the victims were

defrauded of the full amount of the contributions received by LAG and PPP. *See United States v.*

*Read*, 710 F.3d 219, 231 (5th Cir. 2012) (upholding loss calculation based on "the total amount

paid by the victims" notwithstanding the defendants' claim that they "'did real work' to earn most

of that money"); *United States v. Jackson*, 798 F. App'x 793, 799 (5th Cir. 2020) (holding that "it

is plausible that the total loss amount was derivative of fraudulent activity").

The defendant contends that the loss amount should be reduced to account for the PACs'

legitimate political advocacy. That is wrong for the simple reason that the two PACs did not

engage in any political advocacy—they engaged solely in fraudulent solicitations of money. But

even if they did engage in some legitimate political advocacy, the defendant has not met his burden

to show which amounts spent were legitimate. "[W]here the government has shown that the fraud

---

[5]     The Court need not consider the losses associated with the subsequent fraudulent PACs, Support American Leaders and Campaign to Support the President, to arrive at a loss amount of $3.5 to $9.5 million. Even if the Court considered the total amount raised by those two PACs as part of the total loss amount, that would not affect the defendant's Guidelines range, as the loss amount would still be between $3.5 and $9.5 million.

was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012),   In this case, Tunstall's fraud was so pervasive that an actual loss calculation of specific, legitimate services is not practicable.  He has not, and cannot, show that particular amounts spent were legitimate.

The Court need not look beyond the FEC filings of LAG and PPP to conclude that the defendant's arguments about the legitimacy of the fraudulent costs as "independent expenditures" should be rejected.  A federally registered political committee, such as LAG and PPP, is required to itemize and to report each independent expenditure that exceeds $200 and all independent expenditures that aggregate over $200 in a calendar year.  *See* 52 U.S.C. §§ 30101(17) and 30104(b), (d), and (g) (defining independent expenditures and providing the reporting schedule of these expenditures by law).  These committees are required to make these reports no later than the filing date of their next quarterly report with the FEC. *Id.*

During every reporting period, LAG and PPP both failed to report *any* independent expenditures as required by law, even though during the same reporting periods, these same organizations were both raising and spending hundreds of thousands of dollars quarterly and the defendant was amassing thousands of dollars in profits.  The defendant's efforts to re-characterize these amounts *post hoc* as legitimate expenditures, costs which the defendant generated to further the fraudulent scheme and by extension his personal profits, are unavailing.

Nor do the defendant's arguments accurately characterize the pervasive nature of the defendant's admitted fraudulent conduct.  Nearly every aspect of the defendant's involvement in the scheme, every dollar sent to vendors, every advertisement that Tunstall authored, every

solicitation that the defendant orchestrated to be broadcast or mailed, every one of the defendant's actions employed deceit and misrepresentation aimed at generating profits and concealing his involvement and association with the scheme he masterminded. The defendant's argument that his investment of those profits – millions of dollars – back into the scheme constitutes a series *bona fide* independent political expenditures warranting exclusion from the loss calculation requires this Court to disregard the context and the overarching facts of a complex scheme to which the defendant willfully and knowingly pleaded guilty. Merely because the defendant opted to reinvest his ill-gotten gains back into the churn of the fraudulent scheme to generate further profits does not extinguish the fact that the funds were raised under fraudulent pretenses from the outset. The total amount of money raised by the PACs from their contributors should therefore be properly considered and included in the loss calculation, regardless of where or how that money was spent by the PACs. The 18-level enhancement identified in the PSR is therefore warranted and appropriate.

C. Enhancement for Vulnerable Victims

The government respectfully submits that a 2-level "vulnerable victim" enhancement applies pursuant to USSG § 3A1.1(b)(1). USSG § 3A1.1(b)(1) provides for a 2-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." Application Note 2 defines "vulnerable victim" to include a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."

Evidence gathered in the investigation indicates that the defendant was well-aware that many of the victims of his fraudulent scheme were elderly. Both of the defendant's co-

conspirators, Reyes and Davies, admitted that they could tell from speaking to victims or listening to recorded conversations with call center agents that the majority of victims were elderly. The investigation also revealed that the defendant also routinely listened to recorded conversations between victims and call center agents, and therefore would have had the same knowledge. In addition, the PACs were required to report employment information to the FEC as part of their regular filings. Of the donors for whom LAG reported employment data, 100% were reported as "Retired." Thus, LAG's own filings indicate the conspirators' awareness that the victims were elderly.

The investigation further revealed that the defendant targeted these individuals because they were particularly susceptible to criminal conduct.[6] The defendant was responsible for providing the call lists that were loaded into the robocalling platform. Those lists contained phone numbers of individuals who had donated to political causes in the past and therefore were more likely to be susceptible to his fraudulent solicitations. According to Davies, Tunstall told him that the lists the defendant provided were "money."

The defendant also worked with representatives of the robo-calling vendor who provided the robocalling platform used by the PACs, to "test" call data, meaning to run a sample of phone numbers through the robocalling platform to determine what proportion of the recipients were likely to donate. The "testing" process was designed to identify and target the most vulnerable victims. Finally, the defendant directed Kyle Davies to personally call "VIP donors" who had made large contributions in the past to solicit additional contributions. The defendant paid Davies

---

[6]     *See* Attachment D (an email from the defendant to Reyes detailing the older demographics of the victims targeted by the PACs solicitations)

a commission consisting of a percentage of the repeat donations he obtained from the "VIP donors." *See United States v. Allen*, 533 F. App'x 406, 412–13 (5th Cir. 2013) (affirming application of "vulnerable victim" enhancement where defendant "collected money in connection with a fraudulent scheme from the same individuals on multiple occasions").

    D. <u>Enhancement for Role in the Offense</u>

      Although Probation applied a 2-level enhancement for the defendant's role as organizer, leader, manager, or supervisor, the government respectfully submits that a 4-level enhancement is warranted pursuant to USSG § 3B1.1(a) because the defendant "was an organizer or leader of a criminal activity that . . . was otherwise extensive." Application Note 3 states that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

      First, there can be no doubt that the defendant was "an organizer or leader" of the criminal activity in question. The defendant originated the idea for the scheme, which drew upon his prior experience with Restore America's Voice PAC. He recruited his two co-conspirators, Reyes and Davies, neither of whom had prior experience with political fundraising. The defendant directed the PACs' activities and was responsible for the "creatives," meaning the fraudulent solicitations delivered through robocalls and advertisements. He was also responsible for obtaining lists of telephone numbers to be robocalled and "testing" and refining those lists to target the most vulnerable victims. Even where the defendant delegated responsibility to Reyes or Davies, he retained a high degree of control. For example, although Reyes was nominally responsible for managing the PACs' relationships with the call centers, the defendant frequently drafted emails

for Reyes to send to call center representatives.  Thus, a 4-level enhancement is appropriate to reflect the defendant's greater degree of responsibility when compared with Reyes, who has stipulated to a 2-level role enhancement.

Second, the criminal activity was "otherwise extensive" because it employed the services of numerous individuals who were not necessarily knowing participants in the criminal activity. The unwitting participants known to the government include: A.R. (one of the nominal directors of PPP), M.S. (one of the nominal directors of PPP), M.M. (Davies' wife who recruited M.S. and signed M.S.'s name to documents), J.C. (nominal director of LAG), L.D. (nominal director of American Priority PAC), H.T. (accountant for LAG and PPP), M.P. (owner of the main robocalling vendor), B.J. (main robocalling vendor employee), V.C. (Reyes's sister who provided administrative support), B.B. (voiceover artist), J.A.(voiceover artist), B.M. (copywriter), J.C. (Call Center A[7]), C.M. (Call Center A), H.D. (Call Center B[8]), and A.S. (Call Center B).

In addition, the PACs used the services of numerous individuals whose identities are unknown.  Most notably, they employed scores of call center agents who solicited contributions based on fraudulent scripts authored by the defendant to process payments from thousands of victims.  While the precise number of call center agents is unknown, evidence gathered during the investigation indicates that 223,542 victims of LAG and 126,188 victims of PPP were connected with a call center agent over the course of the scheme.[9]  Obviously, many agents were needed to

---

[7]     Call Center A was one of the call center vendors that Tunstall contracted with who provided live operator services to collect the payments of contributors who were initially contacted via the defendant's fraudulent robocalling solicitations.

[8]     Call Center B was another one of the call center vendors that Tunstall employed to collect payments resulting from fraudulent robocalling solicitations.

[9]     *See* Attachments E (Main Robocalling Vendor LAG Campaign Data worksheet) and F (Main Robocalling Vendor PPP Campaign Data worksheet).

complete that volume of calls.  *See United States v. Davis*, 226 F.3d 346, 360 (5th Cir. 2000) (holding that scheme was "otherwise extensive" where "the services of more than twenty people made the fraudulent scheme possible").

    E.  Enhancement for Misrepresentation of Acting on Behalf a Political Campaign

The government agrees with Probation that, despite the defendant's objection, the defendant should receive a 2-level upward adjustment because his offense "involved a misrepresentation that [he] was acting on behalf of a . . . political organization."  USSG § 2B1.1(b)(9)(A); PSR ¶ 64.  The applicable Guidelines commentary expressly states that this enhancement "applies in any case in which the defendant represented that [he] was acting to obtain a benefit on behalf of a . . . political organization . . . regardless of whether the defendant actually was associated with the organization . . . when, in fact, the defendant intended to divert all or part of that benefit (*e.g.*, for the defendant's personal gain)."  USSG § 2B1.1, Application Note 8(B). The commentary gives the applicable example of "[a] defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school." *Id.* at Application Note (8)(B)(ii).  That is comparable to the defendant's actions in this case.  The defendant solicited contributions from individuals by falsely claiming that his organizations were was raising funds to benefit the campaigns of Candidates A and B.  As described above, the defendant's solicitations and website gave the clear impression, often in express terms, that the contributions were for the respective candidate campaigns ["Have [Candidate 2]'s back against [Candidate 1] today by investing generously to help elect [Candidate 1] as the first female president in U.S. History.  Do your part in making **an emergency investment to the campaign** by pressing 1 now . . . [s]o please, press 1 right now to make **an emergency investment in the campaign** to

elect [Candidate 2] for President."  PSR ¶ 31 (emphasis added); ["That is why we must ask you for a generous **investment to help [Candidate 1] to help fund [Political Party A]**."  *Id.* at ¶ 24 (emphasis added).  The result of these misrepresentations is equally apparent in scores of checks that the PACs received from contributors who believed that they were being sent to the official campaigns.[10]  In reality, the defendant intended to divert all or part of these benefits to his PACs, his business partners, and himself.

## IMPOSITION OF SENTENCE

### I.   Imposition of a Sentence Under 18 U.S.C. § 3553

A sentence within the applicable Guidelines range is warranted in this case.  The government's Guidelines recommendation reflects the accumulated wisdom and expertise of the Sentencing Commission and serves the vital goal of uniformity and fairness in sentencing.  It is also based on the assessment, supported by the Presentence Report, and the discovery in this matter, that the factors for the Court's consideration under § 3553(a) do not provide a justification or need for varying from those Guidelines.  To the contrary, the nature and circumstances of the offense, and the need for a sentence that reflects the seriousness of that offense – an offense that sought to exploit and disenfranchise individuals who sought to participate in the democratic political process for personal gain while undermining faith and trust in that process – weigh strongly in favor of a Guidelines sentence.

### A.   Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b)

The Supreme Court has advised that "district courts must begin their analysis with the

---

[10]     *See* Attachments G – I (check images for PPP and LAG drafted by victims of the scheme).

Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  And while those Guidelines serve as one factor among several that courts must consider in determining an appropriate sentence, it remains that "the Commission fills an important institutional role:  It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 90, 108-09 (2007) (internal quotation marks omitted).  Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).  Moreover, there are no other § 3553(a) factors in this case that mitigate against imposition of a sentence within that range; to the contrary, as discussed below the § 3553(a) factors on balance support the imposition of the recommended Guidelines sentence.

### B.      18 U.S.C. § 3553(a) Factors

In addition to considering the properly calculated Guidelines range, the Court must also consider the other sentencing factors set forth in 18 U.S.C. § 3553(a).  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  The most pertinent of those factors here are the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, *id.* § 3553(a)(2)(A); the need to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6).

1.      <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

The defendant's multiple offenses are serious, reflect a devious and reckless disregard of the laws and regulations governing the political process in this country, and affected thousands of innocent and unwitting political contributors and participants across the country.  His conduct spanned multiple years and spawned new iterations of fraudulent organizations aimed at skirting federal laws, regulations, and public scrutiny, which only ceased once the federal government intervened.  The defendant's pre-meditated actions evidence his orchestration of a scheme intended to prey upon the passions and the political participation of American citizens in the political process and their eagerness and generosity to contribute to that process.  In an era of increasing political stratification and mistrust, the defendant applied his knowledge of mass-marketing to profit off those passions.  The defendant played all sides,[11] not to advance the issues or causes he purported to champion, but to do or to say whatever proved the most lucrative that would continue to make him the largest amount of money possible to support his lifestyle and his other, often failing, economic endeavors.

Moreover, the defendant continued his egregious conduct for years despite receiving complaints and warnings from numerous federal political campaigns and candidates, the FEC, the State of Indiana, and private citizens who sued the defendant's organizations for the wanton

_____

[11]     *See* Attachments J (email exchange between the defendant and Reyes detailing the defendant's proposal to start soliciting contributions from liberal contributors in addition to those being already solicited from LAG's conservative contributor base.  Several weeks later the defendant formally registered PPP.) and K (email exchange between the defendant and Reyes that reveals how the defendant was trying to conceal from the public that LAG and PPP were fraudulently seeking contributions for opposing political interests).

disregard of federal laws and regulations governing political fundraising and support.[12]   Tunstall took little stock of the opportunity to heed or even substantively address the myriad legal claims and inquiries resulting of his conduct and operation of the PACs and consistently responded to those inquiries with deceit, manipulation, and misrepresentation.   When the scrutiny from state and federal authorities, the media, and private parties became too large, the defendant wound down the affairs of LAG, leaving those he employed and exploited to deal with the problems of his own creation, to start Support American Leaders and Campaign to Support the President, PACs which had yet to garner the notoriety of the defendant's affiliation, so that he could continue to richly profit using the same fraudulent techniques.   The defendant made a career of duping innocent political contributors out of their hard-earned money and disenfranchising them from their meaningful political participation.   His offense is serious and so should be his sentence.

The defendant's recent history is riddled with deceit and lies nearly everyone involved in the scheme – lies to contributors, false statements to the FEC, false statements to state authorities, fraudulent and fake invoicing and financial transactions used to launder and conceal hundreds of thousands of dollars from these PACs to his personal accounts.   He presents no *bona fide* mitigating information in the PSR to excuse or explain his conduct.   In fact, the defendant was appointed counsel based on claims of indigence, providing a Form 1040 for the year 2019, which reflected a business income of $51,557, which appears flatly contradicted by the million-dollar amounts the defendant collected in the subsequent relevant conduct through his operation of the subsequent scamPACs.   PSR at ¶¶ 98-100   The defendant has received every opportunity to

---

[12]      *See* Attachment L (an email from a private individual threatening to bring a claim against PPP for unauthorized solicitations in violation Telecommunications Privacy Act [TCPA]).

succeed.  He has enjoyed employment in the political, marketing, and technology sectors.  He has, by all accounts, lived and promulgated a lifestyle focused on extravagant living and spending.[13] He has, simply, experienced no hardships that could come close to justifying or explaining his deeply manipulative and deceptive criminal conduct.  This fact weighs in favor of a Guidelines sentence.

        2.      <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence and Protect the Public (18 U.S.C. § 3553(a)(2))</u>

The defendant's scheme with Reyes and others violated the principles of fairness and equity that are supposed to drive participation in the democratic electoral process.  Through the defendant's manipulation and fraud, the defendant effectively stole money from contributors who were led to believe would be used as part of the political process.  These were funds that the candidates or campaigns themselves may have otherwise received and used to support their legitimate efforts had the defendant not intervened and coopted for his own use through deceit and misrepresentation.  Moreover, the defendant's fraudulent, criminal conduct targeted small donors, donors, not wealthy investors.  The evidence gathered during this investigation is filled with numerous instances of the defendant's PACs preying on the elderly and the infirm, on retirees on fixed incomes, all of whom undeniably believed that they were interacting with campaigns of the

---

[13]     Reyes and Davies both described the defendant's lifestyle as extravagant.  Reyes recounted that the defendant reported buying a Mercedes Benz AMG in cash while living abroad during the charged scheme and DMV records reveal that the defendant purchased another sportscar, a Porsche Panamera, in 2019, in the Dallas, Texas area.  Davies advised that one of the primary motivators in the defendant's recruitment of him into the scheme was that his cousin lived lavishly.  The defendant's subsequent conduct has not contradicted those accounts.  *See* Attachment M (text messages exchanged between the defendant and one of his Internet marketing associates in which the defendant admits that he has a "baller life" running political fundraising through the PACs).

candidates they supported.

Today, scamPAC operations, like LAG and PPP, are on the rise and the individuals operating them have conducted their criminal conduct with relative impunity.[14]  Other individuals similarly engaged in the scamPAC world will be closely scrutinizing this Court's treatment of this crime, and the defendant's sentencing should reflect the need to promote general deterrence. Specifically, the Court's sentence should make clear that those who knowing manipulate the democratic political process for their own personal gain will face consequences.  It is particularly important, considering the rising incidents of fraudulent PAC operations, to communicate a message to those who might be tempted to place their own personal gain above the disenfranchisement of those who seek to participate in the political process, as well as chilling their future willingness – and the willingness of others – to participate in the political process.

There is significant evidence that the defendant poses a risk of re-offending, and this is certainly not a case where the defendant willingly stopped his own criminal conduct when his scheme was revealed.  The defendant received cease-and-desist letters from at least two official presidential campaigns but continued with his fraudulent scheme.[15]  The defendant's PACs

---

[14]      *See* Scam PACs are on the Rise, FBI, *available at* https://www.fbi.gov/news/stories/scam-pacs-are-on-the-rise-041521 (last visited Apr. 11, 2023); FEC Asks Congress to Take Action on Scam PACs, Business Insider, *available at* https://www.businessinsider.com/fec-asks-congress-to-take-action-on-scam-pacs-2022-12 (last visited Apr. 11, 2023); How Scam PACs Fall Through the Cracks of U.S. Regulators, Reuters, *available at* https://www.reuters.com/article/usa-fundraisers-scampacs-side-special-re/how-scam-pacs-fall-through-the-cracks-of-u-s-regulators-idINKBN1ZS29E (last visited Apr. 11, 2023); and Statement of Comm'r Weintrab, Federal Election Comm'n, *available at* https://www.fec.gov/resources/about-fec/commissioners/weintraub/statements/2016-09_Memo--Scam-PACs.pdf (last visited Apr. 11, 2023).

[15]      *See* Attachments N (April 22, 2016 Cease-and-Desist demand from the campaign of Sen. Ted Cruz to LAG) and O (July 14, 2016 Cease-and-Desist demand from the campaign of Sen. Hillary Clinton to PPP).

received numerous complaints about the operation of his PACs, from state authorities and private litigants who sued his PACs and PACs' officers in courts in California[16] and Indiana.[17] Additional FEC complaints were filed and sent to the defendants' PACs, PACs' officers, and associated vendors, including warnings about significant fundraising and filing errors, audits, and the defendant himself actually testified in a deposition before the FEC about a number of these matters;[18] and, the defendant and his fraudulent scheme were also publicly detailed in newspaper and other media outlets in 2016 and beyond,[19] but the defendant continued to solicit and steal contributions through his fraudulent solicitations through the November 2016 election. Even after the FBI executed a search warrant at his residence in December 2020, the defendant remained unfazed and continued his fraud with Support American Leaders and Campaign to Support the President PACs through at least April 2021.

The defendant chose to engage in this conduct repeatedly, despite enforcement actions, lawsuits, and without regard for the effect it had on those he brought into the scheme and those victims whose hard-earned contributions he pocketed. His actions were tantamount to the historic traveling confidence man – pitching a shingle in a new community until discovery, and then moving on to engage in similar fraudulent conduct. In sum, nothing short of criminal prosecution

---

[16]    *See* Attachment P (civil complaint 4:16:-cv-5041 filed against LAG in the Northern District of California for violations of the TPCA).
[17]    *See, infra,* n.3.
[18]    *See* Attachment R (the defendant's October 21, 2019 deposition before the FEC for his involvement in PPP).
[19]    Kaczynski, Andrew, <u>Group making anti-Trump robocalls is closely tied to a pro-Trump PAC</u>, CNN, Feb. 17, 2017, https://www.cnn.com/2017/02/17/politics/kfile-progressive-priorities-pac/index.html (last visited Apr. 12, 2023); Kaczynski, Andrew, <u>A Pro-Trump PAC Raised Nearly $800,000 – Where Did That Money Go?</u>, BuzzfeedNews, Sep. 2, 2016, https://www.buzzfeednews.com/article/andrewkaczynski/a-pro-trump-pac-raised-nearly-800000-where-did-that-money-go (last visited Apr. 12, 2023).

was sufficient to deter the defendant, and a sentence of imprisonment within the Guidelines is appropriate to deter the defendant from future criminal schemes and to protect the community.

3. The Need to Avoid Unwarranted Sentencing Disparities ((18 U.S.C. § 3553(a)(1))

The Guidelines are the primary means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the § 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Guidelines, therefore, deserve significant respect. The government recognizes that the Guidelines are advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however, must consider the Guidelines range, *see* § 3553(a)(4), and the Guidelines provide the most appropriate and objective measure to assure fair, proportionate, and uniform sentencing of criminal offenders.

The applicable Guidelines in this case account for facts and factors unique to the defendant, the circumstances of his case, and the nature of the crime charged in this case. These factors — already accounted for by the Guideline range — distinguish the defendant from others in recent cases who received lesser sentences based on the size of the scamPACs others operated, the respective loss amounts in those schemes, and other fact-specific circumstances.[20] Reference to

---

[20] In *United States v. Prall*, the defendant, Kyle Prall, pleaded guilty to one count of mail fraud and received a Guidelines sentence of 36 months in prison, ordered to pay $548,428 in restitution, and forfeit $205,496.68 in proceeds for his role in running several PACs during the 2016 election cycle. Throughout the scheme charged in that case, Prall admitted to defrauding contributors of $548,4280, over $200,000 of which he transferred to himself. Prall admitted to defrauding more than 400 individual donors.

the Guidelines, while carefully considering the § 3553(a) factors, is the best and only available means of preventing the disfavored result of sentencing disparities that do not account for these distinguishing facts.

**<u>CONCLUSION</u>**

The defendant's criminal actions in this case warrant a significant Guidelines sentence of incarceration, and the imposition of a fine that adequately addresses the financial frauds that he perpetrated on the taxpayers and the public. Application of 18 U.S.C. § 3553(a) supports a Guidelines sentence for the defendant's commission of the crimes of conspiracy to commit wire fraud and substantive money laundering. The government submits that such a sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

WHEREFORE, the United States of America respectfully urges that this Court determine that the defendant's Guidelines offense level is 36 and his criminal history category is I.  The United States further respectfully requests that, taking into consideration the sentencing factors set forth in section 3553(a), the Court sentence the defendant to 188 to 235 months in prison, a fine within the Guidelines range, impose a three-year term of supervised release, and order the defendant to pay a $200 special assessment, and to forfeit $789,818.00 in proceeds obtained from offense.

DATED:        April 14, 2023

                                         Respectfully submitted,

                                         COREY R. AMUNDSON
                                         Chief, Public Integrity Section

                              BY:     /s/ Michael N. Lang
                                         Michael N. Lang
                                         Celia R. Choy
                                         Trial Attorneys
                                         Public Integrity Section
                                         United States Department of Justice
                                         1301 New York Ave, NW
                                         Washington, DC 20530
                                         E-mail: Michael.Lang@usdoj.gov
                                         E-mail: Celia.Choy@usdoj.gov
                                         Telephone: (202) 514-1412

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for Tunstall.


Dated: April 14, 2023                    <u>/s/  Michael N. Lang  </u>
                                         Michael N. Lang
                                         Celia R. Choy
                                         Trial Attorneys