**ATTACHMENT R**

# TRANSCRIPT OF PROCEEDINGS

---

```
In the Matter of:           )
                            ) MUR 7468
PROGRESSIVE PRIORITIES PAC, )
et al.                      )
```

```
Deposition of:  Matthew Tunstall
```

```
Pages:  1 through 209

Place:  Washington, D.C.

Date:   October 21, 2019
```

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

DOJ-0000020618

1

BEFORE THE UNITED STATES FEDERAL ELECTION COMMISSION

In the Matter of:          )
                           ) MUR 7468
PROGRESSIVE PRIORITIES PAC,  )
et al.                     )


Deposition of:

MATTHEW TUNSTALL

a witness of lawful age, taken on behalf of the

Agency, pursuant to notice, in the offices of Federal

Election Commission, 1050 First Street N.E., on Monday,

October 21, 2019, at 10:00 a.m., before David Jones,

Notary Public in and for the District of Columbia, when

were present:


APPEARANCES:

On behalf of the Deponent:

CARL J. LAWYER, Esquire
Drake Law Firm
700 N. Washington Street
Alexandria, VA 22314
(202) 316-4842


Heritage Reporting Corporation
(202) 628-4888

2

APPEARANCES:   (Cont'd)

<u>On Behalf of the Agency</u>:

JUSTINE DI GIOVANNI, Esquire
JIN LEE, Esquire
AMANDA ANDRADE, Esquire
FEC, OFFICE OF GENERAL COUNSEL
1050 First Street N.E.
Washington, D.C. 20463
(202) 694-1574

DOJ-0000020620

3

# C O N T E N T S

WITNESS:

   Matthew Tunstall

<u>PAGE</u>

EXAMINATION BY COUNSEL FOR THE AGENCY     9

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020621

4

E X H I B I T S

| EXHIBITS | IDENTIFIED | DESCRIPTION |
|---|---|---|
| 1 | 11 | Subpoena for Matthew Tunstall |
| 2 | 49 | Interrogatory of Matthew Tunstall |
| 3 | 56 | Article of Incorporation, Operating Agreement for Delaware. |
| 4 | 72 | Statement of Organization and Articles of Incorporation. |
| 5 | 77 | Statement of Organization FEC Form 1. |
| 6 | 79 | FEC Form 1 for Progressive Priorities PAC dated 9/23/16. |
| 7 | 82 | FEC Form 1 for Progressive Priorities PAC dated 12/1/16. |
| 8 | 84 | Correspondence Henok Tedla and Graham Wilson. |
| 9 | 90 | Progressive Priorities PAC roles clarification. |
| 10 | 98 | FEC Form 3X 4/15 quarterly report. |
| 11 | 109 | Forwarded email from Matthew Tunstall. |
| 12 | 115 | List of donors. |

Heritage Reporting Corporation
(202) 628-4888

5

<u>E X H I B I T S</u>

| <u>EXHIBITS</u> | <u>IDENTIFIED</u> | <u>DESCRIPTION</u> |
|---|---|---|
| 13 | 122 | FEC Form 3X 7/15 quarterly report/. |
| 14 | 140 | Document for SmartCall Media. |
| 15 | 161 | FEC Form 3X 10/15 quarterly report. |
| 16 | 169 | Transcript of robocall. |
| 17 | 193 | Checks made out to Progressive Priorities PAC. |
| 18 | 198 | Document from appointed registered agent for Progressive Priorities PAC. |

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020623

```
1                    P R O C E E D I N G S

2                                         (10:00 a.m.)

3           THE COURT REPORTER:  October 21ˢᵗ, FEC

4   deposition of Matthew Tunstall.  Check, check, check.

5   Okay, we're on?  Could you please raise your right

6   hand, please?

7           Whereupon,

8               MATTHEW NELSON TURNSTALL

9           having been duly sworn, was called as a

10  witness and was examined and testified as follows:

11          THE COURT REPORTER:  Thank you.

12          MS. DI GIOVANNI:  My name is Justine Di

13  Giovanni.  I'm an attorney with the Federal Election

14  Commission, as is my colleague Jin, Jin Lee and my

15  colleague, Amanda Andrada.  We're gathering

16  information today in connection with Matter Under

17  Review, MUR 7468, which concerns Progressive

18  Priorities PAC.  And this deposition is being

19  conducted pursuant to a Subpoena under 52 USC Section

20  3019.  And though we're calling this a deposition,

21  it's actually an investigative deposition, which is

22  sort of like an interview.  The major difference is

23  that we've got the court reporter here and you've

24  taken an oath to tell the truth under penalty of

25  perjury.  So the oath has the same force in effect as
```

DOJ-0000020624

1    if you've taken it in a courtroom before a judge.

2            THE WITNESS:  I got you.

3            MS. DI GIOVANNI:  During the investigative

4    deposition, I'll be asking you questions and showing

5    you documents.  I want to know everything that you

6    know, regardless of whether you think it's important

7    to our investigation or not.  And this investigation

8    is not governed by the Federal Rules of Civil

9    Procedure or the Federal Rules of Evidence.

10   Therefore, I'm not concerned about the source of your

11   information.  So if you heard it from someone else or

12   overheard it in a conversation, that's fine.  I just

13   want to know what you know and what you remember.

14           And if I ask you about a conversation and

15   you can't recall exactly what you said, that's fine.

16   I still want to know the gist of the conversation and

17   everything you remember about it.

18           THE WITNESS:  Uh-huh.

19           MS. DI GIOVANNI:  So there's also a Federal

20   Statute 52 USC Section 30109(a)(12), that requires all

21   persons to keep investigations conducted by the FEC

22   private and confidential, except with the written

23   consent of all persons who are subject to the

24   investigation.  So this requirement means that unless

25   you have that written consent, you shouldn't publicly

Heritage Reporting Corporation
(202) 628-4888

8

1    disclose of an ongoing FEC investigation or the fact

2    that FEC has conducted you in regard to this matter.

3              THE WITNESS:  Uh-huh.

4              MS. DI GIOVANNI:  So this restriction, of

5    course, doesn't keep you from talking about the

6    substance of the investigation with other people, the

7    underlying facts, but just this interview and the fact

8    that an FEC investigation is ongoing.

9              The court reporter will prepare a transcript

10   for today's deposition.  And you have the right to

11   review the transcript.  You can waive this right if

12   you want to.  You can also request that you be allowed

13   to obtain a copy of the transcript.

14             If you wish to make such a request, you have

15   to do it in writing and you have to send it to the

16   Office of the General Counsel here at the FEC, which

17   will take your request under consideration and unless

18   there's a good cause, we'll notify you and the court

19   reporter in writing that you can make your own

20   arrangements with the court reporter to obtain the

21   transcript.  So no transcript will be made available

22   unless you receive that notification.  And if the

23   Office determines that there's good cause to deny your

24   request, it'll let you know as well.  So that's sort

25   of background stuff.

DOJ-0000020626

```
 1                 EXAMINATION BY COUNSEL FOR THE AGENCY
 2                 BY MS. DI GIOVANNI:
 3          Q    Mr. Tunstall, can you provide me with your
 4     full name and your address for the record?
 5          A    Matthew Nelson Tunstall, my home or --
 6          Q    Your home address.
 7          A    -- 3309 Bandalino Lane, Plano, Texas 75023.
 8          Q    Okay.  And you can identify your counsel for
 9     me?
10          A    My counsel's is Carl Lawyer, J. Lawyer.
11          Q    And is he representing you in an official
12     capacity today?
13          A    Yes.
14          Q    And have you ever been deposed before?
15          A    No, I have not.
16          Q    Okay.  And then, the first thing I'm going
17     to show you.  I'm going to introduce Exhibit 1 from
18     the record (phonetic).
19                 NOTARY PUBLIC:  Mark it.
20                 MS. DI GIOVANNI:  Yes. That's for you.
21                 THE WITNESS:  Thank you.
22                 BY MS. DI GIOVANNI:
23          Q    Sure.  And you can identify this document
24     for me?
25                 MR. LAWYER:  Is this part of it or --
```

Heritage Reporting Corporation
(202) 628-4888

1               MS. LEE:  I hoped (phonetic) you gave --

2               BY MS. DI GIOVANNI:

3          Q    And you can identify this document for me?

4          A    Yes, this was a subpoena issued to myself.

5               (The document referred to was marked for

6     identification as Agency's Exhibit No. 1)

7          Q    Okay.  And that's all I need from you, so

8     you can actually hand it back.  And that subpoena

9     requires you to do what?

10         A    To show up and be, be available here for the

11    deposition.

12         Q    And did the subpoena ask you to produce

13    documents, as well?

14         A    Yes.

15         Q    Okay.  Then, let, let me give you a few of

16    the ground rules for, as we go forward today.  It's

17    important that we speak up and speak clearly.

18         A    Uh-huh.

19         Q    And any question that I ask you, if your

20    answer could be an audible yes or on.  Uh-huh, Uh-uh

21    doesn't really pick up on the audio equipment and so

22    does nodding your head and shaking it.  The court

23    reporter will have trouble understanding us if we talk

24    over each other.  Which I've already messed up you

25    know, here.  So I'll try to give you the courtesy to

DOJ-0000020628

1     let you finish your answers before I clarify any

2     questions and if you could do the same for me, that

3     would be great.  It just makes the audio recording,

4     recording clear for his purposes for providing the

5     transcript.

6               And if you don't hear or understand

7     something, please ask me to clarify.  Otherwise, I'll

8     assume you've understood, and I'll do the same for

9     you, if I don't understand what you've said.  And if

10    you need to take a break at any time, just let us

11    know.  I do ask that if you we have a question pending

12    or maybe a series of questions about the same thing,

13    we just wrap that up, but then we can adjourn and go

14    off the record, and let everyone have a little break.

15              We'll also probably end up breaking for

16    lunch.  We'll see how things are going as we get there

17    --

18         A    Okay.

19         Q    -- we'll see how it goes.  So do you have

20    any questions about the procedures?

21         A    Not at this time.

22         Q    Excellent.  And are you taking any

23    medications or other drugs that would impair your

24    ability to understand me or to remember?

25         A    No, I'm not.

DOJ-0000020629

1      Q   Okay.  And is there any reason why you

2  wouldn't be able to answer my questions fully today?

3      A   No.

4      Q   Can you tell me, what did you do to prepare

5  for this deposition?

6      A   I prepared documents per the subpoena.  I

7  also reached out to people that were involved and

8  collected basic information that was relevant, while

9  also keeping confidentiality of this, you know,

10  investigation.

11      Q   Sure.  And have you produced all of the

12  documents that you reviewed in preparation to us?

13      A   Yes, I have.

14      Q   Okay.  And moving on -- yes, Jin?

15      MS. LEE:  I noticed that you have a laptop

16  in front of you.

17      THE WITNESS:  Uh-huh.

18      MS. LEE:  Can I ask are they're documents

19  that you were looking at?

20      THE WITNESS:  Yes.  These are, I, I need

21  these for reference.

22      MS. LEE:  So are --

23      THE WITNESS:  I was instructed by my counsel

24  that I'm allowed to bring my laptop instead of paper

25  copies.

DOJ-0000020630

1          MS. LEE:  So I just want to make clear that

2    the documents you're looking at --

3          THE WITNESS:  Are the same ones that --

4          MS. LEE:  You produced?

5          THE WITNESS:  -- I produced.

6          MS. LEE:  So if you're looking --

7          THE WITNESS:  If you have a copy, I can look

8    at those as well.

9          MS. LEE:  Right.

10         MR. LAWYER:  Right.

11         MS. LEE:  So, if you are referring to a

12   document, it would be great if you can show us what

13   you're looking at, so we can --

14         THE WITNESS:  If you guys would like to

15   provide paper copies of everything I've submitted, I

16   can look at that here and close my laptop, if

17   necessary.

18         MS. DI GIOVANNI:  We're certainly --

19         MS. LEE:  Great.

20         MS. DI GIOVANNI:  -- you have everything

21   we'll be asking you about, we've got hard copies here.

22         THE WITNESS:  Okay, so --

23         MS. LEE:  Right, but right, okay.  I mean,

24   if you're looking at something to answer a question,

25   that would be great if we saw what you were looking at

DOJ-0000020631

```
1    and --

2              THE WITNESS:  Okay.

3              MS. LEE:  -- making sure that we also have a

4    copy.

5              THE WITNESS:  Understood.

6              MR. LAWYER:  Yes.

7              MS. LEE:  Okay.

8              MR. LAWYER:  Okay.

9              BY MS. DI GIOVANNI:

10       Q    So first, can you walk us through your

11   educational background in brief?

12       A    Yes.  So I have, have a GED.  I graduated

13   from high school and then I went to Texas State and I

14   was doing Business Administration, but I didn't finish

15   my degree.  And then, I moved to California and was

16   working with, I was just working, working in business

17   with people, so --

18       Q    Can you sort of give us the basic dates of

19   those?  So when did you graduated high school?  When,

20   when were you working on your degree.

21       A    So I graduated in 2005 from high school.

22       Q    Uh-huh.

23       A    And then, after that I went to Texas State

24   for about a semester and then I moved to California

25   and I was going to a community college there.
```

DOJ-0000020632

1          Q    And the dates for those?  So about when were

2     you at Texas?

3          A    2006, 2007.

4          Q    Okay.

5          A    And then, yeah.

6          Q    And then, can you -- you said then you got

7     into, into business after that point.

8          A    Correct.

9          Q    And what, you said community college as

10    well, sorry to go back for moment --

11         A    It was --

12         Q    Which community college was that?

13         A    It was called Orange County Community

14    College.

15         Q    And the dates for that was a little bit

16    later or at the same time?

17         A    I believe it was, I, I went to, like several

18    semesters.  So it, it was maybe from the 2007 or 2006

19    to 2008, in between that timeframe.

20         Q    Okay.  Then you mentioned that you went into

21    business after that point.

22         A    Correct.

23         Q    Can you walk me through one thing at a time,

24    your employment history, since you were basically in,

25    in high school to now?

DOJ-0000020633

1          A     Okay.  Yes, I can try, okay.  So the first

2     job that I had after Community College was, I was

3     working in a call center.

4          Q     Uh-huh.

5          A     And I believe it was Skyline Media was the

6     company.

7          Q     Okay.

8          A     And I basically was doing, just sales and

9     things like that for, like, various, like Dish Network

10    and things like that, as, as an affiliate.  So I

11    worked on that project.  And then, after that --

12         Q     And when did that, that end do you think

13    around?

14         A     Exact dates --

15         Q     It's okay if it's not exact, to the best --

16         A     Okay.

17         Q     -- of your recollection.

18         A     Okay, from 2007 to maybe 2009.

19         Q     Okay.

20         A     Yeah.  So, after that, I recall, you know,

21    basically going and working with Adam McDonald, who

22    was, we were doing, like infomercials and, you know,

23    video production and that's why, you know, was, that's

24    where I was employed after, after that, so --

25         Q     And what was the time period with that

DOJ-0000020634

1    employer?

2        A    I believe it was from 2009 to 2014.

3        Q    Okay.  And you said you worked with Adam

4    McDonald.  What was the company's name?  Does, was

5    there one?

6        A    Take Two Direct.

7        Q    Take Two Direct?

8        A    Uh-huh, but I was, actually wasn't paid by

9    him.  I was paid by my own company, but I, I don't

10    remember the actual name of the company.

11        Q    The -- of your own company?

12        A    From that long ago, yeah.

13        Q    Okay.  And can you explain that a little bit

14    more?  I'm, I'm not quite following what you mean.

15        A    I, I don't, like, have the actual, like

16    legal --

17        Q    Oh.

18        A    -- I, I don't remember the legal name.  I

19    wasn't prepared for this, for the, for the timeline

20    of, like all the companies.

21        Q    That's fine.  That's not what I mean.  The

22    question I was trying to ask is can you explain how

23    that arrangement worked a little, in more detail --

24        A    I was --

25        Q    -- how you were --

DOJ-0000020635

1        A    -- self-employed.

2        Q    Okay, so --

3        A    And basically, I, I, he, he was, he was

4    paying me as 1099 or a pay into the business.  It just

5    depended.

6        Q    Is there, correct me if I'm wrong, you were

7    saying that you were functionally an independent

8    contractor through your own company that you were

9    working for this Take Two?

10       A    I, I, I remember receiving payment, like

11   from him as a 1099, but then also, like my company,

12   thereafter, like after that, there, yeah, so he would

13   pay the company and then -- like when I first started

14   out, he would just pay, like hourly to me.

15       Q    Uh-huh.

16       A    And then after that, then I, I started my

17   own company and then, he would just pay me, like a, a,

18   as my company.  Basically, as like, kind of like a

19   consultant, but we would still work together, so.

20       Q    Okay.  So your, your arrangement changed

21   over time?

22       A    Yes, yes to answer, yes.

23       Q    Okay.  And again, what kind of work were you

24   doing with him?

25       A    Production, like video production.  We did a

DOJ-0000020636

1    lot of, like direct response to answer your question.

2        Q    So what for, direct response for whom?  What

3    kind of video production?

4        A    We did -- I remember working with, like

5    doing, you know, call center stuff, you know, also

6    video production, like, yeah, basically making, like,

7    you know, 30 second ads for various clients.

8        Q    For clients like whom?

9        A    Oh, okay.  Well, like Heritage Foundation

10   was one of them.

11       Q    Uh-huh.

12       A    We had -- that's, that's the one that I

13   remember.  Freedom Faith and Freedom Works, it's been

14   a long time ago, so yeah.

15       Q    Sure, okay.  And remind me when you said

16   that work terminated.  Was that around 2014 that you

17   said that you --

18       A    Yes.

19       Q    Would -- did you have any other employment

20   at the same time or were you working sort of

21   exclusively with Take Two?

22       A    I was, yeah, I was, I, I did other, I, I

23   might have done other, I, I actually don't remember,

24   so --

25       Q    Okay.  So what came after your work with

DOJ-0000020637

1    Take Two?

2        A    After that, basically, there was, Adam had

3    a, you know, wanted to explore, you know, working with

4    other people, and I, I didn't like the arrangement he

5    was pushing for.  So I, I, I stopped working with, you

6    know, Adam McDonald and Take Two.

7        Q    What did you not like about the arrangement?

8        A    He was bringing in other people that I, I, I

9    didn't necessarily think were, you know, viable

10   partners on, on projects that we were working with,

11   and I just didn't want to, you know, work with him

12   anymore so.

13       Q    Okay.  So after you terminated that

14   relationship, what was your next employment.

15       A    I, I came to, actually Washington D.C.

16   because I was going to try to get, you know, political

17   clients and things like that, but nothing really ever,

18   like, you know, came up.  I, you know, I wasn't able

19   to get PACs and, like candidates, like I, I, I had

20   imagined.

21       Q    And just to go back, you mentioned you are,

22   that you were working for your own company.  After

23   this deposition, can you produce just the name of,

24   once you look into your records and provide that --

25       A    Yeah, I can, uh-huh.

1        Q    That would be great, thank you.  So you came

2   to D.C.

3        A    Uh-huh.

4        Q    How long were you in D.C. trying to get

5   these political clients?

6        A    it was, like 2014 to, yeah, I think it was

7   just in, actually 2014.

8        Q    Okay.  And was this using the same company

9   you'd been using with, with Mr. McDonald?

10        A    I, I don't recall.

11        Q    Sure.  And that would be information we'd

12   also be interested in.

13        A    But, and just to correct the, the, the

14   company that -- Adam didn't have actual, like

15   ownership in the company that I had.  We just had kind

16   of a partnership, so.

17        Q    Understood, thank you.  But it was your own

18   company you were continuing to work with after you

19   terminated your relationship with --

20        A    Uh-huh.

21        Q    That's correct?

22        A    Yes.

23        Q    Thank you, okay.  So after that attempt in

24   D.C., can you tell me what came next in your

25   employment history?

DOJ-0000020639

```
 1          A    I, I don't recall exactly, but I remember,
 2     you know, relocating back to California, and I was
 3     doing digital marketing for a, a, basically, like
 4     products for instance like , it's, like, like, diet,
 5     muscle, things like that on the, on the internet.  So
 6     I was, basically I was working with a guy named, Hamik
 7     Akhverdyan and his company.
 8          Q    Can you spell that name for us or
 9     approximately.
10          A    I, I just remember the company actually.
11          Q    Oh, sure.
12          A    It's called Big Dream Media.
13          Q    Big Dream Media?
14          A    Correct. And with Big Dream Media, I was
15     doing a lot of Facebook advertising.  We did a lot of,
16     like native ads, which are like Google AdSense and
17     things like that.
18          Q    Uh-huh.
19          A    So that's, you know, I, I wanted to gain
20     experience with that, because I had been previously
21     doing television and things like that.  So I wanted to
22     gain experience with that and I was able to.  So, you
23     know, for, for that employment history, I was working
24     with him --
25          Q    Uh-huh.
```

1        A      -- to up to that point, so.

2        Q      And were you working, pardon me, were you

3    working directly for this company or were you still

4    working, self-employed and working as a contractor

5    consultant.

6        A      I was a, like a contractor consultant with

7    him.

8        Q      Okay.  And still under your, your company --

9        A      Correct.

10       Q      -- was being paid?

11       A      Yes, correct, yeah.

12       Q      Okay.  So that, you said, was approximately

13   in 2015?

14       A      Correct.  Yeah, 2015, yes.

15       Q      Okay.  So what came next?

16       A      So then in, you know, 2016, obviously, you

17   know, there, there was the presidential race.  So, you

18   know, with the experience that I had and because I was

19   doing, like the digital stuff, you know, I wanted to,

20   you know, basically get into that realm.  And since I

21   didn't have, like experience creating or like dealing

22   with the admin, administration stuff of the PAC, you

23   know, I wanted to potentially see about, you know,

24   gaining some of that experience.  So that's when I,

25   you know, decided to, you know, collaborate and

DOJ-0000020641

1    network to, to be able to try to like, you know, see

2    what was out there, so --

3         Q    And in what way did you do that?

4         A    Well, first I reached out to Robert Reyes,

5    who was -- he's been a friend of mine, and he actually

6    had experience in the call center business, things

7    like that, he also had merchant account experience and

8    things like that.  So, you know, just working with

9    him.  Yeah, we, we basically just, I said, hey, you

10   know, we can do something with the political business.

11    I don't know what yet, but we can do something, so.

12        Q    And what did you end up doing?

13        A    So I, yeah, so I, I wanted to gain

14   experience again working with the PACs, okay?

15        Q    Uh-huh.

16        A    And I reached out to Kyle Davies and I asked

17   him, you know, hey, there's the, you know, we can, is

18   there anybody that has, like views or something and

19   wants to get involved in, maybe like be a Director of

20   a PAC or something like that.  And then, he said,

21   yeah, I have this guy named, you know, Joey Cammer

22   (phonetic).  He's a very a strong Trump supporter.

23        Q    Uh-huh.

24        A    And I said, okay, great.  You know, so I, I

25   met him and basically, like I started the, the Liberty

DOJ-0000020642

1    Action Group.  I had, like helped him out and from the

2    experience that I learned from, you know, working

3    with, you know, the PAC and things like that, I went

4    to the FEC website and I looked up the, the rules and

5    everything.  And, and basically, you know, the only

6    requirement was that we needed like a treasurer.  So,

7    you know, I started to, you know, go out and find

8    recommendations for like FEC accountants and things

9    like that.  And, and, and, you know, basically, said,

10   you know, all the information is here to, to, you

11   know, start, start an organization and really, we just

12   need to, like execute and things like that.  So, but I

13   looked at the, you know, the laws for the FEC and it

14   said, you know, the only requirement and I also got

15   counsel from my, the accountant and other attorneys

16   and they said the only requirement was that there was

17   needed to be, like and FEC treasurer and that the

18   filings had to take place and on time.  So, to my

19   knowledge, that was all that, all that was necessary,

20   so.

21        Q    All that was necessary to do what?

22        A    To, to, like start one of these, to start

23   one of these PAC, so.

24        Q    So what it sounds like and correct me if I'm

25   wrong, it sounds like you were interested in getting

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020643

1     involved in the PAC space?

2           A    Correct.

3           Q    And so you were looking to open a PAC, to

4     start a PAC?

5           A    Right.  But the way it was explained to me

6     was, you know, there needed to be, like a Director

7     who, you know, obviously supported the candidate and

8     also I have a, you know, I would say, just like

9     anybody, have a moral obligation to make sure that,

10    you know, whoever wants to start the PAC, actually,

11    you know, morally supports the candidate and things

12    like that, so.

13          Q    Uh-huh.

14          A    And, you know, Joey was one of those

15    persons.

16          Q    Okay.  So, so what was your role in starting

17    that PAC exactly?  I'm just, I've heard you saying you

18    were, were looking for experience in that area.  But

19    how would you describe your role with respect to that

20    Liberty Action Group, I believe you said?

21          A    Yeah.  I was, I had, I had had the

22    experience with, you know, with, I guess, my role was,

23    I was like a media buyer and doing the, the political

24    advertising would be my, like role.  So and then, I

25    was, I was going provide recommendations and things

DOJ-0000020644

1    like that, because, you know, just because somebody is

2    a director doesn't necessarily mean that they're, they

3    have all the pieces that they, you know, if, if they

4    want to support a candidate and augment their voice,

5    it doesn't mean that, you know, they don't need, like

6    direction as well and, like recommendations and things

7    like that, so.

8        Q    And, and you mentioned that you, you

9    contacted Kyle Davies.  Can you explain why you

10   reached out to him when you were looking to start the

11   Liberty Action Group?

12       A    Yeah.  The, the, one of the FEC requirements

13   is to have the, you know, if checks do come in, that

14   the name and address needs to be collected.  So I

15   definitely knew that was, like, a requirement, so --

16       Q    Uh-huh.

17       A    -- Kyle, you know, seemed like an ideal

18   candidate who could handle that kind of thing.

19       Q    And so if he's a, was an ideal candidate to

20   handle this sort of record keeping aspect, why did you

21   contact him with respect to, to finding someone to be

22   the director at the time?

23       A    Oh, he, he, he was in the Austin area and a

24   lot of people in the Austin area are very, like,

25   politically active.

DOJ-0000020645

1        Q    Uh-huh.

2        A    So, it was, like a realistic, you know,

3   guess to think that, like he would, he would be

4   helpful.  So I, I actually, like tried to reach out to

5   other people.  I don't remember who exactly, but I was

6   definitely, you know, working to, to try to do

7   something, so.

8        Q    And how do you know Mr. Davies?

9        A    He's my cousin.

10        Q    Okay.  And did you know Mr. Cammer before

11   Mr. Davies recommended him to you?

12        A    No, I did not.

13        Q    Okay.  So I think I understand that this was

14   in the 2016 time period.

15        A    Correct.

16        Q    And correct me if I'm wrong, but you were

17   interested in starting a PAC and getting involved in

18   that space.  You reached out to Mr. Davies, who

19   recommended Mr. Cammer to you --

20        A    Right.

21        Q    -- and that's how you got your director for

22   Liberty Action Group?

23        A    Correct.

24        Q    Okay.  You also mentioned Mr. Robert Reyes.

25   How do you know him?

DOJ-0000020646

1        A    He's a friend.

2        Q    Sure.  For how long have you known him?

3        A    Since, since I moved to California.  So,

4    maybe, like 2006, 2007.

5        Q    And can you clarify his role a little bit

6    with respect to Liberty Action Group?

7        A    Yeah.  He is like a consultant.  He's really

8    good with, like operations, so, like very organized,

9    you know, very on top of things and he was just

10   basically kind of like, you know, managing and

11   organizing things, making sure that, you know, the

12   accountant, there was going to be communication and

13   that, you know, the, the, you know, the director had,

14   like access to, you know, be able to have a FEC

15   account and things like that, so.

16       Q    Okay.  And were you two, Mr. Reyes and

17   yourself, working for the same company at that time?

18       A    No, he, he had his own company.

19       Q    Okay. Do you recall the name of that

20   company?

21       A    Modern Media Group.

22       Q    Okay.  And at that time, were you working

23   for anyone or, or in your individual capacity or for

24   your own company?

25       A    I was working for my own company.

DOJ-0000020647

1         Q     Okay.  And do you recall the name of that

2    company?

3         A     Yes, one was Supreme Dream Media.

4         Q     Supreme Dream Media?

5         A     Uh-huh.  The other was Matte Media

6    Corrections.

7         Q     And neither of those were the company that

8    you, your own company that you were working for

9    before, is that correct, when you were working for Mr.

10   McDonald.

11        A     Correct.

12        Q     Okay.

13        A     Right.

14        Q     So this -- do you know how many corporations

15   you've operated under over the course of your career?

16        A     No, I have not.  No, I do not.  I don't know

17   the exact number.

18        Q     Sure.  We would appreciate it if you could

19   just sort of give us a list.  If you could go back

20   through your records and just every, everybody that

21   you, every company that you've worked for, for

22   yourself --

23        A     That's fine.

24        Q     -- that would be --

25        A     I can provide that.

DOJ-0000020648

31

1       Q    Excellent, okay.  So that's in 2016 that you

2    get involved with Liberty Action Group.  What came

3    next?

4       A    Well, that's, oh, in 2017?

5       Q    And simultaneously.

6       A    Okay.  Yeah, so 2017 I was doing, like,

7    after the election, basically I made a pivot to doing,

8    like a mobile app development, because --

9       Q    Uh-huh.

10       A    -- that was kind of like what I've been

11    wanting to do.  I always wanted to, you know, get into

12    the engineering aspect.  So I was doing mobile app

13    development.

14       Q    Okay.  And what kind of mobile app

15    development were you working on?

16       A    One was called Bid Rush. It was kind of like

17    a -- yeah, one was called Bid Rush.

18       Q    Go ahead and you were about to explain.

19       A    Yeah, it's, it's basically kind of like a,

20    like a Tophatter or like eBay, kind of like a retail

21    app so.

22       Q    Okay.  And was there anything else you were

23    working on during 2016?

24       A    During 2016?  Besides Progressive

25    Priorities?

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020649

1       Q       That would be --

2       A       Okay, yes --

3       Q       -- what we would --

4       A       Yes, I, I was working on that as well.

5       Q       Okay.  And was that around the same time

6  period as Liberty Action Group or?

7       A       It started a little bit later.  I would say

8  maybe in, like from March to May.  I, I actually don't

9  know the exact date on when I, you know, it was

10 started, but --

11      Q       Okay.  So you said around the spring of --

12      A       Correct.

13      Q       -- 2016?

14      A       Uh-huh.

15      Q       And what was your role with respect to

16 Progressive Priorities PAC?

17      A       Yeah.  So I was, I was, basically getting,

18 like, kind of like the media buyer for that and I, I

19 helped with like political advertisements and stuff,

20 so.

21      Q       And, and was your role with Progressive

22 Priorities similar to your role with Liberty Action

23 Group where you were --

24      A       Correct.  And, just for the record too, you

25 know, I, previously, like I had worked with Justice

DOJ-0000020650

1    For All.

2        Q    Uh-huh.

3        A    Who was a, was a Democratic, it was either a

4    501(c)(4) like a, like a super PAC, I forgot which

5    one.  But it was with Marquita De Jesus (phonetic).

6    And, you know, I was, I would, I, you know, gave her

7    recommendations on like starting that and things like

8    that.  So it, it wasn't out of the realm to, you know,

9    have both clients, like Democrat and Republican, as

10   long as like, you know, like, the, for, for me at

11   least, like, being a media buyer, there really wasn't,

12   like a conflict of interest, because I was just

13   basically providing, you know, services, so --

14       Q    And when was that work with Justice For All?

15       A    I, I, yeah, so I want to go back and correct

16   it.  I believe --

17       Q    Sure.

18       A    -- I, I actually wasn't paid necessarily,

19   but I did, like, help her, you know, start that.  I, I

20   believe that was back in 2012.

21       Q    Okay.

22       A    Yeah.

23       Q    And did that continue?  Was it just 2012 or

24   did that last, did that engagement continue?

25       A    It, it fizzled out, I would say, yeah, in

DOJ-0000020651

1    like 2012, 2013, I mean, I still, I, I only remember

2    keeping in contact with her, you know, as, as somebody

3    in the industry.

4         Q    Uh-huh.

5         A    But I don't recall doing, you know, day to

6    day Justice For All stuff.

7         Q    Okay.  And, and so your role and correct me

8    if I'm wrong, with that, that organization was helping

9    this individual start her own PAC and get that

10   rolling, is that correct?

11        A    Right, yeah.  Yeah, exactly.

12        Q    And, and why -- what got you into that

13   business of sort of advising clients on, on starting

14   PACs?

15        A    You know, the law was so new, I mean, it

16   was, like 2010 that law came out.  So, you know,

17   people, nobody really knew about it.  So I was kind of

18   the ones who was working with the original, kind of

19   like the people who were really big in the space.  You

20   know, I worked with, when I was working with Adam

21   McDonald, I worked with Dan Backer (phonetic), not, I

22   indirectly worked with him --

23        Q    Okay.

24        A    -- and he had, like a, just a slew of

25   clients, you know, who were, you know, wanted kind of

DOJ-0000020652

1    like this direct response style, you know, political

2    advertising, so.

3         Q    And what law are you referring to when you

4    say the law was so new?

5         A    I believe it's Citizens United versus

6    Supreme Court, I'm not sure, Citizens United versus

7    FEC.

8         Q    Sure.  And so, can you clarify sort of what

9    was, was new that your, your clients were trying to

10   sort of capitalize on in that, in that space at that

11   time?

12        A    The, the super PACs, just, you know, the new

13   law, understanding, you know, what exactly was, you

14   know, that money constitutes free speech, kind of

15   things like that, so --

16        Q    And how did you get the experience to sort

17   of advise in this role of starting PACs?  Where did

18   you, you come into that ability to advise clients on

19   that from?

20        A    From, from working with Adam McDonald and,

21   and, you know, those clients, so.

22        Q    Okay.  We'll come back --

23        A    And vendors (phonetic).

24        Q    -- and discuss the priorities in a minute,

25   but I want to make sure we, we're complete.  So you

DOJ-0000020653

1    mentioned the, the app start up business.

2         A    Right.

3         Q    Was there anything that came after that or

4    is that ongoing?

5         A    That is, I mean, I, like, I still have the

6    apps and things like that.  I can, you know, I just, I

7    just wanted to go back to school.  Basically, you

8    know, we were trying to get funding for the apps, you

9    know, with venture capital, but, you know, the venture

10   capitalists, they want, they want to make sure that

11   you're either, you know, an expert in your field or

12   that you have success like selling a previous

13   business, things like that.  And I just decided, you

14   know, with, with the Pell Grant, it was probably best

15   that I go back and, like finish my degree, which is

16   actually what I'm doing.

17        Q    Okay.

18        A    So right now, I'm studying to be a software

19   engineer.

20        Q    Sure.

21        A    And I also wanted to take a break from just

22   the instability of this whole ordeal for, you know,

23   ten years, you know, become a software engineer and

24   then, you know, maybe have like a stable income,

25   things like that.  And then, also have that expertise

DOJ-0000020654

1    to possibly if I wanted to go back and get funding

2    for, you know, an app and, you know, do things like

3    that, so.

4         Q    Okay.  And so, now you are in school.

5         A    Right.

6         Q    When did you go back to school?

7         A    I went back to school last year.

8         Q    Okay.  So that was in 2018?

9         A    2018, correct.

10        Q    Okay.  And so --

11        A    2017, yeah.

12        Q    -- in that 2017 period until you went back

13   to school, were you doing anything else?  Was there

14   any other employment history going on at that time?

15        A    Any other employment history?  No, not to my

16   knowledge, no.

17        Q    And other than the app, are you employed

18   currently?

19        A    I have my own business, yes.

20        Q    What does that business do?

21        A    Well, right now, I have the PAC like, it's,

22   like a, yeah, it's basically, it's called United

23   Advocates Group.  And that's, that's like the business

24   that I have.  But I'm actually, like I was, I have the

25   PAC Support American Leaders and I'm actually, like

DOJ-0000020655

38

1    paid out by that PAC.

2         Q    Okay.

3         A    So I thought, you know, it would probably be

4    best if I just, you know, have this PAC and, and stop

5    trying to, you know, delegate out to everybody and

6    just, you know, basically, you know, have the PAC and,

7    you know, file, things like that, so.

8         Q    So Support American Leaders is your PAC?

9         A    Correct.

10        Q    Okay.  And you mentioned another

11   organization at the same time.  Was that United

12   Advocates?

13        A    Yeah.  United Advocates Group is, just a,

14   like a business that I have, but I haven't actually,

15   like technically been, like, paid out by it so.

16        Q    Okay.  So with Support American Leaders,

17   what's your role with that PAC?

18        A    I am the director, like that's, yeah.

19        Q    Are you the treasurer of that PAC?

20        A    I am, too, yes.

21        Q    Okay.  Is there anyone else involved in that

22   PAC of yours?

23        A    I have a designated agent.  Her name is

24   Amber Vaughn or Amber Gormley so --

25        Q    Okay.

DOJ-0000020656

1       A    -- and basically, from this whole ordeal,

2    you know, with my attorney and Amber, I've been able

3    to really get things organized and, you know,

4    understand the laws versus just kind of, you know, my

5    attorney said this, this accountant said this, kind of

6    thing.

7       Q    So can you just describe some of her duties

8    and your duties?

9       A    So she is a -- she does all the filings, and

10    I am the one who does the political advertisements and

11    make sure that, you know, there's compliance that says

12    "paid for" things like that.

13       Q    Does she prepare the filings?

14       A    Yes, she does.

15       Q    Okay.  But -- and you are the treasurer of

16    the organization?

17       A    Correct.  So she, she, she does the filings

18    and I, yeah, but I, I basically have my name on the

19    PAC so.

20       Q    And who's responsible for the fundraising

21    for that PAC?

22       A    I do the fundraising.

23       Q    Okay.  And can you tell us anymore about

24    sort of how the PAC fundraises?

25       A    We do, right now, we do voice broadcasts.

DOJ-0000020657

1   So, they're, like, you know, basically political

2   messages.

3        Q    Are those in the form of robocalls

4   generally?

5        A    Yes.

6        Q    Okay.  Is there any other way that you do

7   fundraising, any other advertisements or?

8        A    Not right now.

9        Q    Okay.  Have there been any other PACs that

10  you've worked with, other than those we've discussed,

11  Liberty Action Group, Progressive Priorities, Support

12  American Leaders, Justice For All?

13       A    When I worked for Adam McDonald, I, I can,

14  I, I did work with, okay.  So there, the, the news

15  article about this whole Conservative Majority, you

16  know, that, that came out.  So I actually, I, I

17  remember working, that was, like, Adam's client, but

18  I, I remember like working with that, because Dan

19  Backer had, like a bunch of them, like that he worked

20  with.  Also, Maureen Otis, I don't know if you know

21  her, but she had, like a bunch of, bunch of them as

22  well.  So just kind of that whole, you know, space.

23       Q    So my understanding that when you worked

24  with Mr. McDonald you worked with a number of PACs --

25       A    Correct.

DOJ-0000020658

1    Q    -- through that engagement?

2    A    Correct.

3    Q    But you were not yourself directly engaged

4    with those PACs?

5    A    Correct.

6    Q    Okay, understood.  Jin, do you have anything

7    else that you'd like to ask clarifying questions on?

8         BY JIN LEE:

9    Q    So besides political action committees,

10   PACs, have you worked with any other political

11   organization that you haven't mentioned?

12   A    Justice For All, it's called Silence The

13   Violence was another one that, you know, Marquita

14   started.  So those were, those were the majority.  Are

15   you talking about indirectly, like working?

16   Q    No, I mean, directly working.

17   A    Directly working without Adam was Justice

18   For All and Silence The Violence, then Liberty Action

19   and Progressive Priorities, those were the ones that I

20   had direct advise -- kind of advising recommendations

21   with on, like, you know, but, you know, the PACs that

22   Adam was dealing with, you know, revolved around Dan

23   Backer.  So those were, like the Faith and Freedom

24   PAC, you know, Conservative Majority.  There was, I

25   forgot the one I mentioned originally.  But yes, there

DOJ-0000020659

1    were, there were some of those PACs.  I can, I can

2    provide those for you if needed.

3              MR. LAWYER:  That's awhile back, so --

4              THE WITNESS:  It was awhile back, but I

5    might not remember everything -

6              BY MS. LEE:

7        Q    And what type of specific services did you

8    provide to those PACs?

9        A    To which ones?

10       Q    Well, to the ones that, when you were

11   working with Adam McDonald.

12       A    Uh-huh.

13       Q    What kind of specific services did you

14   provide?

15       A    Direct response, and we did TV, radio, voice

16   broadcast, so those are the main ones.  Basically, we,

17   we did a lot of, like offline media.  We also did a

18   little bit of online, but like our, our thing was,

19   like, you know, we were like really good at, like TV,

20   So TV and radio.

21             BY MS. DI GIOVANNI:  So that's, and that's

22   basically your purpose on the team?

23             THE WITNESS:  Right.

24             BY MS. LEE:

25       Q    And what types of ads were they?  Were they

DOJ-0000020660

1    issue ads or campaign ads or?

2        A    Yeah, they were, we kind of infused, like

3    infomercial and, like the political ad together.  So

4    we, we had messages that were really like, very call

5    to action style.  You know, we were kind of the first

6    to, to create this hole where the politician's, like

7    talking directly to the camera.  So it was, like, call

8    right now, I need you to, you know, call and pledge

9    your support, so we can get, you know, X, X amount of

10    things done or whatever, you know, pass, this bill

11    passed in August.  So yeah, that was kind of our

12    forte.

13        Q    So the candidates would be involved in these

14    advertisements?

15        A    Not necessarily candidates, but we would

16    have, they would be PACs that are supporting the

17    candidates.  So it would be, you know, kind of a

18    mixture of, like the candidate speaking and then,

19    also, you know, the call to action at the very end,

20    where it's, like, you know, call right now to, to, you

21    know, pledge that you'll, that you will go out and

22    vote for this candidate kind of thing.

23        Q    So these ads, did they ask for money or did

24    they do anything --

25        A    They were --

DOJ-0000020661

44

1      Q     -- anything else?

2      A     Yeah, so once we, once they called in, they

3    would call a tollfree number and then, that would go

4    to like the, we have, like an IVR and the IVR is, like

5    a, a, a it would say, like, thank you so much for

6    calling and, you know, helping support elect, you

7    know, Trump for instance.  You know, he needs our help

8    more than ever, you know, to, to defeat him it's going

9    to take, you know, millions of people to get out and

10   vote, you know, and to do this, we need your support.

11    Can you help us, you know, with leaving a modest

12   contribution, if you can, press one and, you know,

13   about, like, 20 percent of those people would like

14   press one and that would be transferred to the call

15   center and then, they would take the call that's,

16   like, you know, hey, can you help us donate kind of

17   thing.

18     Q     So --

19     A     Does that make sense?

20     Q     Right.  So you did that for Adam McDonald?

21     A     Right.

22     Q     So can you give me an example of a PAC that,

23   you know, for which you did that type of work?

24     A     The Heritage Foundation.

25     Q     Heritage?  Okay.

DOJ-0000020662

1     A    Faith and Freedom, I, I mean, I don't have

2  my laptop, but I think you, you guys know the one I'm

3  talking about, you know, Conservative Majority for

4  sure we did them, because that was like InfoCision's,

5  like, you know, InfoCision was working with

6  Conservative Majority, so I remember that one.  I

7  think that's, I, you know, I don't remember others,

8  but yeah.

9     Q    Okay.  So if the candidate is, is talking to

10  the viewer, you would, how did you get that type of

11  footage?

12     A    That was whitehouse.gov.  So it's allowed,

13  yeah or it's from the, it was from like CNN or like a,

14  a source where – a free source.

15     Q    So you would just get some footage through

16  the internet?  Is that what you're saying?

17     A    Well, like the, the one that we had, would

18  be, like, for instance, like if, well, actually we

19  did, we, we did have original content as well.  And

20  actually to, to remember, because this is jogging my

21  memory.  So, you know, like a, I remember doing stuff

22  for, like Mike Huckabee.  So we actually did one where

23  Mike Huckabee was, like speaking it.  So yeah and

24  actually I think it was called Restore America's

25  Voice, like --

DOJ-0000020663

1     Q     That was, that was the political committee?

2     A     Yeah, yeah, yeah.  So Restore America's

3  Voice was, like, you know, I think a paid Mike

4  Huckabee to get on camera and then, Mike Huckabee

5  would get on camera and say, hey, you know, I think he

6  did, like, oh, another one that I did was the Fair

7  Tax.  This is kind of like coming back to me now.  So

8  yeah, Mike Hu -- so, so we did do candidates, but we

9  also had, you know, video footage of like a candidate

10  speaking, like for instance, you know, the one in 2016

11  we did for the Liberty Action Group.  We had, you

12  know, Trump's, Trump's speaking at his, his primary

13  or, like, I think it was some conference that he had,

14  but it was, it was available, it was free.  I, I even

15  called the FEC, and I asked my attorney if we could

16  use this, he said, yeah, it's fine so.

17     Q     Okay.  So now, we're going to turn and talk

18  a little bit more about Progressive Priorities.

19     A     Okay.

20     Q     So starting at the beginning.  Can you just

21  tell me what Progressive Priorities PAC is?

22     A     Yeah.  So Progressive Priorities PAC was,

23  you know, a Democratic PAC I believe that supported

24  candidates, they wanted, she wanted to support and she

25  meaning, Alexa Roth, wanted to support, you know,

DOJ-0000020664

47

1    Hillary, so, Hillary Clinton.

2         Q    Okay.  So was the purpose of the PAC to

3    support Hillary Clinton's election?

4         A    Yes.

5         Q    Okay.

6         A    Or, correct, yes, yes.

7         Q    Okay.  And how did Progressive Priorities

8    accomplish that purpose?

9         A    They did voice broadcasts and I'm not sure,

10   but because I, I don't have record, but I think we

11   might have done, like one or two spots on the radio,

12   but I'm not sure.  I'm not entirely certain.

13        Q    Do you know if there were any mailers?

14        A    I think they sent out.  I think the mailers

15   was sent.  Kyle Davies he, he handled a lot of like

16   the mail.  So, you know, he, he, he would enter in

17   the, the data for the checks that came in.  So yeah,

18   there might have been mail that went out.

19        Q    Okay.  And you mentioned there may be radio

20   ads.  Were there any television advertisements?

21        A    No, we, we didn't get to that level, no.

22        Q    Sure.  And anything else that you might not

23   have mentioned that --

24        A    No, that was it.

25        Q    Okay.  What, can you tell me about how

DOJ-0000020665

1    Progressive Priorities started?  We've discussed that

2    a little, but if you could tell me a little bit more

3    about that.

4        A    Yeah.  So Kyle, I don't know how the

5    conversation went exactly, but Kyle said that, you

6    know, Alexa was like a, you know, Democratic and he

7    was, Alexa was like his girlfriend and that, you know,

8    you know, she, she might want to be like a director

9    kind of thing of like a PAC.  So that's kind of how it

10   started.  And I made sure that, you know, when, she

11   actually did support Hillary, I even, like went and I

12   spoke with her.  We met, you know, one night for

13   dinner.  And we, I remember having a political

14   conversation with her about, you know, her views and

15   things like that.  So she definitely was, like very

16   pro woman, and you know, and wanted to support

17   Hillary, so.

18       Q    Okay.  And when did that conversation that

19   you recall take place?

20       A    In 2016, you know, I --

21       Q    All right.

22       A    -- don't know exactly when, but --

23       Q    Early, late, Spring, Fall?

24       A    Spring I would say.

25       Q    Okay.  We are going to use a document that

DOJ-0000020666

49

1   you may recognize.  Can you identify this document for

2   me?

3       A    This is the Interrogatory, I believe, it's

4   called, that I presented to Justine Di Giovanni

5            (The document referred to was marked for

6   identification as Agency's Exhibit No. 2)

7       Q    And --

8       A    -- or the subpoena.

9       Q    Got it.  And did you draft this document?

10      A    Yes, I did.

11      Q    Okay.  And can you attest for us that, that

12  to the best of your knowledge what's in this document

13  is accurate?

14      A    I can attest that, to the best of my

15  knowledge, what is in this document is accurate.

16      Q    Okay.  We are going to look at your response

17  to question one here.  And then, we'll just walk

18  through these individuals that you've listed and --

19      A    Okay.

20      Q    -- and get some more information about them.

21   So you just brought up Alexa Roth.

22      A    Correct.

23      Q    What have you labeled her as here in your

24  answer?

25      A    I said representative, but, you know, she

50

1    would, she was kind of more or less like the director.
2     She was like the, the face of the organization if you
3    want to say, you know, I mean, they, they were her
4    views, you know, the political advertising that we
5    did, augmented, like her views, so that, yeah.
6         Q    Sure.  And was starting Progressive
7    Priorities, was that her idea or someone else's idea?
8         A    That was, we, we, we told her about the PAC.
9     The, the, the PAC concept and she said that she
10   wanted to do it so.
11        Q    Okay.  And by we, do you mean yourself and
12   Kyle Davies?
13        A    Yes, because that's how I, that's the
14   connection between myself and Alexa.
15        Q    Understand.  And so she was involved with
16   the PAC from the beginning in early 2016 --
17        A    Correct.
18        Q    Is that correct?  And when did she cease her
19   involvement with the PAC?
20        A    Yeah, so interesting story.  One of the
21   things that I definitely was not prepared was the
22   media scrutiny.  I, I, you know, did the political
23   advertising, so I never really understood the, the
24   whole admin, you know, side of, you know, what's the
25   difference between, you know, filing and, like just

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020668

1    the media scrutiny that came along with it, because

2    everything's public, you know?

3         So Alexa was contacted by a, a representative, I

4    think at the time he worked for Buzzfeed.  His name

5    was, like Andrew Kay or something.  And he, he was

6    basically just trying to gather information, red meat,

7    you know, as people call it, to, to just dig up a

8    story.  I believe that's how it happened.  But he

9    actually reached out to Alexa, either he found her

10   phone number or some way.  And, you know, I don't know

11   how, how the conversation went, but I know after he

12   spoke with her, she was very, like, like insistent on,

13   like stopping the PAC.  She didn't want anything to do

14   with it, you know, things like that.  So very

15   reactionary.

16        Q    And when do you think that that happened

17   that you can remember?

18        A    I think it was, I mean, it was definitely

19   between, like March and October.

20        Q    Okay.  So maybe the summer of 2016?

21        A    Right.

22        Q    Okay.  Let's, okay.  And, and while Alexa

23   worked for the PAC, what were her responsibilities?

24   You mentioned that she wanted to start it, but what

25   did she actually do for the PAC?

DOJ-0000020669

1      A    Well, I mean, they were her views, like, you

2   know, her political views.  So she didn't exactly

3   have, like day to day operations, but she, you know,

4   we were, we, Kyle was in contact with her and things

5   like that.  So to answer your question, she didn't

6   really have like day to day specific assignments,

7   because we, we, since it was so, like nascent, the

8   whole operation, we didn't really have like, you know,

9   policies and procedures and things like that.

10      Q    So you, you mentioned a CNN article.

11      A    Right.

12      Q    Do you know approximately when that might

13   have come out?

14      A    I know it was in 2016.  I don't --

15      Q    Okay --

16      A    -- know the exact dates.

17      Q    Okay.

18      A    But I do remember it, because it was a very

19   exciting time --

20      Q    Yes.

21      A    -- to say the least so.

22      Q    Certainly true, okay.  And we may come back

23   to that, but we'll move on for, for now.  You then

24   listed Michelle Sotelo.

25      A    Correct.

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020670

1      Q     What did you label her as here?

2      A     Yeah, she was a representative.  So she was,

3  you know, I made sure that, you know, if Alexa was

4  going to leave, then at least somebody that had her

5  same views and wanted to support the candidate stayed

6  synonymous.  So, you know, Kyle told me that, you know,

7  Michelle, you know, was very pro woman, wanted to

8  support this candidate, you know, things like that.

9  Understood, you know, this is a PAC.  It's a political

10 organization, things like that.

11     Q     And can you help me understand a little bit

12 more when she got involved with the PAC and why?

13     A     I, I believe she got involved, like in the

14 summer, once Alexa, Alexa, you know, was no longer,

15 like the representative.  So yeah, she got involved

16 and actually from the email correspondence that I sent

17 you, I noticed that there was a Monique Moyers

18 (phonetic) --

19     Q     Uh-huh.

20     A     -- and that was, that was, that was Kyle's

21 like new girlfriend, now his, like, wife, I believe.

22 And Michelle was friends with Monique.  So I think

23 they just had some networking kind of thing and then

24 it was, like, hey, you know, Michelle would be

25 interested and kind of, you know, she, like, you know,

DOJ-0000020671

1    we told her, you know, about the election, things like

2    that and, you know, yeah, she believes in this

3    candidate.  She wants to support, yada, yada.

4         Q    And who approached Michelle about getting

5    involved in the PAC?

6         A    I believe it was, I, I'm, I'm not for

7    certain, but it was either Kyle or Monique, it could

8    have been either.  I'm not sure exactly.

9         Q    Okay. And it was in, they did that with the

10   purpose of replacing Alexa as the director of the PAC,

11   is that correct?

12        A    Correct, correct.

13        Q    Okay.  And so once she came on board, did

14   she have responsibilities similar to Alexa's in that -

15   -

16        A    Correct.

17        Q    -- not very hands on?

18        A    Correct.  Yeah, exactly.

19        Q    Okay.  And when did she stop being involved

20   in the PAC?

21        A    Yeah, so I, from, from what I gathered, all

22   the information from, you know, Kyle, things like

23   that.  Kyle had told me that the reason why she wanted

24   to leave is because she was, she had got engaged and

25   she, she was going to move to California and she

DOJ-0000020672

55

1    didn't want to have this kind of, like responsibility,

2    slash you know, yeah -- this, she didn't want to have

3    this responsibility of, like, working with the PAC.

4    She just kind of wanted to move on with her new life

5    with her husband, and you know, close things out so.

6         Q    Okay.  And while she was engaged with the

7    PAC, would you say that she was sort of actively

8    participating in it, in its running and its

9    involvement.  Was she in contact with you or Mr.

10   Davies?

11        A    She was in contact with Monique.  So I, I, I

12   believe she was in contact with Kyle Davies indirectly

13   through Monique.  I'm not really sure how they

14   communicated or --

15        Q    Uh-huh.

16        A    -- you know, the, but I, yeah, there was,

17   there was some communication.  That was, like the line

18   of communication at least.

19        Q    So keep Exhibit 2 for the moment, but I

20   would like to, to show you something else at the same

21   time.  So this is Exhibit 3.  Can you identify this

22   document for me?

23        A    This is the Articles of Incorporation; this

24   is the Article of Incorporation slash I think

25   Operating Agreement for Delaware.

DOJ-0000020673

1          (The document referred to was marked for

2     identification as Agency's Exhibit No. 3)

3          Q    And did you produce this document to the

4     FEC?

5          A    Yes, I did.

6          Q    Okay.  So can you tell us a little bit about

7     this document?  How it came into your possession for

8     instance?

9          A    Kyle Davies had forwarded me this

10    information from these (phonetic), yep, like, like

11    these documents came from the email that Kyle Davies

12    sent me.

13         Q    Okay.  And so, this document isn't signed.

14    Do you know if --

15         A    Right.  So with Delaware, basically, they,

16    they, like, if you go on, like incnow.com, some of

17    these websites, they send you like a, like a document

18    like this.  And once you go to the bank, then the bank

19    will have you typically sign, like off on this so.

20         Q    So is there a signed copy of this document

21    in, in existence?

22         A    I believe so.  It would be, I mean, the bank

23    would have them sign this, typically.

24         Q    Okay.  Do you have a copy that's signed?

25         A    I do not.

DOJ-0000020674

1          Q    Okay. And what does this document indicate
2     regarding Michelle Sotelo?
3          A    It indicates that she is the president,
4     treasurer, and secretary of, of this particular LLC.
5          Q    Were you involved in preparing this document
6     at all?
7          A    I provided, I, I've worked with IncNow, but
8     I, I don't recall, like, actually, like changing this
9     or anything.  But this document came from IncNow.
10         Q    Okay.
11         A    Which is what I use for like a lot of the,
12    you know, creating the PACs and things like that.
13         Q    Sure.  And do you know why Michelle would
14    have been the president and treasurer and secretary of
15    the PAC, as well as its director?
16         A    That's just the way that, in Delaware that
17    you're allowed to set it up.  So you can in, in
18    Delaware, you're allowed to be the president,
19    treasurer and secretary.  It's not like other states
20    where, you know, there's more than one person that is
21    required to, to start or, or be on as one of these
22    LLCs.
23         Q    Okay.  And, and were other people, you know,
24    you, you've mentioned that you and Kyle Davies and
25    Monique Moyers were all working for the PAC.  Was --

DOJ-0000020675

1   we'll walk through, is there any reason why, why no

2   one else was sort of named to these positions within

3   the, the company?

4       A   Honestly, the, the simplicity of just the

5   fact that you could go online and, and, you know, have

6   assurance that, you know, you, you could get an LLC

7   and keep it very simple.  You know, and the fact that

8   we didn't have, we had limited resources.  It didn't

9   really align itself to, you know, created a, a very,

10  it, yeah, a very, like complicated formal document

11  like that, that listed out all of the policies and

12  procedures and, and duties.

13      It was just, just the timeframe and time urgency

14  of, you know, the political atmosphere.  We, we, you

15  know, we wanted to make sure that A, there was a LLC

16  that, you know, it was registered with FEC, which we

17  did so on the website.  And that we had an FEC

18  accountant who could do the filings.  Those were kind

19  of the main objectives that we were trying to

20  accomplish so.

21      Q   And you mentioned that you believe that

22  there is a signed copy of this document, that's

23  correct?  I'm just confirming.

24      A   I, I do believe so.

25      Q   Okay?  Did Michelle fill any other roles

DOJ-0000020676

1   with respect to the PAC specifically?  This is, I see,

2   the LLC, but there's also the, the entity we know as,

3   as the PAC.  Did she have any other responsibilities

4   other than as directed?

5        A    No.  That, that was primarily her objective

6   --

7        Q    Okay.

8        A    -- these two, yeah, yes.

9        Q    I'll take back Exhibit 3 now.  And do you

10  know if Michelle was paid by the PAC?

11       A    Yeah, she was.  From the information that I

12  gathered from Kyle Davies, he paid her out through a

13  PayPal, you know, in hindsight, it would, it would

14  probably be best to, you know, have, you know,

15  everybody on, like ADT or like a payroll, something

16  like that, but, you know, just, yes, yes, so to answer

17  your question.

18       Q    Do you know how much she was paid?

19       A    I do not have the exact answer on that.

20       Q    Do you have sort of an estimate?

21       A    I, I think it was anywhere from, like $0 to

22  $1,000 maybe a month.

23       Q    Okay.

24       A    So --

25       Q    And was that for the duration of her

DOJ-0000020677

1    engagement with the PAC do you think?

2        A    Yes, correct.

3        Q    And to be, just to, to make sure I'm

4    understanding.  That was probably for, so from when

5    Alexa stopped being the director to, when did she just

6    move to California?

7        A    I believe, I believe the PAC closed down

8    sometime in October of 2016, right around that time.

9    I'm not sure.

10       Q    Okay.

11       A    Yeah, give or take.

12       Q    Okay.  Let's, let's go back to Exhibit 2 and

13    we'll keep walking through these individuals.

14       A    Okay.

15       Q    Oh an since you, you spoke with us about

16    Michelle being paid.  Was Alexa also paid when she was

17    engaged with the PAC?

18       A    I believe so.  She was paid.

19       Q    Around the same amount or different?

20       A    Yeah, it was $0 to $1,000.

21       Q    And how did you determine how much Alexa and

22    Alex would be paid?

23       A    We, actually that's, I, I don't know the

24    answer to that question.  I, we just had, like a

25    reasonable, you know, just reasonably, like how much a

Heritage Reporting Corporation
(202) 628-4888

1    director should get paid.  I mean, yeah, I mean, like

2    a, like typically somebody who's not really paying,

3    like having a, a fulltime role in, in something, you

4    know, make like, I think that would be more or less

5    like, like a reasonable amount, yeah.

6            Q    Was it hourly or was it based on how much

7    the PAC brought in?  I'm just wondering --

8            A    It was just, I think it was like a fixed

9    amount.

10           Q    A fixed amount?

11           A    Uh-huh.

12           Q    Okay.  And when you say, 'we', who, who are

13   you talking about, we as in?

14           A    Like, Rob, myself, Kyle, even like her, you

15   know, because when we talked to her we asked her, you

16   know, like, I don't actually know.  I don't know if we

17   asked her, but there was some communication with her

18   to decide like what is a, a fair amount, I would say.

19    So yes, yeah.

20           Q    Okay and, okay.  So we'll, we'll continue

21   down these folks now.  So looking back at your answer,

22   you also list Henok Tedla.

23           A    Correct.

24           Q    Can you tell me what he's labeled as here?

25           A    Yeah.  So Henok is the, the guy that, you

DOJ-0000020679

1    know, we, we thought would be really good at doing all

2    these PACs.  And he, yes, he is, he, he was the

3    treasurer for Progressive Priorities.

4         Q    And so that's accurate?

5         A    Yes, it's accurate.

6         Q    Okay.  Did he do anything else for the PAC?

7         A    He was, no, he was just the treasurer.

8         Q    And when did he become involved in the PAC?

9         A    From inception, I believe.

10        Q    Okay.  And how did he become involved?  Can

11   you tell me, walk me through that?

12        A    Well, you know, I was aware of requirements

13   that, you know, an FEC accountant is -- oh, well, an

14   accountant is necessary to do the filings, but not

15   just any accountant, like it's very complicated and

16   convoluted.  So, like, I've, I can attest to like

17   looking at it and seeing that it's very complicated.

18   And so you really need somebody with FEC experience,

19   filing experience I should say.  So he, he, Rob, I

20   believe, Reyes was in charge of finding somebody.  And

21   he found, you know, Henok and Henok had the experience

22   to file with the FEC report.  So that's how he was

23   found.

24        Q    At what, so was he found in connection with

25   Progressive Priorities or with Liberty Action Group?

DOJ-0000020680

1          A    Oh, yes.  I'm sorry, with, with Liberty

2     Action Group.

3          Q    Okay.

4          A    Yes.

5          Q    So that was, likely in, do you know

6     approximately the timeframe when he came onboard with

7     Liberty Action?

8          A    From, from the start.  Yeah, from the start.

9          Q    Oh, so when it began?

10         A    Correct, yeah.

11         Q    Okay.  And how did Mr. Reyes know that, that

12    Mr. Tedla had FEC accountant's experience?

13         A    Rob Reyes told, had, had told me that, you

14    know, Henok said he had FE -- experience filing, FEC

15    filing, I mean, that was --

16         Q    Okay.

17         A    -- the gist, yes.

18         Q    Okay.  So you said he was, he was engaged

19    from the PAC inception, both Liberty Action and

20    Progressive Priorities, is that correct?

21         A    Correct.

22         Q    And when did he stop being involved with the

23    PAC?

24         A    Yeah, so he, he, I believe, he sent an email

25    to Rob or there was communication there that, you

DOJ-0000020681

1   know, Henok said, hey, look, I, and, you know, this,

2   this is again, like a gist, like you were saying.

3   But, hey, I'm kind of a new accountant, you know, this

4   is public record.  There's a lot of news stories

5   coming out.  A lot of media scrutiny.  I just don't

6   feel comfortable, you know, having my name as, as

7   treasurer, you know, with, with all this, you know, I,

8   I think he was trying to build his business, things

9   like that.  So he just didn't want to open himself up

10  to a lot of media scrutiny, which is kind of

11  synonymous with, you know, doing these PACs, as I, as

12  I found out through experience.

13       Q    And do you recall when he would have sent

14  that email?

15       A    I'm not sure, but I, I believe I provided

16  to, to, to you guys.  When he said he was, like a

17  treasurer, but I actually don't have the email

18  correspondence that, from that conversation.  I just,

19  I'm just recalling this.

20       Q    Sure.

21       A    So --

22       Q    So is he still involved with the PAC or --

23       A    No, he's not.

24       Q    He's not?

25       A    No longer.

DOJ-0000020682

1      Q    Okay.  So sometime in, do you think 2016,

2    2017, he --

3      A    It was mid, maybe Summer, Spring, Summer,

4    like Fall, like, you know, he would, he, at that time,

5    yeah, he, he stopped.  I'm not sure of the exact date,

6    exact date.

7      Q    But Spring, Summer and Fall of 2016?

8      A    2016, correct, yeah.

9      Q    Okay.  So next on this document, you list

10    yourself.  Can you tell me how you describe yourself

11    on this?

12      A    Yes.  So I, I took over for Progressive

13    Priorities, because I was contacted by yourself and,

14    you know, you'd said the, the filings were outstanding

15    and late and that we needed to, you know, bring some

16    closure on these.  So and get these rectified.  So

17    that's why I'm the treasurer, because I reached out to

18    other people.  I reached out to Alexa, Michelle,

19    everybody else.  Nobody wanted anything to do with it.

20     So morally, I felt obligated to, you know, restore,

21    you know, and, and do these FEC filings.  So that's

22    why I listed myself as the treasurer, yes.  And then,

23    I was an agent at, in, an agent before, I, I guess I

24    was doing consulting and political advertising, media

25    buying so.

DOJ-0000020683

1      Q     And you were involved in, in, as you said

2   previously, starting the PAC, is that correct?

3      A     Correct, yeah.  The, helping to advise on

4   formation, things like that.

5      Q     Okay.  And so while the PAC was, was still

6   operating in 2016, that consultant in the media

7   buying, was that your only role with the PAC?

8      A     Can you repeat the question or rephrase it?

9      Q     Sure.  You said that now, you have taken

10  over as treasurer in the PAC --

11     A     Uh-huh.

12     Q     -- once you spoken with me and that is in

13  2019, is that correct?

14     A     Correct.

15     Q     So back in 2016, when the PAC was still

16  actively working with respect to the election.

17     A     Uh-huh.

18     Q     Can you tell me about -- was your role

19  solely that media buying consultant role or did you do

20  anything else for the PAC or could you elaborate on

21  your role?

22     A     As I said previously, I, I helped advise on,

23  you know, form, forming the PAC that an FEC accountant

24  or somebody with the FEC experience for filing was

25  necessary.  So I actually, yeah, so I, I would say

DOJ-0000020684

1    that classifies or qualifies as consulting.  So to

2    answer your question, yes, that's my role.

3        Q    Okay.  And you've spoken a little bit about

4    the founding the PAC.  Was, I thought you said once,

5    but clarify for me, was the idea of the PAC sort of

6    your idea, yours and Rob's, Robert Reyes?  Is that

7    correct?

8        A    I don't want to say it's, it was fully my

9    idea, but there was some interest from Kyle and then,

10   some interest from Alexa, you know, saying that, you

11   know, she could do this or, you know, she, you know,

12   she's interested in supporting and things like that.

13   So there was some general interest from there, that

14   might have, like solidified, you know, starting this

15   PAC.  It's just kind of the nature, as you know, of

16   these things starting towards organization so.

17       Q    Sure.  And that's a good segue to talk a

18   little bit about Kyle as well.

19       A    Okay.

20       Q    Can you describe for me how you listed him

21   here?

22       A    Yes.  So Kyle Davies was an agent who,

23   basically, was kind of the office clerk who would

24   handle the, you know, receiving the mail.  He also

25   worked with some vendors.  He had direct, you know, he

DOJ-0000020685

1    had contact with Alexa and Michelle and Monique.  So,

2    yes.

3         Q    And you mentioned he's your cousin, that's

4    correct, right?

5         A    Correct, correct.

6         Q    And so he was, is it correct that he was

7    involved with the PAC from the beginning, as well?

8         A    Yes, he was.

9         Q    So, okay.  Did he ever cease his involvement

10   with the PAC?

11        A    Yeah.  At the very end, after the election

12   was over, I mean, it was kind of understood that, you

13   know, the, the race is over.  So, you know, his role

14   is basically, you know, doesn't, doesn't, there's no

15   more role for him to play.

16        Q    Okay.  And do you happen to have up to date

17   contract information for him?

18        A    I, I have his phone number, but yeah.

19        Q    Yeah, that's fine.

20        A    Okay.

21        Q    We can also do it after and a mailing

22   address would be great, just sort of --

23        A    Okay.

24        Q    -- contact information for Mr. Davies would

25   be --

DOJ-0000020686

69

1        A     Okay.

2        Q     -- very helpful.

3        A     Sure.

4        Q     Okay.  So, so just to, to clarify.  So Kyle

5    was, was the PAC's connection to Alexa --

6        A     Uh-huh.

7        Q     -- through Monique, also to Michelle Sotelo.

8        A     Uh-huh.

9        Q     And to Monique, because he's now, was dating

10   and is now married to Monique.

11       A     Right.

12       Q     Is that All correct?

13       A     That's correct.

14       Q     Okay.  And so you, Monique Moyers, who is

15   now, Mr. Davies wife --

16       A     Uh-huh.

17       Q     Can you tell me what her role was at the PAC

18   as you listed it here?

19       A     And, I also want to clarify, I'm not sure --

20       Q     Sure.

21       A     -- they're actually married or if it's, like

22   a fiancé, but like they're, okay?

23       Q     Understood.  That, that --

24       A     Okay.

25       Q     -- that's fine.

DOJ-0000020687

1        A      Can you repeat the question, please?

2        Q      Absolutely.  Can you identify for me how you

3    labeled Ms. Moyers here?

4        A      Yes.  So I labeled her as an agent,

5    basically, somebody that's involved in, you know, was

6    involved in, you know, finding Michelle and then,

7    clerical assistant.  I think, you know, like, as you

8    can see from the emails that I provided, she kind of

9    was, like forwarding things back and forth.  So she

10   had some, like role there as well, so some

11   communication.

12       Q      Okay.  So, so her role was assisting Mr.

13   Davies with --

14       A      Right.

15       Q      -- his role in the PAC?

16       A      Right.

17       Q      And was she paid by the PAC for that

18   service?

19       A      I don't, I don't believe so, but --

20       Q      Okay.

21       A      -- I also, yeah, I'm not sure.

22       Q      And it, was it correct, as you said that,

23   that Monique knew Alexa and recommended her for the

24   PAC or was it just Michelle that Monique --

25       A      Just Michelle, because yeah, like Alexa,

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020688

1    actually, when Alexa left, too --

2         Q    Uh-huh.

3         A    Yeah, when Alexa left, her and Davies broke

4    up.  So then, you know, she, Davies got with, yeah,

5    okay.

6         Q    Understood.

7         A    Okay, thank you.

8         Q    That's the, the complicated --

9         A    Thank you for sparing me that.

10        Q    -- relationships.

11        A    Yes.

12        Q    No, of course.  So, so Mr. Davies was

13   involved with, with Alexa and subsequently, after

14   Alexa left the PAC, he became involved with Monique.

15        A    Correct.

16        Q    Understood.

17        A    Thank you for that.

18        Q    Sure.  I've got it.  I think that's all we

19   need with Exhibit 2.  So I can take that back from

20   you, as well.

21        A    Okay.

22        Q    Keep my piles in order, don't want to get

23   disorganized.  I want to introduce another document to

24   you.  This is Exhibit 4. And this, can you identify

25   this document for me?

1        A      This is a document showing the Statement of

2    Organization and Articles Incorporation, I believe.

3               (The document referred to was marked for

4    identification as Agency's Exhibit No. 4)

5        Q      And --

6        A      The formation --

7        Q      Sure.  And how did you get this document in

8    your possession?

9        A      I believe I received it from Kyle Davies or

10    -- yes.

11        Q      Okay.  And can you identify for me to whom

12    this document is addressed?

13        A      To Alexa Roth.

14        Q      Okay, and what's the date on the document?

15        A      April 28, 2016.

16        Q      Okay.  I don't have much to ask about this,

17    but one of the questions we have is do you know why

18    the PAC and why they chose to incorporate as a LLC as

19    opposed to a, a different corporate structure?

20        A      I'm not certain, but I, I do remember the

21    structure of the corp -- the structure of the company

22    not being as important as making sure that it's

23    registered with the FEC.

24        Q      Okay.  And were you involved in sort of

25    getting these documents prepared?

DOJ-0000020690

1     A    I believe I had some involvement, yes.  I'm

2    not sure exactly what involvement.  I didn't go to the

3    bank with Alexa Roth, for instance, but I, yes, I

4    might have had some, some involvement.  I, I, I

5    definitely recommended, like IncNow, so as a company

6    to, to start this.

7     Q    And do you recall how you were familiar with

8    IncNow?

9     A    I just, I, I found them.

10          MR. LAWYER:  Online.

11          THE WITNESS:  Online, online.

12          BY MS. DI GIOVANNI:

13     Q    You found them online?

14     A    Correct.

15          MS. DI GIOVANNI:  Okay.  Do you have any

16    questions you want to ask at this juncture (phonetic)?

17          BY MS. LEE:

18     Q    So you said that you weren't with Alexa

19    when, when she went to the bank with this document.

20     A    Correct.

21     Q    Can you explain why she needed this document

22    when she was going to the bank?

23     A    These are just required documents for

24    creating a, creating a bank account, so --

25     Q    And right, okay.  So was Alexa in charge of

DOJ-0000020691

1     the bank account --

2          A     She had the signer access, yes.

3                MR. LEE:  All right.

4                BY MS. DI GIOVANNI:

5          Q     So if her signer access is as the director,

6     what do you mean signer access?  How often was she,

7     was she accessing the PAC's funds?  You know, what

8     was, what did that responsibility entail?

9          A     She, she created the bank account and then,

10    provided, like online access to, you now, the parties

11    that were involved, so like Kyle Davies for, like,

12    yeah and she also had access as well.

13         Q     So did she keep responsibility over the

14    account after she left the PAC?

15         A     No, she -- did she keep responsibility --

16         Q     Yeah, did she, was she --

17         A     Can you rephrase the question?

18         Q     -- still the designated, have that signing

19    authority for the bank account for the PAC after she

20    left the PAC?

21                MR. LAWYER:  Excuse me one second.

22                MS. DI GIOVANNI:  Absolutely.

23                THE WITNESS:  Yeah, so Alexa she started a

24    bank account at, I believe it was Wells Fargo.

25                MS. DI GIOVANNI:  Okay.

DOJ-0000020692

1          THE WITNESS:  And then, when she, you know,

2    wanted to terminate her, you know, her involvement.

3    She closed down that account and then, Michelle opened

4    another account at Chase.

5          MS. DI GIOVANNI:  Okay, okay, that makes

6    sense.

7          BY MS. LEE:

8          Q    And so, Alexa was the only one who had

9    signing authority for that Wells Fargo account?

10         A    Correct.  I believe there were users that

11   were added as well.  So, you know, there, there could

12   be access so.

13         Q    So who were the users?

14         A    Rob Reyes, I believe Rob Reyes and Kyle

15   Davies, yes.

16         Q    Were you one of the users as well?

17         A    I actually was, was not.

18         Q    Okay.  So you never --

19         A    Because I, I communicated through Rob Reyes.

20         Q    Okay --

21         A    We, we just had kind of like a delegation.

22         Q    So you never had access to the bank account?

23         A    No, I didn't.

24         MS. DI GIOVANNI:  Okay, okay, I'll take that

25   back from you there.  It's nice to keep a good clean

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020693

1    workspace, so we're not getting all confused.

2              MR. LAWYER:  I think that was one of the

3    hardships he had with retrieving the bank information,

4    because he wasn't designated.

5              THE WITNESS:  I'm not a signer.

6              MR. LAWYER:  So there's two particular banks

7    and accounts.

8              MS. DI GIOVANNI:  So is that, that's

9    correct, Mr. Tunstall that you had some difficulty

10   with the bank records?

11             THE WITNESS:  Correct.  I, I actually went

12   to Wells Fargo and Chase and they said, since you

13   weren't a signer on the bank account, we can't give

14   you the previous --

15             MR. LAWYER:  Right.

16             THE WITNESS:  -- bank statements.

17             MR. LAWYER:  Right.

18             BY MS. DI GIOVANNI:

19       Q    Okay.  And, and you went to those accounts

20   where, did you go to local branches or?

21       A    I did.  I went to, like in Plano, Dallas, I,

22   the exact city was Plano.

23       Q    Sure, okay. Now, this is Exhibit 5.  I'm

24   going to hand over that to you. Okay, so do you

25   recognize this document?

DOJ-0000020694

1        A    Yes.   This is the statement of Organization

2   FEC Form 1.   Yes, I do recognize this.

3             (The document referred to was marked for

4   identification as Agency's Exhibit No. 5)

5        Q    And this is for Progressive Priorities PAC?

6        A    That's, that is correct.

7        Q    Okay.   At the bottom of the first page, can

8   you tell me the date of this document?

9        A    5/11/2016.

10        Q    Okay.   And can you identify the treasurer

11   for me?

12        A    Henok Tedla.

13        Q    Okay.   And we're going to turn to page

14   three.   Can you identify for me, it's going to be

15   about halfway down the page, she's listed as

16   Progressive Priorities Custodian of Record?

17        A    Alexa Roth.

18        Q    Okay.   And on the next page, it's designated

19   agent, at the top of the page.

20        A    Yes.

21        Q    Can you tell me who that is?

22        A    Alexa Roth.

23        Q    Thank you.   And, as far as you're aware, at

24   the time it was filed, was this document accurate?

25        A    Yes, I mean, this was filed by Henok, I

DOJ-0000020695

1      believe, it was Henok Tedla.

2          Q    Sure.  And looking at, halfway down that

3      last page, so it's the back of the document for you.

4      Can you read for me what the bank is?

5          A    The bank is Chase Bank.

6          Q    And can you, I believe you just said a

7      moment ago, that originally the account was opened at

8      Wells Fargo and then, Michelle opened the account at

9      Chase.

10         A    Yeah, I'd like to recant that statement.

11     It, it was Chase.  There was a bank account, I, yeah,

12     I misspoke.  It was not Wells Fargo, Chase.

13         Q    Okay.

14         A    Yeah.

15         Q    Okay.

16         A    It was a bank, yes.

17         Q    Got it.

18         A    Actually Chase.

19         Q    Okay.  And do you know --

20         A    Right.

21         Q    So you, you said that, that Henok Tedla

22     prepared this report, is that correct?

23         A    Correct, yes.

24         Q    So he actually drafted it and filed it with

25     the FEC?

DOJ-0000020696

1         A    He filed it, I believe, because his email

2    was here and yes.  Yeah, I remember that was, that was

3    one of his --

4         Q    You said his email is here.  Can you point

5    to me where you're seeing that?

6         A    Under the Committee's email address, it says

7    Henok@accesscpa.com.

8         Q    Got it, okay, okay.  And, and you said he

9    filed it.  Do you believe that he also prepared this

10   document?

11        A    Yes, he, he prepared this document.

12        Q    Okay.

13        A    Because, personally, I did not prepare this

14   document.

15        Q    Okay.  That's all I had about this.  I'll

16   take it back, thank you.  Now, this is Exhibit 6.  And

17   can you identify this document for me?  I might have

18   given you two copies of that one.  Yes, thank you.

19        A    This is the Statement of Organization FEC

20   Form 1 for Progressive Priorities PAC.

21             (The document referred to was marked for

22   identification as Agency's Exhibit No. 6)

23        Q    Okay.  And at the bottom of the first page,

24   the first page here, can you tell me the date of this

25   document?

DOJ-0000020697

1          A      September 23, 2016.

2          Q      Okay.  And can you identify the treasurer

3     listed there on that first page?

4          A      Yes, Alexa Roth.

5          Q      Okay.  And does it say Alexa Roth?

6          A      Yes.

7          Q      Is the first name Alexa?

8          A      Oh, I'm sorry, Alex Roth, sure, yep.  Sorry.

9          Q      And then on page 3, like before, can you

10    identify for me who's listed as the Custodian of

11    Records?  Halfway down on the third page.

12         A      On the third page where --

13         Q      Yes.

14         A      Yes, Alexa Roth.

15         Q      And then, on the last page, the full name of

16    the designated agent at the top of the page.

17         A      Alexa Roth.

18         Q      Thank you.  And then, this document also

19    lists Chase Bank, is that correct?

20         A      Correct.

21         Q      Okay.  As far as you're aware, was this

22    document accurate at the time it was filed?

23         A      Yes.

24         Q      Do you know at all why the treasurer changed

25    between the first document, which was filed in May and

DOJ-0000020698

1      this document in September?

2          A     Yes.  I believe he did it to take his name

3      off of the, the PAC, because, because of the media

4      scrutiny or there's some, there was some occurrence.

5                MR. LAWYER:  Onwards (phonetic), that's when

6      he didn't want to be affiliated in any --

7                THE WITNESS:  He didn't want to be

8      affiliate, yes, so.

9                MS. DI GIOVANNI:  Okay.

10               MR. LAWYER:  That's the reason --

11               BY MS. DIGIOVANNI:

12         Q     Okay.  Thank you, and, and do you know who

13     prepared this report?

14         A     Henok must, must have prepared this.

15         Q     Okay.

16         A     I did, I did not personally prepare this.

17         Q     Okay.  So you, you believe that Henok would

18     have prepared it?

19         A     Yes.  He was in charge of, of this, so --

20         Q     Okay.  But you did not personally file it

21     and you do not have personal knowledge that he filed

22     it?

23         A     Right.  I, that's correct.

24         Q     Okay.  Thank you for confirming that.  I'll

25     take that back from you.  This is Exhibit 7.  And can

DOJ-0000020699

1    you identify this document for me?

2        A    FEC Form 1 Statement of Organization.

3            (The document referred to was marked for

4    identification as Agency's Exhibit No. 7)

5        Q    And for Progressive Priorities PAC, is that

6    correct?

7        A    For Progressive Priorities PAC, yes.

8        Q    Okay.  And at the bottom of the first page,

9    can you tell me the date of this document?

10        A    12/1/2016.

11        Q    Okay.  And can you identify the treasurer

12    here?

13        A    Michelle Sotelo.

14        Q    Okay.  And then, do you know why the

15    treasurer would have changed again at this point, at

16    the end of 2016?

17        A    I'm not, I'm not certain on, like when these

18    forms were exactly filed and the dates.  I just

19    remember the actual events, so --

20        Q    So --

21        A    -- I'm not sure why that would be the case.

22        Q    Okay. And then on page three, can you

23    identify the Custodian of Record for me?

24        A    Michelle Sotelo.

25        Q    Sure.  And then, on the last page halfway

DOJ-0000020700

1   down, can you identify the bank account for me?

2        A    Chase Bank.

3        Q    Okay.  And as far as you're aware, was this

4   accurate at the time it was filed?

5        A    Yes.

6        Q    Okay.  And do you know who prepared this

7   document?

8        A    I wasn't in charge of the preparations at

9   this point for, for Progressive Priorities, but it,

10  it, Henok would have been, Henok was the person who

11  was doing the filing.

12       Q    And he was in charge of the filing even in

13  December after he said he did not want to be the

14  treasurer anymore?

15       A    I'm not sure.  I can't attest to this date.

16   I don't know, like when it was submitted or but I,

17  during that time period, Henok Tedla was the, the, the

18  accountant, so --

19       Q    Okay, understood.  All right, I'll take that

20  back from you.  Now, I'll introduce Exhibit 8.  One

21  for you and you.  Can you identify this document for

22  me?

23       A    Yes, this is a document I sent to Justine di

24  Giovanni that shows correspondence with, with Henok

25  Tedla and Graham, sent from Graham Wilson, a reply.

DOJ-0000020701

1           (The document referred to was marked for

2    identification as Agency's Exhibit No. 8)

3        Q    Okay.  And if you could take a moment to

4    review the email and the attached letter.  I'll let

5    you have a second to refresh your memory.

6        A    Okay.

7        Q    Okay?  Do you recall why Graham Wilson at

8    Perkins Coie would have sent this letter to

9    Progressive Priorities PAC?

10       A    Yeah, I, I believe he was not okay with, I,

11   I guess, the cease and desist letters are sent by

12   candidates a lot of times to, even if you're totally

13   compliant, they'll still send to you to kind of deter

14   PACs from trying to raise money or speak up.  So I

15   believe that's why this was sent.

16       Q    And do you know with respect to what he, he

17   was not okay and, and --

18       A    Yeah, a lot of people just don't like the,

19   the robocalls.  So that might have been what this was

20   in relation to.

21       Q    And do you know who, who he represented?

22       A    It says, I believe it said in the email,

23   like Hillary Clinton.

24       Q    Okay.  Now, looking at the email chain that

25   you sent me --

DOJ-0000020702

1          A     Yeah, Hillary for America.

2          Q     Got it, thank you.  So the email you sent me

3     at the bottom of the first page, can you confirm for

4     me in this cc -- here at the To: line --

5     Matt.mediateam@gmail.com. Is that your email address?

6          A     Yes.  I, I don't have access to that email

7     or I, I have access to it, but basically, the storage

8     was full, full and when the storage is from Google,

9     you can't send or receive emails and I just, like I

10    deleted those emails, so --

11         Q     Do you know when you deleted those emails?

12         A     I deleted them, I deleted some back, like

13    during this, this time period.  And I went back and I,

14    I didn't have any emails at all, so in there.

15               MS. LEE:  So when you say this time period,

16    you're saying you deleted them in July 2016?  Is that

17    what you're saying?

18               THE WITNESS:  I --

19               MS. LEE:  What do you --

20               THE WITNESS:  -- deleted, I've, I've deleted

21    some, like, like in the past, but I, I, like, didn't,

22    I deleted the emails.  I never had, okay, so this is,

23    I'm cc'd on this, right?

24               MS. DI GIOVANNI:  Uh-huh.

25               THE WITNESS:  I don't have access to this.

Heritage Reporting Corporation
(202) 628-4888

1    That's why Rob had to forward it to me, to my email,

2    premiummediateam@gmail.com, because I don't have

3    these, because they were deleted.  That one was

4    deleted.  So that's why Rob forwarded it to me, so I

5    have the email.

6            BY MS. DI GIOVANNI:

7        Q    Is that actually what that email, this email

8    indicates?  I'm looking at the chain and I see in 2016

9    that Mr. Reyes forwarded it to you.  But then, the

10   next email I see is from you, at a different email

11   address forwarding it to your counsel.  So did you

12   have access to matt.mediateam@gmail.com, perhaps

13   through your PremiumMedia team account?

14       A    In 2016, I had access.  I, I still have

15   access, I just can't send any emails and those emails

16   are, like deleted, even the Google drive, like some of

17   the stuff on there was, like, deleted so.

18       Q    So how did you obtain this email now?

19       A    Rob Reyes forwarded it to me.  So, like all

20   the emails that I needed when I was requesting

21   information.  I had Rob send those emails to me and

22   then Kyle as well.  So, I can provide you those for

23   you, the documentation for you.

24       Q    So turning the page, on page 2, here.  To the

25   best of your knowledge, do you see the line from Tedla

DOJ-0000020704

1    where it says, "I have no involvement on the program

2    area of the PAC."

3         A    Which --

4         Q    Just the actual emails, to page 2 of the -

5         A    Yes, okay.

6         Q    Yes.  So it's the email beginning, "Hi

7    Wilson" and then, on the next line down --

8         A    Uh-huh.

9         Q    -- it says, "I have no involvement on the

10   program area of the PAC."  Do you see that?

11        A    Yes.

12        Q    To the best of your knowledge, what did you

13   understand Tedla mean when he said that?

14        A    That he doesn't, he's not involved in like

15   the political advertisements of Progressive

16   Priorities.

17        Q    Okay.  And why were you copied on this

18   email?

19        A    Rob typically would, like copy me on emails.

20    I don't know.  He just cc'd me or --

21        Q    Rather -- actually, you're right.  No, Reyes

22   forwarded it to you, that's correct.

23        A    Yes.

24        Q    So why was -- rather than -- why was Reyes

25   copied on this?

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020705

1      A    He worked with Henok.

2      Q    Directly?

3      A    Correct.

4      Q    So, so Reyes was sort of the one person who

5  communicated --

6      A    Correct.

7      Q    -- with Tedla?

8      A    Yes, that's correct.

9      Q    Thank you.  All right, I'll take that back

10  from you.

11          MS. LEE:  Do you know what, if anything,

12  Progressive Priorities PAC did in response to this

13  letter?

14          THE WITNESS:  Yes, nothing was done.

15          BY MS. LEE:

16      Q    Did you have discussions about this letter

17  with anybody at Progressive Priorities?

18      A    Yes.

19      Q    Okay.

20      A    We had reached, I, I, personally, reached

21  out to counsel before, you know, pertaining to cease

22  and desist letters and they, they advised me that as

23  long as the requirements are met by the FEC for

24  reporting the "paid for by" and the compliancy, that,

25  you know, these type of letters most of the times were

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020706

89

1       kind of like scare tactics.

2                MS. DI GIOVANNI:  Now, I'll take that from

3       you.

4                BY MS. LEE:

5       Q     So just to close the loop.  So after you got

6       this letter, you continued to do your advertisements?

7       A     That is, we, I believe I checked the

8       advertisements and then, we, we continued, yes.

9                MS. LEE:  Okay.

10               BY MS. DI GIOVANNI:

11      Q     And then, this is going to be Exhibit 9 and

12      here you go.  And can you identify this document for

13      me?

14      A     Okay.  I don't know who, when he's saying we

15      will submit the amendment, I'm not sure who that is,

16      but yes.  I'm looking at this document.

17      Q     Can you identify what it is for me?

18      A     This is a document that Rob sent to Henok,

19      basically saying that we all have to clarify the

20      roles, myself included as not director of contact for

21      the PAC, but an outside consultant.  I believe, no, I,

22      I, I honestly can't speculate, but this might have

23      been in relation to who exactly, you know, is the

24      point of contact for the media to, to contact, whether

25      or not it's Henok or somebody else, because a lot of

DOJ-0000020707

1    times people, the media, will always look at the

2    treasurer, because that's public record to contact the

3    PAC.

4              (The document referred to was marked for

5    identification as Agency's Exhibit No. 9)

6         Q    If you could just take it a little slower.

7    Can you read aloud for me the email from Mr. Tedla

8    from Sunday, September 18th, beginning "Hi Rob"?

9         A    "Henok, everyone is in accordance with that,

10   we all have" --

11        Q    Oh, no, the, the email from Mr. Tedla below,

12   saying, that begins, "Hi Rob".

13        A    Oh, okay.

14        Q    Just read it aloud for me.

15        A    "Hi Rob, after carefully reviewing the PAC

16   treasurer responsibilities, I don't think that my

17   contract fits to perform the responsibility of the

18   treasurer.  I am hired to maintain the books of the

19   PAC, and that's all I do.  I have no control of the

20   rest of the PAC activities.  Please submit an

21   amendment and remove my name as a treasurer of the

22   PAC."

23        Q    Okay.  And then, can you read Mr. Reyes's

24   response, which was at the top of the page, which you

25   started reading before?

DOJ-0000020708

1       A     Okay. "Everyone is in accordance with that.

2    We all have to clarify roles, myself included, not as

3    director of contract for the PAC, but outside

4    consultant.  We all know your role within the PAC as

5    the accountant.  We will submit the amendment."

6       Q     And to confirm, there in the top line, the

7    To: line, matt.mediateam@gmail.com, that is your email

8    address, correct?

9       A     This was sent to me.  Yes, that's, that was

10   my email at the time, yes.

11      Q     Sure.  So, Robert Reyes here appears to

12   confirm that Tedla wasn't Progressive Priorities

13   treasurer, at least as that role is defined by the

14   FEC.  Was that accurate?

15      A     Can you repeat or rephrase the question?

16      Q     Sure.  So --

17      A     I'm, I'm just not familiar with this piece

18   of, you know, information.

19      Q     Sure.  So here at, in this document at the

20   top of the page, where he writes, everyone is in

21   accordance with that, in response to Tedla's email

22   saying that he is not the treasurer.  Mr. Reyes

23   appears to confirm that that's correct.  Do you

24   believe that to have been accurate?

25      A     Can you repeat the one, the question one

DOJ-0000020709

1       more time.  I, I'm --

2           Q    Sure.  I'll come back to it in a second.

3           A    Okay.

4           Q    Do you recall receiving this email?

5           A    No, I don't remember at all receiving this

6       email.

7           Q    Do you remember having any conversations

8       about roles within the PAC with anyone, Mr. Reyes or -

9       -

10          A    Yes --

11          Q    -- Mr. Tedla?

12          A    -- I do, yes.

13          Q    Can you tell me about those conversations?

14          A    Yes.  So I don't, I don't think that Henok

15      and from the previous piece as well, I don't think

16      Henok was comfortable, you know, being the, being the

17      person that was receiving all of the "heat" or, like

18      media scrutiny.  I think he wanted to, you know,

19      potentially, just be the accountant and, and that was

20      it.  He didn't want to necessarily, you know, have to

21      also have this other facet of this business that was,

22      like, you know, conflict, you know, management of,

23      like media and things like that, so and public

24      relations, so yes, to answer your question.

25               MS. DI GIOVANNI:  Okay.  Just a moment.

DOJ-0000020710

1          BY MS. LEE:

2      Q    And just one question, so in this email, Mr.

3   Henok copies the treasurer's responsibility, I believe

4   from some FEC literature.  It says treasurer's

5   responsibility, registering the committee and he says

6   that he was not hired to assume these

7   responsibilities.  Is that, is that a fair, a fair and

8   accurate description of this email?

9      A    Yeah, I, I mean, okay.  The, he wasn't in

10  charge of making sure the deposits were received

11  within ten days of receipt.  He wasn't responsible of

12  that, but he was responsible for ma-- submitting the

13  filings.

14     Q    So is it your testimony that you actually

15  had a conversation with him about --

16     A    No, I never did, but just, in general, I

17  wouldn't, I don't think that would be expected of him

18  to, for, for that particularly.  Because he wouldn't,

19  he, it wasn't his daily duty to go in the bank account

20  and make sure that, like the deposits came from the

21  merchant account, you know --

22     Q    Right, but in terms of the filing of the

23  Statement of Organizations and filing the reports, was

24  that, did you ever have a discussion with him, before

25  he took the job that this was his responsibility?

DOJ-0000020711

1      A    The Statement of Organization, he wouldn't

2    have been responsible for that, any, any, like company

3    documents pertaining to that, but he, from what I

4    recollect, like he would have, he's, he would have

5    been responsible for things like making sure, you

6    know, the filings were done.

7      Q    Did you ever have a conversation with him

8    about that?

9      A    I never did, no.  I, I, I, I didn't have any

10   communication, I mean, I had communication, but it

11   was, it was indirectly with Henok through Rob.

12   Basically, Rob would always relay information to me.

13     Q    Was it your understanding that he, he was

14   also, because he was the treasurer, he was -- he had

15   to authorize all committee expenditures?

16          MR. LAWYER:  Just for the record, I don't

17   think any of these people were given a "job

18   description."  I think they -- it was vague as to

19   their duties --

20          MS. LEE:  Okay.

21          MR. LAWYER:  I mean, with each person, so

22   there was not anything formal given out saying here's

23   your job description, here's your job description.

24          MS. ANDRADE:  Is that your testimony, Mr.

25   Tunstall?

DOJ-0000020712

1          THE WITNESS:  The one requirement that I was

2    aware of was that somebody had to be a treasurer,

3    whether that and, and, I, I wanted to make sure it was

4    somebody that actually had knowledge of, of FEC

5    filings and things like that.  So Henok had that

6    experience.  He, he, you know, he had the accounting

7    firm.  So that was, that was the only requirement that

8    I knew.  I, I, I wasn't aware of these specific

9    responsibilities that, that are on this email.

10          BY MS. DI GIOVANNI:

11     Q    Okay.  So having read this email and had

12   this conversation.  Do you recall anything further

13   about Mr. Tedla's responsibilities, with respect to

14   the PAC's FEC filings?

15     A    Can you repeat the question?

16     Q    Sure.  So, so based on this conversation,

17   you know, sometimes looking at emails like this, like

18   we did, we were talking about your employment history

19   before --

20     Q    Uh-huh.

21     Q    -- and things will jog your memory.  Do you

22   recall anything further about Mr. Tedla's role, with

23   respect to the FEC filings.  You've stated that he was

24   in charge of those things, but do you recall any

25   communications about that?  Any documentation that

DOJ-0000020713

1    might exist showing that that's what his

2    responsibilities were with the PAC?

3        A    I don't, I don't, I, yeah, I wouldn't, I

4    wouldn't have that documentation or I don't recall

5    having that documentation.

6        Q    Sure.  And I imagine you've given this

7    answer, but can you confirm for me why this email was

8    not included with the documents you produced to us?

9        A    Those emails were deleted and, to free up

10   space, because the Dropbox would only allow or the,

11   the Gmail would only allow 10 gigabytes of space and,

12   like we were doing video productions.  So we had like

13   120 gigs or something, you know, in there.  So I

14   couldn't, I couldn't even like, I tried to actually

15   log in there and, like send you the emails.  But like,

16   there was, there was, like, no emails and, like, there

17   was also, like, the issue of space and so, like, I

18   could actually, I, I could put in my testimony that I

19   was able to log in to the email, but I just wasn't

20   able to, like, forward anything.

21       Q    So understanding what you, what you've said

22   here.  For the record, I would like to reiterate that

23   our subpoena requests all communications that are in

24   your possession that relate to Progressive Priorities

25   and this email does indicate to me that we haven't

DOJ-0000020714

1   received all the communications that exist.  So will

2   you agree that, to the best of your ability, you will

3   systematically go back and attempt to discover any

4   emails and communications that you haven't yet

5   produced to us and then, get those to us?

6        A    Yes, I can.  But I, I don't have, I don't

7   have any of these emails, which is why I reached out

8   to Rob to, to retrieve some of the information.  Also,

9   I reach, reached out to Kyle Davies and you can see

10  the dates on those emails, like I, I couldn't even,

11  like, send out from that account.

12       Q    Sure.  And something else, you mentioned

13  that you couldn't forward emails, but are you able to

14  print emails from that account?

15       A    I, I tried, but, I mean, I guess, I could

16  try, but there's I, I think, to answer your question,

17  I think there's a way to print them, but for me to

18  gather evidence for you, it was easier for me to just

19  get them from Rob and Kyle, because they both have

20  their emails for, for this stuff.

21       Q    When you go back and, and do look again for

22  us, anything that perhaps we haven't received, if

23  you're able, even if it's just a screenshot, that

24  would be okay, as well.  But we would like to see

25  anything that you, you can get your hands on.

DOJ-0000020715

1        A     Okay.

2              MS. DI GIOVANNI:   Okay.  So I will take that

3    back from you.   Thank you.

4              THE WITNESS:   I also reached out to Henok

5    and I, I asked him if he had any records, as well and

6    he said, I think I sent you that email, but he said,

7    no, he doesn't have anything.

8              BY MS. DI GIOVANNI:

9        Q     So this going to be Exhibit 10.  And can you

10   identify this document for me?

11       A     Progressive Priorities PAC. This is the

12   form, the FEC Form 3X, Report Of Receipts And

13   Disbursements.

14             (The document referred to was marked for

15   identification as Agency's Exhibit No. 10)

16       Q     Okay.  And if you look under box 4, it can,

17   will tell you the type of the report.  Can you read

18   for me what it is?

19       A     It's the April 15ᵗʰ Quarterly Report.

20       Q     Okay.  So at the bottom of page one, can you

21   read for me the date?

22       A     5/1/2017.

23       Q     And who is listed as the treasurer there?

24       A     Henok Tedla.

25       Q     Okay.  And so having looked at the email we

DOJ-0000020716

1    just discussed, do you know why Mr. Tedla might have

2    signed a report that listed him as treasurer of the

3    PAC about eight months after he requested to be

4    removed?

5         A    I don't know; I don't know who filed this.

6         Q    Okay.

7         A    I don't know who filed this.  I, I, no, I

8    don't have the answer to that question.

9         Q    Okay, okay.  I can take that back from you,

10   thank you.

11        A    Yeah, I also don't recall that.  It's been,

12   like three years or whatever.

13        Q    Sure, memories fade.

14             MS. LEE:  I just, can we just go off the

15   record for a second?

16             (Whereupon, a short recess was taken.)

17             MS. DI GIOVANNI:  Okay.  Well, we're back.

18   Thank you for your patience, that's very kind.

19             BY MS. DI GIOVANNI:

20        Q    So now, we're going to move on, we've been

21   doing some sort of general discussions.  We're going

22   to get a little, a little bit more specific now.  But

23   first, I have some background questions, you know,

24   about the, the operations of the PAC.  You know, as a,

25   as an organization, the PAC raised money and spent

DOJ-0000020717

100

1     money.  Can you walk me through clearly, each of the

2     individuals who were involved in that process and

3     their responsibilities.  And I'll ask clarifying

4     questions, if necessary.

5         A    Okay.  So I, I was in charge of the

6     political advertisements and media buying.  Rob had

7     some role in that, as well.  And Kyle Davies was kind

8     of the person who handled the operations and things

9     like that, like, I'm sorry, like the, the day, like he

10    was the, he was in the office, getting the mail.  If

11    we had to, one time I think we had to send out, like

12    a, you know, best efforts to collect name and address.

13    So he was doing, like some of that, through like

14    stamps.com, so.

15        Q    Okay.  So let's, let's break that down a

16    little bit further.  So who was involved in producing

17    the PAC's fundraising materials?

18        A    I, I was involved in some of that, yes.

19        Q    Okay.  And in what capacity were you

20    involved in that?

21        A    I believe I sent a voice broadcast message.

22    So I handled some of the, the message creation.

23        Q    Okay.  So, so you, is it correct that you

24    were involved in, in actually sort of drafting the,

25    the messaging that went out from Progressive

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020718

1    Priorities?

2         A    Yes.

3         Q    Okay.  And what other responsibilities did

4    you have with respect to fundraising?

5         A    I believe, I mean, I think that was, I had

6    other general roles, like I had to obviously

7    communicate with other people, but like, that was kind

8    of, you know, the, the main, my main role was, like

9    doing that and then also, like, you know, making sure,

10   like the, the calls get sent out and then, yeah, like,

11   yeah.

12        Q    And how did you make sure the calls got sent

13   out?

14        A    I, well, I just, they have like a platform

15   that you just, like log into.

16        Q    Who are they?

17        A    There was a company called Smartcall.

18        Q    Okay.

19        A    And that's the, that's the service I used to

20   send out these political advertisements.

21        Q    Okay.  So you would draft these political

22   advertisements, like the Robocall --

23        A    Correct.

24        Q    -- we were discussing just then.  They were

25   in charge of distributing it, is --

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020719

102

1      A     Yes.

2      Q     -- that correct?

3      A     Yes.

4      Q     Okay.

5      A     It was a platform, yeah.

6      Q     Sure.  And then, when donations would come

7  in, in response, contributions rather from, as a

8  result of those fundraising efforts.  Who was in

9  charge of receiving those donations, contributions.

10     A     Yeah, I think the call center.  I'm not

11 really sure what, I forgot the name.  Yeah, I, I don't

12 recall the name, but I believe the, the girl's name

13 was, like Jackie --

14     Q     And --

15     A     -- it was the call center.  But Rob would

16 main, mainly handle like the call center stuff.

17     Q     Sorry, for whom did Jackie work?

18     A     I don't know the call center's name.

19     Q     Sure, so --

20     A     I can look it up, if you need me to.

21     Q     Are you referring to a vendor that was --

22     A     It was a vendor, yes.

23     Q     -- used?  Okay.

24     A     Yes, so the call center would take the

25 calls.

DOJ-0000020720

1          Q    So Jackie was your contact at this vendor?

2          A    Yes.

3          Q    Okay.  And Robert Reyes, were you saying was

4     the, was your communication person for interacting

5     with Jackie?

6          A    Right, yes.

7          Q    Okay.  And so who was in charge of sort of

8     keeping track of these contributions?

9          A    How do, how do you mean?  Can you --

10         Q    So --

11         A    -- rephrase that question?

12         Q    -- obviously as the PAC is spending money,

13    which --

14         A    Right.

15         Q    -- you got the fun job.  Who, who was in

16    charge of making sure how much the PAC had on hand and

17    recognizing its fundraising needs, in order to meet

18    its expenditures?

19         A    We didn't have a, like exact roles on, on,

20    you know, on that and so --

21         Q    Sure, but who was involved in doing so?

22         A    Who was involved in making sure that the,

23    the funds went to the merchant account, then to the

24    bank account?

25         Q    Yeah, so you're sort of managing the money

Heritage Reporting Corporation
(202) 628-4888

1    for the PAC.

2         A    Rob Reyes, like had a, yeah, Rob Reyes

3    would, like had access to see, like the merch, like

4    the funds hitting the merchant account and then going

5    to the bank, which is --

6         Q    Okay.

7         A    -- required by the FEC to, like be

8    deposited.

9         Q    Sure, okay.  So I'm understanding how that

10   works a little bit better.  But was anyone else sort

11   of involved in that process?  You mentioned that, for

12   instance, that Kyle Davies would pick up the mail.

13   Did that include checks that were sent to the PAC?

14        A    I do remember that Kyle was, yes, receiving

15   checks.  He was, because there was, like, I think it

16   was the address on the interstate so he would go and

17   pick up the mail.  So those were the duties that he

18   had and then, he would also record, like the name and

19   address.

20        Q    Okay.

21        A    I don't know if he, I don't recall or I

22   don't know if he, he actually gave those to Henok for

23   the filing, but I knew that that was, like a

24   requirement.  So I remember, you know, having to do

25   that.

DOJ-0000020722

1      Q    So Mr. Davies was actually opening the mail

2   and processing what was coming in.  Is that correct?

3      A    Yes.

4      Q    Okay.  And what happened to the checks after

5   he recorded that information?  How did they get into

6   Progressive Priorities bank account?

7      A    He would make a deposit.

8      Q    Okay.  And did he, how would he make that

9   deposit?

10     A    I, I believe you just go and just take the

11  checks and you just tell them the, the account number

12  and then, make the deposit.

13     Q    And so, in terms of signing the checks, was

14  he signing the checks and taking them to the account?

15     A    I don't think there was ever a, I don't

16  think we ever had, I, I'm not sure if there was ever

17  checks signed or anything.  I didn't handle, like

18  actual overseeing of, like, the checks being signed.

19     Q    But they, and so, you know that the checks

20  would have to be endorsed, is that correct, to be

21  deposited?

22     A    On the?

23     Q    You have to, a check has to be signed by the

24  recipient to be deposited.  Is that correct as to your

25  understanding?

DOJ-0000020723

1        A    Right.  But I also know that, like for

2    instance right now with, with the PAC that I have, my

3    accountant just, like has a stamp that says, 'for

4    deposit only', she just --

5        Q    Sure.

6        A    -- stamps it.

7        Q    Sure.  So do you --

8        A    So --

9        Q    -- know who was, was doing that for the PAC?

10       A    That, I don't know if, I, like I don't know

11   exactly if Kyle was doing that, but like that was his

12   domain.  So however, like I believe the checks were

13   like depositing in the bank account.  So like I just

14   don't know how, the specifics of that.  I'm just not

15   aware of that.

16            MS. DI GIOVANNI:   Okay.  Before we get into

17   details, do you have any further questions, Jin on

18   that?

19            BY MS. LEE:

20       Q    So once the money came in, who decided how

21   the money should be spent?

22       A    It was a collection of myself, Robert Reyes

23   and even some parts with Kyle and then, but the

24   director, like didn't really have access to, like, we

25   didn't, I mean, like, she, you know, we would try to

DOJ-0000020724

1    involve these people, but, like, they were really

2    just, were more concerned with, like, you know, like,

3    supporting, things like that, so yeah.

4        Q    Who do you mean director?

5        A    Well, Alexa and, like, Michelle, yeah.

6        Q    Okay.  And did somebody have the final

7    approval?  You said it was a collective decision, but

8    --

9        A    Yeah, we --

10        Q    -- was there somebody, you know, really --

11        A    Yeah, in hindsight, you know, I, I think,

12    like an approval would be, you know, a, a better way

13    to go about it, but it was just a very new PAC and new

14    experience for us and we didn't really understand,

15    like, that, you know, the safe harbors and things like

16    that that the FEC has on their website needed to be,

17    like put in place.  So --

18        Q    Sure, so --

19        A    -- to answer your question, no.  We, we

20    didn't have like a formal approval process, like a

21    large organization.

22        Q    Right and so, when you had to spend money,

23    who actually, did you write checks to the vendors or,

24    I mean, who did all that?

25        A    Yeah, so Rob would, Rob Reyes would send

DOJ-0000020725

1      out, like online, like payments, things like that,

2      yeah, so he would make sure that, like things got

3      paid.  So Henok would, like basically take everything

4      from Rob, you know, all the, all the, Rob would, like

5      do the, do the, like getting invoices, you know, make

6      sure the deposits were coming in, but Henok would then

7      take that information and then, like, do the filing.

8      That was actually how it was supposed to be and it,

9      from my view, that's, that's how, you know, it was, it

10     was, it was working.

11          Q     Sure.

12              BY MS. DI GIOVANNI:

13          Q     So practically speaking, since you were, had

14     this experience, in terms of the media buys and --

15          A     Uh-huh.

16          Q     -- things like that, is it correct to say

17     that when it came time to engage a vendor or draft

18     the, to get those robocalls out, were you the one sort

19     of making those decisions, because of your experience?

20          A     Yes.

21          Q     Okay, understood.

22              BY MS. LEE:

23          Q     Oh, one more thing.  Did, did Progressive

24     Priorities actually have an office space or anything

25     like that?

DOJ-0000020726

1      A    Yes, it had, like, WeWork.  It was on --

2      Q    Oh, right --

3      A    It was a different WeWork location so --

4           BY MS. DI GIOVANNI:

5      Q    And as far as you're aware is that this 3300

6   North Interstate 35?

7      A    That's correct.

8      Q    Thank you, all right.  Now, we are going to

9   move onto a document, this is going to be Exhibit 11.

10  There you are.  And two (phonetic).  Okay, so do you

11  recognize this document?

12     A    Yes, I do.  This is a document that I

13  forwarded, that I was able to find in my Google drive,

14  mattmedia@gmail --

15          (The document referred to was marked for

16  identification as Agency's Exhibit No. 11)

17     Q    Okay --

18     A    -- uh, mattmediateam@gmail.com and this is

19  a, I believe, like either, yeah, I wasn't sure if this

20  was, like actual people who donated or people who

21  promised to donate, but this was, like a list that I

22  found of, of people that, you know, work some, some

23  kind of data entry.

24     Q    Okay.  So can you elaborate a little bit

25  more about what you believe this document to show?

DOJ-0000020727

1       A    I believe it either shows who promised to

2   send in a piece of mail or somebody who actually sent

3   in a piece, but yeah, I, I don't know if, like, these

4   people actually sent in a piece, like this could just

5   be, like a promise, we call it, like promise to pay,

6   like if they just promise to pay, send in a check.

7   But so, like we might have sent something out to them,

8   but, like they didn't necessarily, like send a check

9   back.

10      Q    Sure.  You mentioned that you had this in

11  your, your Gmail, your G Drive.

12      A    Yeah.

13      Q    Can you explain sort of why you had this in

14  your possession?

15      A    I think this came from Kyle Davies.  So I,

16  it was just kind of like a random document that I

17  might have had.  I might have actually requested this

18  from him, just because I wanted to see, like, you

19  know, the amounts and things like that.  I, from time

20  to time, I would just request information from, you

21  know, Kyle and Rob just to do a little, like do my

22  job, which is make sure that, like, you know, people

23  are donating or, like, you know, the message works.

24  It's just kind of one of those things you, you do when

25  you're running a campaign, making sure it's

DOJ-0000020728

1    performing, so.

2         Q    So you're saying, so your, part of your role

3    was to sort of check the efficacy of, of --

4         A    Right.

5         Q    -- PAC's efforts?

6         A    Right, correct.

7         Q    Okay.  And so do you know what this document

8    was used for?

9         A    No, I, not, not to my knowledge.  I mean, it

10   says 10 PP PAC (phonetic) mail in report.  So I'm not

11   sure, like this might have come from, like a report

12   from the call center or it, it might have been a,

13   maybe just a document that, like Kyle sent me, but

14   yeah, I'm not sure.

15        Q    Okay.  And do you have any idea of when

16   this, this might have been created?

17        A    I mean, the date says 6/15/16.  So I don't

18   know, yeah.  I mean, yeah, it's, it, this is, like

19   what I wrote was created it says in the, the title

20   that it's 6/15/16.  So that's, that's all I know.

21        Q    Okay.  And, and so you, you stated that

22   maybe this came from Kyle.  Do you know whether he

23   created this document or someone else did?

24        A    No, I mean, I don't, I don't think he, he

25   didn't, like or he didn't, like enter in all these

DOJ-0000020729

112

1    addresses, like this definitely came from, like a call

2    center somebody, yeah.

3        Q    Okay.  so when you mentioned before that he

4    was sort of registering the checks that were coming

5    in, this wouldn't have been what he was doing?

6        A    I don't think so, because it says mail in

7    report, like and, and it just, it looks very much like

8    it's, like automated or something, maybe it came from

9    the call center or some, some piece of software,

10   maybe, maybe it came from, like authorize.net.  I

11   actually don't know, to be honest, but, like yeah.

12       Q    Authorize.net, could you elaborate a little

13   bit on that?

14       A    That's, like just a, a, just a payment

15   processor that, like processes the, the credit cards.

16       Q    Credit cards that are from where?

17       A    From the call center.

18       Q    Okay.  So the call center directs them to a,

19   sort of an interface then --

20       A    Yes.

21       Q    -- or they, they're running the, the charge

22   over.

23       A    These authorize.net's API, it's a live

24   integrate.

25       Q    And which call center are you referring to?

DOJ-0000020730

113

1   Do you recall?

2        A    It was the call center that, for the, the,

3   this, it was like a Democratic call center in

4   Colorado.  I have it on my laptop, but it's, her name

5   was, like Jackie, she was like a one time --

6        Q    Oh, so this is the vendor we were --

7        A    Yeah.

8        Q    -- speaking about before?

9        A    Yeah.

10       Q    The one that Robert Reyes was --

11       A    I think it was, I think it was called, like

12  Signal Marketing maybe.

13       Q    Oh, perhaps, it, was it perhaps Signia

14  Marketing?

15       A    Signia, yeah, I think that was them, yeah.

16       Q    Okay, good.  And so you, am I correct that

17  you're uncertain as to how this information basically

18  got to you, but you, you believe it to have come from

19  Signia Marketing?

20       A    I believe it's come from, came from either

21  Kyle Davies or -- but I don't, yeah, either Kyle

22  Davies or Signia Marketing, yes.

23       Q    Okay. So you're uncertain, but one of those

24  two people -- sources?

25       A    Yes.

DOJ-0000020731

1      Q    Okay.  Do you know if other reports of this

2  kind would have been created while the PAC was

3  operating?

4      A    Yeah, I mean, I, I try to, I try to get this

5  information for you guys.  Basically, I tried to see

6  if, like we had access to the authorize.net.  I sent

7  you the, there's, like a, a sheet that we used that

8  had all the authorize, authorizations in, like so we

9  all had, like that access.  But I tried --

10     Q    Uh-huh.

11     A    -- to login, like there, I, I, I wasn't able

12 to get access to, like the authorize.net report to try

13 and pull that.  I couldn't go into the bank account at

14 either Chase, because I'm not a signer.  So to answer

15 your question --

16     Q    Why couldn't you get into the authorize.net?

17     A    I tried and like, it's, it's not working and

18 I don't, yeah.

19     Q    The credentials you have are --

20     A    Yeah.

21     Q    -- are not working?

22     A    And also, like it's been, like three years.

23  So it's probably, like closed out or something.

24     Q    Understood, okay.  Okay, so as far as you're

25 aware those, those aren't in your possession and you,

DOJ-0000020732

1    do you have any idea who might have access to those

2    things, like more charts of this kind and --

3        A   No, I don't.  Well, who, who would have it,

4    it would be in the authorize.net for sure, like that

5    would, that's, that's what, like typically now we use,

6    like for any, any PAC funds that I do with any

7    accountants like I just give them authorize.net,

8    because it, it has all this information.

9        Q   Okay, okay.  And I'll take that back from

10   you now, thank you.  This will be Exhibit 12.  One for

11   you and one to you. Okay.  And can you identify this

12   document for me?

13       A   Yes, this was a document that I sent to

14   Justine di Giovanni, basically showing some of the,

15   some of the names of either donors or, yeah, but I

16   don't think they were, they might or might not have

17   been, like actual people who sent in checks, because

18   it says, 'P to P', which means it's a promise to pay,

19   which means they made a promise, but might not have

20   sent it.

21         (The document referred to was marked for

22   identification as Agency's Exhibit No. 12)

23       Q   Okay.  And at the top of the page, can you

24   read the title of this document for me?

25       A   Yeah.  It says (11_Obamamailer ptp).

DOJ-0000020733

1      Q    Okay.  And where did you get this document?

2      A    I believe I got this from, I actually don't

3  know off the top of my head where I got this from.  It

4  was just on my drive.

5      Q    Okay.  So this was also in your G drive?

6      A    Correct, yes.

7      Q    Do you have any idea when this document was

8  created?

9      A    No, I'm not sure --

10      Q    Okay.

11      A    -- when it was created.

12      Q    And do you know who would have created it?

13      A    I, I don't know.  I mean, the, the subpoena

14  asked for any information that was related, so I just

15  saw, it said mailer on there and it said PTP.  So I

16  just sent this, yeah.

17      Q    Absolutely and that was, that was definitely

18  correct.  Thank you for doing so.

19      A    Okay.

20      Q    Or just sort of the best of your

21  recollection, what do you know about it?

22      A    These might have been leads, like I, I don't

23  know.  It says received on column G.

24      Q    Uh-huh.

25      A    But I don't know what RF stands for.

DOJ-0000020734

117

1        Q    Uh-huh, okay.  And do you know if, if the
2   PAC had sent mailers to these individuals?
3        A    I'm not, I'm not sure if they did or not.
4        Q    Okay.
5        A    I know there were mailers sent out, but I,
6   I'm not sure if it was for the FEC requirement or
7   because I'm, I'm getting confused between, like
8   Liberty Action Group and Progressive Priorities.  So
9   I'm not --
10       Q    Sure.
11       A    I'm not, I can't answer that accurately.
12       Q    Understood.  And does the, the phrase,
13  'Obama mailer' sound like something that, something
14  you remember Progressive Priorities sending out?
15       A    Yeah, I don't know, maybe, maybe it was,
16  like, maybe a test or something, but we didn't, like
17  we didn't send out anything that would be related,
18  like, but sometimes, like, since Obama has, like the
19  same, like, supporters as like Hillary, maybe that's
20  why, like maybe this is like a lead source.  I don't,
21  I honestly don't know why it's called Obama.
22       Q    Sure.  When you say sort of like a test, do
23  you, what do you mean by that?
24       A    Yeah, this might have been like maybe, like
25  leads or something, but I don't know.  I, I, I, I

Heritage Reporting Corporation
(202) 628-4888

1    wasn't, I'm not prepared to, to, to speak on, like,

2    the origin of this since it was so long ago.

3         Q    Sure, with the understanding that you're

4    speculating a little bit.

5         A    Correct, correct.

6         Q    So when you say leads, you mean, perhaps

7    people that the PAC could target for fundraising?

8         A    Right, correct.

9         Q    Okay.  And leads of this kind, do you recall

10   where the PAC may have, might have obtained this kind

11   of lead?

12        A    Yeah, yeah, yeah, maybe from the call

13   center, yeah.

14        Q    So is that your recollection that, that it

15   would have been something that you wouldn't have

16   gotten from the call center or did you perhaps employ

17   other vendors or obtained this information from other

18   sources?

19        A    No, it, it probably came from a call center.

20        Q    Okay.

21        A    Yeah.

22        Q    Okay.

23             MS. DI GIOVANNI:  Did you have any other

24   questions you wanted to ask about that document?

25             MS. LEE:  No.

DOJ-0000020736

119

1             MS. DI GIOVANNI:  Okay, I'll take that back

2       from you, from you now.  And it's about noon, so if no

3       one has any objections, this might be a good time for

4       a lunch break.

5             MR. LAWYER:  Do you have a men's room or --

6             MS. DI GIOVANNI:  We do, we can take --

7             NOTARY PUBLIC:  Can we go off?

8             MS. DI GIOVANNI:  Yes, please go off the

9       record.

10            (Whereupon, at 12:00 p.m., the deposition

11      was recessed, to reconvene at 1:00 p.m., later that

12      same day.)

13      //

14      //

15      //

16      //

17      //

18      //

19      //

20      //

21      //

22      //

23      //

24      //

25      //

DOJ-0000020737

120

1          A F T E R N O O N  S E S S I O N

2                                    (1:00 p.m.)

3          MS. DI GIOVANNI:  Okay, so we're back from

4     lunch.  Thank you for coming back so promptly.  We

5     really appreciate it.  I think now, what we're going

6     to do is I think we, we basically understood most of

7     what you told us with the background on the

8     disbursements, before you, we went to lunch.  Did you

9     have something you wanted to add?

10         THE WITNESS:  Yes, we wanted to add the, the

11    name of the company that I forget was MNT Media.

12         BY MS. DI GIOVANNI:

13    Q    MNT?

14    A    MNT Media, yes.

15    Q    And it's an and not an N?

16    A    M-N-T, like --

17    Q    M-N-T, got it.

18    A    Like initials, yes.

19    Q    Okay.

20    A    Yeah, so just MNT Media.

21    Q    And that was, so that's your initial, so

22    that was your --

23    A    Yeah.

24    Q    -- company when you worked for yourself?

25    A    Yes.

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020738

1      Q    Okay.  So that was when you were working for

2  Mr. McDonald?

3      A    It was between 2008 and 2012, I'm not sure

4  of the exact dates, but yes, this, yes, well --

5      Q    Okay.

6      A    -- for Adam McDonald, yes.  This was the

7  company.

8      Q    Got it.  And I believe we, I'm looking at

9  your laptop screen and I see it lists MNT Media

10 Supreme Dream Media, LLC --

11     A    Uh-huh.

12     Q    -- MATT and does that have an E at the end

13 of MATT?

14     A    It's like the --

15     Q    Like --

16     A    -- yeah.

17     Q    -- not shiny matte?  Matte Media Creations,

18 Inc. and United Advocates Group, LLC.

19     A    Correct.

20     Q    Okay.  And you, I believe you mentioned the

21 last three, so I think --

22     A    Yes.

23     Q    -- that's, that's good.  Thank you very much

24 for supplementing that --

25          BY MS. LEE:

DOJ-0000020739

1        Q    One thing, I see that it, one is

2    incorporated and two are LLCs.  Where, where did you

3    register those companies?  What states?

4        A    They were in Delaware.

5        Q    They're all Delaware companies?

6        A    Yes.

7        Q    Okay, okay.

8             MS. DI GIOVANNI:  Thank you.

9             BY MS. DI GIOVANNI:

10       Q    Okay. So this is a big book, but I promise

11   we're not going through all of it.  It's just a large

12   document.  This is going to be Exhibit 13.  So one for

13   you, okay.  And if you could identify this document

14   for me?

15       A    This is the FEC Form 3X, Report Of Receipts

16   And Disbursements for Progressive Priorities PAC.

17            (The document referred to was marked for

18   identification as Agency's Exhibit No. 13)

19       Q    And if you look at box four, can you read

20   the type of report for me?

21       A    July 15th Quarterly Report.

22       Q    Great.  So were you at all involved in the

23   filing or preparing of this document?

24       A    No, I was not.

25       Q    Okay.  And whom do you believe, who do you

DOJ-0000020740

1    believe did do this filing and preparing?

2         A    Henok Tedla.

3         Q    Okay.

4         A    I believe.

5         Q    Sure.  So what I'm going to do now, is we're

6    going to walk through a few of the disbursements

7    listed here.  The page numbers for your convenience,

8    they're generally at the top right of the page.  So as

9    I refer to pages, that's what I'm referring to, like

10   for instance, page 73 of 180, things like that.  To

11   start, we'll start at page 6, and you can unclip this,

12   so that it makes it easier for you to see the pages.

13        A    Okay.

14        Q    So on page 6, can you please look at the

15   itemization for the individual titled Good Al

16   (phonetic) it's at the top of the page.  Okay, and do

17   you see that?

18        A    Yes.

19        Q    Is there an occupation or an employer listed

20   here for Good Al?

21        A    No, there is not.

22        Q    Okay.  And to the best of your knowledge, do

23   any of Progressive Priorities PAC's itemized receipts

24   include employer or occupation data?

25        A    I'm not sure if they do.  Yeah, I'm not

DOJ-0000020741

1    sure.

2         Q    Is this information that you believe that

3    the PAC attempted to collect when it received --

4         A    Correct.

5         Q    -- contributions?

6         A    Correct.  I believe there was a follow up,

7    either for Progressive Priorities or Liberty Action

8    Group from the FEC that was requesting that, you know,

9    any, any contributions over $200 that we reach out and

10   make best efforts to collect name and address.

11        Q    But that information was not collected at

12   the time the contributions were received, is that

13   correct?

14        A    I'm not sure if it was or was not.

15        Q    Okay.

16        A    Yes.

17        Q    If that information was collected or if it

18   wasn't, do you have any idea why it was excluded from

19   the reports?

20             MR. LAWYER:  What date is that?  The date --

21             THE WITNESS:  This is 6/30/2016.  I'm not

22   sure why it would be excluded.  No, I'm not sure.

23             BY MS. DI GIOVANNI

24        Q    Okay.  And then, as far as you're aware, you

25   mentioned that there was some follow up undertaken.

DOJ-0000020742

125

1    You weren't sure when you stated, if I'm correct, that
2    whether you were, whether that was Liberty Action
3    Group or Progressive Priorities, is that correct?
4         A    Correct.  I'm not sure.  I believe it was
5    Liberty Action Group, but I'm not sure if there was
6    also one for Progressive Priorities.
7         Q    So do you recall who undertook those efforts
8    -- might that lead you to which group?
9         A    Kyle Davies sent out mail, but I'm not sure
10   if it was Liberty Action Group or Progressive
11   Priorities, but there was some attempt there to, to do
12   that, because I remember Henok Tedla telling Rob, who
13   told me, that, you know, there was this feedback from
14   the FEC that said we needed to go back and attempt to
15   collect the name and occupation for people $200 or
16   over.
17        Q    Okay.  And do you have any memory of when
18   that might have happened though, that conversation?
19        A    I believe it was maybe in July.
20        Q    Of?
21        A    Actually, no.  I don't know the exact dates.
22    I know it was in 2016.
23        Q    In 2016?
24        A    Yes.
25        Q    Okay.  You stated that you've sort of

DOJ-0000020743

1      undertaken the responsibilities of treasurer for

2      Progressive Priorities PAC --

3          A     Correct.

4          Q     -- is that correct?

5          A     Correct.

6          Q     Have you made any efforts to obtain this

7      information?

8          A     I haven't sent out any mailers at this

9      point.

10         Q     Have you done anything else?

11         A     No.  I haven't attempted to contact any

12     previous donors.  But yes, to answer your question.

13         Q     Got it.  And so, we spoke briefly before

14     about how Progressive Priorities PAC raised money.  I

15     understand that, that part of that was, was through

16     mailers and these robocalls, possibly mailers.  You

17     were a little unsure on that, is that correct?

18         A     Yes, correct, yes, possibly.

19         Q     Okay.  Is that the only way in which

20     Progressive Priorities PAC raised money?  Was it

21     through these robocalls and possibly mailers or were

22     there other methods?

23         A     Those were the main methods.

24         Q     Were there any others?

25         A     I'm not, I'm not sure if there were.  I

DOJ-0000020744

127

1       don't, no, there wasn't anything on web for instance

2       or anything like that, to my knowledge.  We didn't

3       have a targeted campaign for the web for instance.

4            Q     Okay.  So were there any internet-based ads

5       or, or no?

6            A     No, I don't, I don't believe so.

7            Q     Okay.  And then, just making sure, so, so we

8       could imagine that, that many of these came through

9       the call center, is that correct, based on what you

10      remember?

11           A     Correct, correct.

12           Q     Okay.  That makes sense.  Let's move ahead

13      to some, oh, and then, oh, yes.  I'm aware that

14      Progressive Priorities PAC had a website.  Do you

15      recall the Progressive Priorities PAC?

16           A     Yes, I do.  From, from that and from the

17      article where they displayed the actual website, so --

18           Q     Which article are you referring to?

19           A     I believe it was in that article, the one

20      that Andrew wrote about -- I, I, I remember there

21      being a website, but I don't believe there was, like

22      an actual donation feature, where you could, like

23      donate on the website.

24           Q     Okay.  And you don't believe that there was

25      a donation, donation page on --

DOJ-0000020745

1      A    No.

2      Q    -- the website?

3      A    No.

4      Q    Okay.

5      A    It was more of just to show the presence of

6    the PAC.

7      Q    Okay.

8      A    And then, like the mission and values,

9    things like that.

10      Q    And do you think it, it, did it provide a, a

11    contact number for people to make donations or?

12      A    It might, it might have been linked, but I'm

13    not sure if, I, I don't remember if it, there was a

14    phone number on the website.

15      Q    Okay.

16      A    Other, other than the information that was

17    required by the merchant to have the merchant account,

18    things like that, like a privacy policy, potentially

19    like an address.  We, I think the address might have

20    been on there, but I'm not sure if the phone number

21    was there.

22      Q    What merchant are you referring to?

23      A    When you get merchant processing, they,

24    typically they'll look at, like your website just to

25    make, like see that you're, like a, a real company and

DOJ-0000020746

1    that you have your, like mission statement or

2    whatever, you know, whatever you're doing, so --

3         Q    And what merchant processing did Progressive

4    Priorities use?

5         A    I just remember authorize.net.

6         Q    Okay.

7         A    Just those are the ones that --

8         Q    Okay.  So, to be clear, you're saying that

9    the authorize.net or whoever else Progressive

10   Priorities might have used, they required Progressive

11   Priorities have the, to have a web presence?

12        A    Correct, correct.

13        Q    Got it, okay.  We're going to move a little

14   bit further in this document to page 168, that's

15   rather significantly farther in this document.

16             MR. LAWYER:  Was that page 168?

17             MS. DI GIOVANNI:  It's at the top, so top

18   right, it says page blank of blank.

19        THE WITNESS:  Oh, yeah, okay.

20        MS. DI GIOVANNI:  Yep.

21        THE WITNESS:  168?

22        MS. DI GIOVANNI:  Yes.  Are you on page 168?

23        THE WITNESS:  Yes.

24        BY MS. DI GIOVANNI:

25        Q    Okay.  What we're going to be doing now is

DOJ-0000020747

1    walking through a few, several of, of the PAC's

2    disbursements and asking you what you recall.  We

3    understand that this was some time ago, so we

4    understand, we understand that you may not remember

5    fully, but anything you can tell us is helpful.  At

6    the top of the page, do you see a disbursement for

7    $280 to Access Accounting?

8         A    Yes.

9         Q    Okay.  Do you recall anything about Access

10   Accounting?  What it was?

11        A    No.  I, I don't recall at all.

12        Q    Okay.  Is there a mailing address listed

13   for, on this page for Access accounting?

14        A    No, there is not.

15        Q    Okay.  Do you have any idea why there isn't

16   that information here?

17        A    I'm not, I'm not certain if the name and

18   address was, I know, I, I, to answer your question, I

19   don't know why it wouldn't be on there.

20        Q    Okay.  And do you recall what this

21   disbursement might have been for, the purpose?

22        A    I don't.

23        Q    Okay.  Lower down on the same page, you'll

24   see a $5,000 disbursement to Brian Thompson.  Do you

25   recall who Mr. Thompson was?

DOJ-0000020748

131

1        A    No, I do not.

2        Q    Okay.  And can you confirm that there is

3   also not a mailing address for Mr. Thompson?

4        A    Yes, there's no mailing address for him.

5        Q    Okay.  And, and since you don't remember

6   him, I imagine you probably don't recall the purpose

7   for this disbursement, is that correct?

8        A    Correct.

9        Q    Okay.  Further down the page, you'll see

10   that there's a disbursement to PayPal.  Do you see

11   that?

12        A    Yes.

13        Q    Do you recall what Progressive Priorities

14   used PayPal for?

15        A    Yes.  Do you want me to explain --

16        Q    Please.

17        A    -- like why?  Okay.  So after doing some,

18   you know, basic research gathering, information

19   gathering, I remember that, you know, that the reason

20   PayPal, there was so many PayPals is because Henok

21   said he tried to go in at one point to, to see the

22   PayPal and they weren't showing, like, PayPal didn't

23   have even, like access to show the, the, the itemized

24   names on there, so --

25        Q    So are you, to clarify, are you saying that,

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020749

1    that payments that were made through PayPal were to

2    third parties, but you are, it is unknown to which

3    third parties these payments are for?

4         A    Correct.  Yeah, from, from what I understood

5    from the conversations at that time, like PayPal

6    didn't allow Henok to be able to see, like the names,

7    the first name and last name of the, of the people.

8         Q    Okay.  So this disbursement for $164.75 that

9    just says PayPal, you have, do you have any

10   recollection of what that could possibly have been

11   for?

12        A    I don't, but the, actually, can I go back

13   and --

14        Q    Please.

15        A    -- modify what I said?

16        Q    Uh-huh.

17        A    So I believe that PayPal at one point was

18   actually the, the merchant processor.

19        Q    Okay.

20        A    And they were, you know, Progressive

21   Priorities was using PayPal as the merchant and I

22   believe that Henok logged in, but wasn't able to,

23   PayPal just didn't have the functionality to be able

24   to itemize, like the names of, like the actual

25   contributors.  So that's where he ran into issues, I

DOJ-0000020750

133

1    believe.

2         Q    So are you referring right now to

3    disbursements or contributions received by --

4         A    Contributions.  Is this disbursements?

5         Q    This is under disbursements.

6         A    Okay.  Never mind, that's something

7    different.

8         Q    Okay, understood.

9         A    So this is disbursements meaning these are

10   expenses?

11            MR. LAWYER:  Yes, monies (phonetic) that

12   have paid out. Winnings (phonetic) that have paid out.

13            MS. DI GIOVANNI:  Yes, these were

14   expenditures made by Progressive Priorities.

15            THE WITNESS:  Yeah, I, again, I don't

16   remember any of these, I don't remember Brian Thompson

17   or Access Accounting or I remember there was a PayPal

18   merchant account, now that you refreshed my memory.

19            BY MS. DI GIOVANNI:

20        Q    Sure, but you are uncertain as to, to the

21   purpose of this --

22        A    Correct.

23        Q    Understood.  Okay, then looking over at the

24   next page, which is 169.  You'll see a number of

25   disbursements that start on this page to Signia

DOJ-0000020751

1    Marketing --

2         A    Right.  Yeah, that --

3         Q    Can you tell us what you recall about Signia

4    Marketing?

5         A    Right.  So Signia Marketing was the call

6    center to, to modify what I said previously.  I was

7    trying to think of the name, but this is, yeah, this

8    is them.

9         Q    So can you tell me a little bit more

10   specifically about exactly the services Signia

11   provided for Progressive Priorities?

12        A    They provided call center services.

13        Q    More specifically, so, so what did they do?

14        A    They provided call center services and their

15   agents recorded the information --

16        Q    So --

17        A    -- for the donations, contributions.

18        Q    So how did calls, how did the call center

19   receive calls on behalf of Progressive Priorities?

20        A    They received calls by a voice broadcast

21   political advertisement message that we sent out.

22        Q    By voice broadcast political advertising

23   message, do you, are you referring to robocalls --

24        A    Yes.

25        Q    -- soliciting contributions?

DOJ-0000020752

1     A    Yes.

2     Q    Okay.  So would, would people who received

3     the robocall from Progressive Priorities PAC, they

4     would have the option to speak to someone at the call

5     center in order to make a contribution?  Is that

6     correct?

7     A    That is correct.

8     Q    Okay.  So the call center would then speak

9     with the people who were attempting to contribute to

10    Progressive Priorities, is that correct?

11    A    Correct.

12    Q    And are you saying as well, that Signia

13    Marketing collected information from these

14    contributors on behalf of Progressive Priorities?

15    A    That is correct.

16    Q    Okay.  That makes sense and I think I

17    understand a little more clearly what you were saying

18    earlier about the call center.

19    A    Okay.

20    Q    And how did you find them to, as a vendor

21    for Progressive Priorities?

22    A    Just online.

23    Q    Was, when you say just online, you know, can

24    you explain your process for how you did that a little

25    bit?

DOJ-0000020753

1       A    Yes.  So we just, we, we realized that, you

2    know, it's a very niche kind of call center, this,

3    the, you know, these political calls.  So this

4    particular outlet had a, Signia Marketing had the

5    experience to take these political calls.  So that's,

6    so we were looking, you know, for potential vendors

7    and they fit the description.

8       Q    And you had ever worked with them in the

9    past that you recall?

10      A    No, no, I didn't.

11      Q    Okay, excellent.  And can you confirm for me

12   whether there's a mailing address listed for Signia

13   Marketing on, on any of these on this page?

14      A    No, there's not.

15      Q    Okay.  And do you recall why that

16   information would not appear here?

17      A    No.  I don't know why.

18           BY MS. LEE:

19      Q    Do you actually have the, the address and

20   the address and purpose of disbursement information

21   for Signia?

22      A    Yes, I can get that.  The address is what

23   you guys need?

24      Q    Right, that would be great.

25      A    Sure.  Yes, I can provide that.

DOJ-0000020754

1          Q     That would be very helpful.  And this is

2     Jackie who was at this company and --

3          A     Her name is Jackie, was the point of

4     contact.

5                BY MS. ANDRADE:

6          Q     Do you have a last name for Jackie?

7          A     I believe it was, like started with a C, but

8     that, yeah, that's --

9          Q     Would you be able to find that information?

10         A     I can, I can get that from Rob.  He would,

11    he would have that since he was handling most of the

12    call center stuff.

13               BY MS. LEE:

14         Q     So in terms of hiring Signia Marketing, who

15    was responsible for that?

16         A     Rob actually did the, brought them on.

17         Q     Okay.  Did you ever have any discussions

18    with, with Signia Marketing?

19         A     I might have talked to, like somebody

20    briefly or, like, because typically, like I'll do,

21    maybe test calls, just to make sure that the

22    functionality is working.  So there, there was some

23    communication there, between myself and the call

24    center.

25         Q     Okay.

DOJ-0000020755

138

1     A    But not direct, day to day.

2     Q    All right.

3          BY MS. DI GIOVANNI:

4     Q    To clarify what you said, you likely found

5     them, as a potential vendor, recommended them to the

6     PAC and then, Robert Reyes brought them on, did the

7     actual work of, of the onboarding and, and engagement

8     with the vendor?

9     A    Correct and I didn't actually find them.  It

10    was a collective effort between Rob and myself, so it

11    wasn't me exclusively.

12    Q    Okay.

13    A    Just to clarify.

14    Q    Thank you, okay.  And if, if we think of

15    anything about Signia, we'll come back to that, since

16    it seems like they did, is it correct to say that they

17    did a lot of work with the PAC?

18    A    Yes.  They were the primary call center.

19    Q    Okay.  Moving on to page 171.

20    A    Okay.

21    Q    You'll see several disbursements here to

22    SmartCall Media.  What do you recall about SmartCall

23    Media?

24    A    SmartCall Media was the platform that

25    allowed us to send the voice broadcast robocalls.

DOJ-0000020756

1      Q    Okay.  So the original robocalls that would

2    then redirect to Signia Marketing, the call center --

3      A    Correct.

4      Q    -- were broadcast through SmartCall Media?

5      A    Correct.

6      Q    Thank you.  So here, how did you find this

7    organization?

8      A    I, I think I've known them for, since like

9    2007 or something.  I've just known them forever, you

10   know.

11     Q    Have you done work with them in the past?

12     A    Yes, I have.

13     Q    Okay. And was that also in the robocalling

14   capacity?

15     A    Yes.

16     Q    Okay.  And then just to clarify, we're,

17   we're keeping Exhibit 13 here, but I, I just wanted to

18   present to Exhibit 14.  To the best of your knowledge,

19   is this the SmartCall Media that you engaged with, on

20   behalf of Progressive Priorities PAC?  Oh, and also

21   can you please identify for me what I, what I just

22   provided you.

23     A    Yes, this is a document showing

24   SmartCallMedia.com.  I'm, I'm not sure exactly if this

25   is SmartCall, but I do, yes, no, I don't know if it's

DOJ-0000020757

1     the actual, like SmartCall.  I don't, yeah, I don't, I

2     don't know.

3              (The document referred to was marked for

4     identification as Agency's Exhibit No. 14)

5         Q    You, so is it correct to say that you're

6     uncertain, but does this appear to be --

7         A    It does appear.

8         Q    -- the company?

9         A    Yes.

10        Q    Okay.  Thank you.  I can take it back, thank

11    you.  All right, continuing on there, okay.  Oh and do

12    you also have, do you also have the address for

13    SmartCall Media in your possession?

14        A    I can, I can get it as well, yes.

15        Q    That would be great thank you.

16        A    Okay.

17        Q    We'd appreciate that.  Then, do you know if

18    every, so we've, we've talked to a number of people

19    who did work for Progressive Priorities PAC.  These

20    individuals, do you know if they were paid for their

21    services for Progressive Priorities and when I say

22    these individuals, I'm referring to you, Kyle Davies,

23    Robert Reyes, Michelle Sotelo, Alexa Roth and Monique

24    Moyers.

25        A    I'm not, I'm not sure if Monique was

DOJ-0000020758

1   compensated.  I'm not sure if, but Kyle, Kyle, well,
2   I'm not sure if Kyle was -- okay, so Monique Moyers, I
3   guess, like can I have a list of the names?
4        Q    Sure absolutely --
5        A    That would be helpful.
6        Q    -- I can give you back, I can present you
7   with Exhibit 2 --
8        A    Okay.
9        Q    -- which is your answer to these
10  interrogatories.  If I can track it down, which,
11  theoretically I can.  So I'll present you with Exhibit
12  2, which is your response and has the list of
13  individuals.
14       A    Okay.  Alexa Roth, I'm, I'm not exactly sure
15  if she was paid, but Kyle did tell me that she was
16  compensated.  Yeah, so Alexa Roth was compensated.  I
17  understand that Kyle also compensated Michelle.  So
18  she was compensated.  I know Kyle was compensated.
19  Henok was compensated.  Myself and Robert, so I, I
20  just don't know about Monique.
21       Q    Okay.
22       A    That's the only one that I'm not sure of.
23       Q    so everyone other than potentially Monique
24  Moyers, you believe to have been compensated by
25  Progressive Priorities?

142

```
 1        A    I believe to, but I, I never saw an actual
 2    check or anything.
 3        Q    Sure, though you received compensation from
 4    Progressive Priorities, is that correct?
 5        A    Yes.
 6        Q    So did you see the, how did you receive
 7    compensation?
 8        A    Through Matte Media Creations.
 9        Q    Sure.  Do you believe that this is reflected
10    in Progressive Priorities filings with the FEC, these
11    disbursements?
12        A    I'm not able to, like accurately answer
13    that, because I don't have the report in front of me.
14        Q    So when you were paid through Matte Media
15    Creations, how was the payment affected?  Was it
16    through check, through an electronic disbursement, how
17    did you --
18        A    Electronic.
19        Q    Okay.  And that was directly from
20    Progressive Priorities bank account to yours --
21        A    Correct.
22        Q    -- to Matte Media Creations?
23        A    Correct.
24        Q    Okay.  Do you recall how much you were paid
25    by Progressive Priorities PAC?
```

DOJ-0000020760

143

```
 1        A     Hold on, can we go back --

 2        Q     Sure.

 3        A     -- to the, to what, what was the question?

 4        Q     The, I just asked do you recall how much you

 5   were paid by Progressive Priorities PAC?

 6        A     No, I don't know the exact amount.  I don't

 7   have it on, on hand.

 8        Q     Sure.  Would you be able to figure that out

 9   from your records?

10        A     I don't know if I have that information,

11   like all I have is tax returns.  So I don't have the

12   exact amount, because that, I don't have that, access

13   to that account anymore.  I don't have Matte Media

14   Creations access, it was closed.

15              BY MS. LEE:

16        Q     Were you ever invoiced, did, by Progressive

17   Priorities for your services?

18        A     No, we never had formal invoices.  In

19   hindsight, that would have been helpful, but we didn't

20   have formal invoices.

21        Q     So how did, how did they determine how much

22   to pay you?

23        A     The Progressive Priorities?

24        Q     Yes.

25        A     We had, basically like consulting fees that
```

DOJ-0000020761

1    we charged.

2         Q    Okay.  So they, so how did, how did they

3    know how much money they were supposed to pay you?

4    Who kept track of that?

5         A    We, we were anticipating on Henok to

6    basically keep track of all of the account statements

7    to show disbursements.  And we, we didn't have a

8    formal role for somebody to actually keep track of,

9    like who's paying invoices, like, like maybe a

10   bookkeeper of the company.

11        Q    But if you're providing services to

12   Progressive Priorities PAC, did you ever give them an

13   amount --

14        A    No, I did not.

15        Q    -- for them to pay you?

16        A    No, I did not.

17        Q    You never calculated how much you were owed

18   for your services?

19        A    I, I did, I did, but I don't have record of

20   that.

21        Q    Did you, so how did you communicate that to

22   Progressive Priorities?  Once you calculated how much

23   you were owed, how, did you send them an email?

24        A    I basically, no, I, I didn't send an email,

25   to answer your question.

DOJ-0000020762

1        Q     So how, how was that information provided?

2        A     I just, I, I don't have, like a record of,

3    like, the invoices.  I don't know if, I'm not saying

4    they were never, like, there was never a record of it.

5     I just don't have, like an actual record.  Basically,

6    you know, whatever was, whatever was charged, like as

7    a consulting fee, I was just anticipating on, you

8    know, Henok filing that and showing that amount.

9        Q     But how would, how, but how would Henok, how

10   would Henok know how much to pay you?

11       A     Henok didn't pay at all --

12       Q     Okay.  Well, then who did?  Who paid you?

13       A     Rob was in charge of the account.

14       Q     Okay.  So did you tell Rob how much

15   Progressive Priorities owed you?

16       A     Yes, I did.

17       Q     Okay.  And do you --

18       A     Yes.

19       Q     -- have any, so how did you provide that

20   information to Rob?

21       A     Basically, you know, we were going to

22   something where, I, you know, like I was providing,

23   like acquisition of, like a donor, you know, and then,

24   I was also, as, as a consultant providing access to,

25   to my experience and things like that.  So that's

Heritage Reporting Corporation
(202) 628-4888

1    where the compensation came from.

2          Q    Right, but, but you had to bill him for your

3    services.  So how did you provide that information to

4    Rob?

5          A    I didn't, I didn't, I didn't have a formal

6    bill.

7          Q    So then how would he know how much to pay

8    you?  Did he read your mind?

9          A    No, I, I, I would say, you know, this is how

10   much the Media was and then, you know, this was how

11   much that needs to be charged.

12              BY MS. ANDRADE:

13         Q    Were these conversations, I think over the

14   phone, in text messages, in emails?

15         A    Typically, they were --

16              NOTARY PUBLIC:  Towards the mic please.

17              MS. ANDRADE:  Apologies, let me repeat.

18              NOTARY PUBLIC:  Thank you.

19              BY MS. ANDRADE:

20         Q    I think one of the questions is sort of more

21   basic about how this information was conveyed,

22   literally.  Was it, you were having coffee and you

23   would tell him or was it over a phone call or was it

24   in email?

25         A    Yeah, it was, it was typically over the

DOJ-0000020764

```
 1    phone, yeah.

 2         Q    Okay.  And I apologize for jumping in, but -

 3    -

 4         A    Maybe, maybe a couple text messages, but I

 5    don't have record of that it was so long ago.

 6         Q    That's fine.  We're trying to get to

 7    information about how things worked.  When you were

 8    talking about Access Accounting, Brian Thompson,

 9    Signia and you said you didn't remember what these

10    were.  Would it be your testimony that Rob Reyes was

11    also making those decisions to pay these vendors?

12         A    Yes, he was in charge of, like, making sure

13    that the call center was paid and things like that.

14         Q    Okay, thank you.

15         A    In hindsight, yes, it would have been, and,

16    and with the, with the future PACs and things, you

17    know, we, we're keen on following, like the Safe

18    Harbor.  It was just a lot at once, so we weren't

19    really prepared for, you know, having exact amounts

20    and bookkeepers and all this.  So we relied heavily

21    on, like Henok for instance, to do, do things like

22    that and the things that he didn't, we just had to

23    kind of improvise.

24              BY MS. LEE:

25         Q    But in terms of the calculations for the
```

DOJ-0000020765

1    services that your company did, did you write those

2    calculations down on paper?  I mean, how did you come

3    up with those calculations?

4         A    Basically, it was just, like access to

5    experience and then also, just, like user acquisition

6    and then, also did the media buys themselves, like

7    actual, you know, like a, like how much we, you know,

8    brought in versus how much we spent.

9         Q    And does your, does Matte Media have records

10   of, of those, of those activities?

11        A    Of, of me receiving?

12        Q    Right.

13        A    I, I believe I have some of that, but I, I

14   don't have access to the, the account anymore, the

15   actual bank account, because I don't have the, I

16   closed that account.

17        Q    If, even if it's closed, you, you can --

18        A    I can, I can request it and get that --

19        Q    Right.

20        A    -- yes.

21        Q    Okay, all right.

22             MS. DI GIOVANNI:  Yeah, I think that would

23   be helpful to have --

24             THE WITNESS:  Okay.

25             MS. DI GIOVANNI:  -- for the records.

DOJ-0000020766

1          MS. ANDRADE:  Can I ask just a follow up --

2          THE WITNESS:  Sure.

3          BY MS. ANDRADE:

4     Q     -- and I apologize, when you say the things

5     that are included in your fees are your experience in

6     the field and creative project, I understand that.

7     When you say media buys themselves, what does that

8     mean?

9     A     Yeah, basically, okay, how, how this works

10    and how a lot of political organization do it is they

11    charge, like 100 percent of whatever that comes in.

12    Then, from, from that, you know, the PAC is given the

13    rights to the or their, their allowed to have the name

14    of that donor.  So, like the RNC does that.  It's a,

15    it's a, it's a very common practice for acquiring, you

16    know, lists and things like that.  So that was, that

17    was the arrangement that we basically had.

18          So, like, the consulting and everything was

19    kind of built into that, to give it this model of,

20    okay, you know, if we can get something that can be

21    self-sustaining, that can, you know, you know, be

22    there to, like run, run itself and keep continuing to

23    run, you know, then, then, you know, we can keep, you

24    know, 100 percent of that, but the organization gets

25    the actual name.  So that's how that works, typically.

DOJ-0000020767

1                BY MS. DI GIOVANNI:

2        Q    So when you say media buys and, and you just

3    sort of described something here, were you talking

4    about, perhaps like a contact list --

5        A    Right.

6        Q    -- is, is that what you're referring to that

7    some of these leads for potential contributors that we

8    were discussing before?  Is that what you were

9    referring to?

10        A    The list before, I'm not really sure what,

11    because that list was pretty small, but generally,

12    like, you know, like it's our prerogative to go out

13    there and find potential donors and then, you know,

14    bring them to use to potentially call to become a

15    donor, like for the donor acquisition process.

16        Q    Sure, but just to be very clear about what

17    you're saying and what you mean by the, by the words

18    you're using.  When you say, when you refer to a media

19    buy, are you referring to purchasing these lists of

20    potential contributors?

21        A    Yes.

22        Q    Okay.  And so, do you recall sort of

23    ballpark what you received from Progressive Priorities

24    for these services?

25        A    I think it was anywhere between 300,000 and,

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020768

1    like a million, 1.2 million, I'm not sure, but --

2         Q    Over what time period?

3         A    Through the, the actual PAC time period.

4         Q    So, so in 2016 is that what you're

5    referring?

6         A    Correct.

7         Q    Okay.  And then --

8         A    So, so and just to clarify, too, like --

9         Q    Sure.

10        A    There are, yes, so we, you know, I, I did

11   provide the data.  I provided, you know, the creative

12   things like that to, to actually help them to raise

13   the money.  So there was also, like, you know, fees

14   from that.  It wasn't just, like everything's a

15   consulting fee for me just offering my advice.  There

16   was a lot of elements and that, so --

17        Q    Sure and so, so do you recall, exactly, you,

18   yourself through Matte Media Creations and for your

19   individual services, the bulk of what you received

20   through those two avenues for your services to

21   Progressive Priorities?

22        A    Can you repeat, rephrase your question --

23        Q    How much money did you make for your work

24   with Progressive Priorities?

25        A    How much did I make --

DOJ-0000020769

152

1       Q    Yes.

2       A    -- with Progressive Priorities?

3       Q    Yes.

4       A    I'm not sure of the net of, of it, but I, I,

5    I think the money that was brought in from that

6    client, whether directly or indirectly was anywhere

7    from 300,000 to, like 1.2 million, but I don't know

8    how much exactly.

9       Q    Sure.  So, so do you, just to clarify, just

10   be, so I make sure I understand what you're saying.

11   Over the course of 2016, with your involvement with

12   Progressive Priorities PAC, do you recall ballpark

13   within $50,000, how much money you made for your

14   services to Progressive Priorities PAC?

15      A    No, I do not.

16      Q    Okay.  Go ahead.

17           BY MS. ANDRADE:

18      Q    You said, you expressed your answer as a

19   net, which sort of implies that you had expenses

20   involved with your work.  Can you detail what those

21   were?

22      A    Expenses of my work?

23      Q    Yes.

24      A    I mean, my personal energy that I put into

25   acquiring data, creating the message, paying other

DOJ-0000020770

1    people to help me with video production, things like

2    that.  So there's a lot of, yes.

3         Q    And we were talking a little bit about

4    these, I think, about the media buys, which as I

5    understand it and correct me if I'm wrong, are the,

6    the list of leads for potential donors.

7         A    Right.

8         Q    Did you pay somebody else for those?

9         A    Of, of which ones?  I'm sorry.  Say that

10   again.

11        Q    Did you pay anyone to get that information

12   and then, sell that to Progressive Priorities?

13        A    Oh, you mean, like, almost like broker

14   something?  No, I, I, I'm not sure if I did or didn't.

15    I mean, a lot of the data that I acquired was from

16   just, you know, relationships with people and things

17   like that, so yes.

18        Q    So what --

19        A    To answer your question, everything,

20   everything originated with me, mostly.  I would say

21   maybe, like, like I had Dropbox expenses and things

22   like that, but --

23        Q    Right.

24        A    -- I'm not sure if that counts.

25        Q    I think, I think we're just trying to

DOJ-0000020771

1    understand the work that you did --

2         A    Right.

3         Q    -- of course you know it better than anyone.

4     Would it be fair to say that from your past work, you

5    had these lists of potential donors and that you

6    brought that to Progressive Priorities and they paid

7    you for it?

8         A    I had some lists that were, actually, I

9    mean, the source of the data was from, is that what

10   you're asking, like what is the source of the data?

11   Oh, so, I'm, I'm not, I'm not --

12        Q    Yes.

13        A    -- sure where you're, what are you, I don't

14   want to --

15        Q    I think --

16        A    I don't understand the question.

17        Q    I think the question is you had said that

18   one of the services you provided Progressive

19   Priorities PAC was media buys.

20        A    Right.

21        Q    And I understand you to mean from that, that

22   you provided lists of potential donors.

23        A    Right.

24        Q    And I'm wondering where you got those lists.

25        A    Okay.  So yes, to answer your question,

DOJ-0000020772

155

1    there was one time where I got a list of, of, like,

2    from a, from somebody, a contact that I met through

3    SmartCall.  Yeah, so it was, like, a fairly big list,

4    but that list came from a guy, I forget his name, but

5    it was, like, Dan, but he, he basically had this list

6    that I, I'm not sure where he got it from, but I got

7    it from him and it was basically, a list of potential

8    donors.  So he, what he does is typically, like he

9    maybe takes, like a database of, like all the

10   consumers that you can purchase and then, he, they

11   have, like the, the, you know, the status of, like

12   their voting, things like that, that they, that they

13   take and then he's able to like make the data and

14   then, provide it to me.  So yes.

15        Q    And did you pay him for that list,

16   initially?

17        A    He would get paid, like on the backend,

18   sometimes, like I never paid him, like directly for

19   the data, but like, for instance, sometimes like in

20   the rate, you know, you can put in there on, like,

21   like to rent his lists, you know, kind of thing, like

22   he can get, like 2 cents per minute or something that,

23   of actual time.  so like he's compensated kind of that

24   way.  That's how that would work.

25        Q    And would he be compensated by Progressive

DOJ-0000020773

1    Priorities PAC directly or by you?

2         A    That was done through SmartCall, yes.

3         Q    So the way that he's compensated is

4    Progressive Priorities PAC pays SmartCall and

5    SmartCall uses a percentage of that to pay him --

6         A    Correct.

7         Q    -- for these lists?

8         A    Correct.

9         Q    Okay.  So when you say that you provided

10   media buys to Progressive Priorities PAC, what does

11   that, what were you --

12        A    Like, just media buying as a general concept

13   of, of basically, like, putting out a political

14   advertisement and paying for that.  So, like just

15   media purchase, I guess, I could say that, like

16   purchasing the ability to -- that was a, that was an

17   incorrect term.  I, I, maybe just a service or I don't

18   know how to phrase that.

19        Q    I'm just trying to --

20        A    It's just a --

21        Q    -- understand.

22        A    -- sub platform.

23        Q    You, you have to understand we're attorneys

24   and --

25        A    Right.

DOJ-0000020774

1      Q    -- so we are just trying to get a clear

2  record of how exactly these kinds of transactions work

3  in --

4      A    Okay.

5      Q    -- in your business.  So if this seems

6  really elementary, I apologize.  But I was hoping we

7  could just get a sense of, like exactly what services

8  you were providing, like you were explaining it to a

9  kindergartner.

10     A    Right, okay.  Well, I, I guess, because I

11 don't want to, like say something and, like misspeak,

12 so --

13     Q    Of course.

14     A    -- generally, the, the, the idea is to get

15 something that's going to work and keep, like funding

16 itself.  So, like whether or not that's voice

17 broadcasts or, like something like TV, which, you

18 know, we, we did for Liberty Action Group.  The goal

19 is to keep it going, so more people can be reached.

20 So as far as like specifics on, like pay and things

21 like that, for the data for instance, like, I recall

22 one time where the, the, the person was, Dan was

23 compensated through SmartCall.

24          They would basically pay, like a per minute

25 rate or something.  And then, like he would, like

DOJ-0000020775

1    every time I would send the message out, he would get

2    like 2 cents per minute or something, but I don't have

3    record of that.  So it's kind of, like almost, like,

4    you know, he's, like a, a, like, you know, he's

5    getting paid, like instead of like a lump sum, you

6    know, to, to, like to buy the database, you know,

7    we're basically, like, okay, well, we'll, you know,

8    every time we run, like we'll pay you, you know, the 2

9    cents per minute, so you can, you know, be compensated

10   that way, if that makes sense.

11        Q    Sure.

12             MS. DI GIOVANNI:  Something I'd like for you

13   to, I'll take Exhibit 2 back from you, since it's just

14   in the way.  Thank you.  Just really quickly,

15   something I'd like you to do with me is, we've

16   discussed how you were paid.  Perhaps, individually

17   but also through your company Matte Media Creations.

18   Starting on page 168.  I'll wait for you to get there

19   with me, okay.  This is where in the filing,

20   Progressive Priorities disbursements begin.  Can you

21   look through this page to the end, which is just

22   through page 180 and see if you can find any

23   disbursements to Matte Media Creations or to you,

24   individually?  So from page 168 to 180, does Matte

25   Media Creations or your, your name appear?

DOJ-0000020776

```
1            THE WITNESS:  No, I don't see it.
2            MS. DI GIOVANNI:  Okay.  Thank you for
3     confirming that for me, okay.  All right, I can take
4     back this monster exhibit.  Okay, I can take that back
5     from you.  It's sort of cluttering up your table
6     space.  Don't worry.  It's okay if it's out of order.
7            THE WITNESS:  Okay.  And I just want to say
8     to, I remember going to OpenSecrets on the, on the web
9     and, like, I'm not sure, like anyways, I guess --
10    remember when I told you on the phone that one time
11    that I remember seeing, I, I remember actually seeing
12    my name on there and it said, like Matt something and,
13    like there was an amount.  So, like that's why I told
14    you that I thought it was in the report, but again,
15    like I didn't handle any of the FEC filing, that was
16    all Henok.
17            So Henok was in charge of getting the
18    information that he needed from Progressive
19    Priorities, from the PAC, from, from Rob for the PAC,
20    taking those, you know, whether it's, like access to
21    the PayPal or access to the bank account.  He would
22    take those, that information and then, you know, put
23    it in QuickBooks or whatever and then do, do the FEC
24    filing.  So at that time, my, my duties were not the
25    financial, like you guys are, you know, I don't know
```

DOJ-0000020777

1     if you're trying to insinuate that I was or not, but,

2     like, I'm just, I'm just letting you know that that

3     was not my responsibility up until, you know, two

4     months ago, when I wanted to assume role as treasurer.

5              MS. DI GIOVANNI:  Sure.  And just as, as I

6     said in the beginning, this is sort of fact gathering

7     for us.

8              THE WITNESS:  Okay.

9              MS. DI GIOVANNI:  This is an investigative

10    deposition.  So we are trying to, to understand what

11    happened.

12             THE WITNESS:  Got it.

13             MS. DI GIOVANNI:  So we appreciate your

14    answers to the best of your knowledge and

15    recollection.  Anything you don't know, you don't

16    know.  So we're, we're totally in accordance on that.

17             THE WITNESS:  Okay.

18             MS. DI GIOVANNI:  So with that said, we will

19    be looking at another filing.

20             THE WITNESS:  Okay.

21             BY MS. DI GIOVANNI:

22       Q    So this will be Exhibit 15.  I'll give you

23    this.  This is much less hefty.  And can you identify

24    this document for me?

25       A    This is FEC form 3X, Reports and receipts

DOJ-0000020778

1       and disbursements Progressive Priorities PAC.

2                   (The document referred to was marked for

3       identification as Agency's Exhibit No. 15)

4            Q     Okay.  And under box 4, can you identify

5       which report it is?  It's at the left side of the --

6            A     It's October 15th Quarterly Report.

7            Q     Excellent, thank you.  And just to, for

8       completeness, were you at all prepared or involved in

9       preparing or filing this report?

10           A     No, I was not.

11           Q     Okay.  And again, just briefly about the

12      PACs receipts.  To the best of your knowledge, do

13      these reports include information regarding employer

14      occupation data for the people who contributed to the

15      PAC and those are itemized beginning on page 6.

16           A     Can you repeat the question?

17           Q     Sure.  To the best of your knowledge, which

18      we do understand may be limited, do any of the

19      itemized contributions here in this report contain

20      employer or occupation data for the contributors?

21           A     No, they do not.

22           Q     Okay.  And do you have any idea why, why

23      that information would have been excluded?

24           A     No, I'm not sure.

25           Q     Got it.  And you said before, with respect

DOJ-0000020779

1    to the other report, that that information was not

2    collected contemporaneously, is that true for this

3    report as well?

4         A    Yes.

5         Q    Okay.  And thus far, you personally, have

6    you undertaken any efforts to collect this information

7    for these contributors?

8         A    No, I have not.  I haven't, I have had, I

9    haven't had the resources and Progressive Priorities

10   PAC currently is insoluble.

11        Q    Sure.  And then, has anyone else that you're

12   aware of, undertaken efforts to collect that

13   information?

14        A    I'm not sure.  No, I'm not sure.

15        Q    Understood.  And like we did before, if

16   you'll turn to page 42.  These are itemized

17   disbursements of the PAC.  And all right, at the top

18   of the page, you'll see a $500 disbursement to Josiah

19   Cammer.  What do you know about Mr. Cammer?

20        A    Josiah Cammer was the director of Liberty

21   Action Group.

22        Q    Okay.  And is there, do you recall why he

23   was paid by Progressive Priorities PAC?

24        A    I can't speculate and I, I didn't oversee

25   him being paid.  I know he had access or not Josiah,

DOJ-0000020780

1      but I know Kyle Davies had access to the Progressive

2      Priorities and also the Liberty Action bank account.

3      So this might have been an error, you know, so.

4          Q    Okay. And as far as you're aware, did Mr.

5      Cammer do any work for Progressive Priorities PAC at

6      any time?

7          A    I'm not sure if he did or not.

8          Q    Okay.  And so you, the, can you read to me

9      the purpose of this disbursement here?

10         A    Consulting.

11         Q    Okay.  And does that job your memory with

12     respect to any payments by Progressive Priorities PAC

13     to Mr. Cammer?

14         A    No.

15         Q    Okay.

16         A    It doesn't.

17         Q    All right.  Lower down on the same page,

18     you'll see a disbursement to Paysafe.  Can you recall

19     anything about this disbursement?

20         A    Paysafe?  That might have been the, the

21     merchant that I was trying to think of, but I'm not,

22     I, I don't want to speculate.

23         Q    Sure and do you see the purpose for that

24     disbursement listed in the report?

25         A    Bank charges, okay.

DOJ-0000020781

1          Q    And does that clarify for you?

2          A    Well, a bank charge is, I mean, Paysafe, I

3     know is, is a company that does merchant processing.

4     So this, this, you know, might have been a, like just

5     a, like a fee or something that they charged.

6          Q    And you said they do merchant processing.

7     Would that have been, like for contributions received

8     by Progressive Priorities, so they would have been

9     processing those, those transactions?  Is that what

10    you're saying?

11         A    It, yes.  It might have been.

12         Q    It might have been?  Okay, understood.  And

13    then, if you'll skip ahead to the last two pages, 51

14    and 52.  At the bottom of 51 and top of 52, there are

15    disbursements to USMS (phonetic) also for bank

16    charges.  Can you recall anything further about these

17    disbursements?  I'll give you a second to look at

18    them.

19              MR. LAWYER:  Where is it?

20              MS. DI GIOVANNI:  The bottom of 51 and top

21    of 52.

22              THE WITNESS:  You said 51?  Okay.

23              MS. DI GIOVANNI:  Yes, I'm sorry.  The last

24    two pages of the document.  At the bottom of 51 and

25    top of 52.  So I, the question was about USMS.  I'm

DOJ-0000020782

1    trying to see if you recall anything further about

2    these disbursements.

3             THE WITNESS:  I, yeah, I didn't handle the

4    merchant processing.  So I can't give an accurate

5    answer on that.

6             BY MS. DI GIOVANNI:

7        Q    But you believe that USMS to have been

8    merchant processing perhaps?

9        A    I'm not sure if they did or didn't.  I know

10   that was a bank that we used, but I'm not sure if USMS

11   was used by Liberty Action Group or Progressive

12   Priorities.

13       Q    Okay, understood.

14       A    I would have to check those records.

15       Q    Okay.  And so in terms of, preparing these

16   reports, who do you recall was responsible for

17   collecting the missing information we've been talking

18   about today?

19       A    Henok was, was instructed, well, Henok was,

20   was the, the, the, the main person that was kind of

21   giving direction on what needed to be, what

22   requirements, you know, needed to be fulfilled by the

23   FEC, if there were any, because I do remember him

24   saying that, you know, we needed to go back and use

25   best efforts to try and collect name and occupation

DOJ-0000020783

1    for, name, occupation, employer for, for 200 and over.
2     So as far as, like, duties, can you repeat the
3    question again?
4        Q    Sure.  Just sort of who was in, whose
5    responsibility was it to collect all this information
6    when the, so for instance, the occupation and the
7    employer, whose job was it to make sure that
8    information was, was aggregated for these filings?
9        A    I don't think it, I don't think anybody had
10   a specific role.
11       Q    Okay.
12       A    On that, I think it was a collective effort.
13       Q    Okay.
14       A    That we, that we just wanted to collect all
15   the information.  I don't, I'm not, I'm actually not
16   even certain if everybody that was part of the
17   organization even knew about the occupation, name and
18   employer requirement.  We were always just kind of
19   looking at, at Henok for direction on that, so.
20       Q    Sure.  And, and do you recall that email we
21   read from September of 2016, where Henok no longer
22   wanted to be the treasurer?
23       A    Right.
24       Q    You, you do recall that email?
25       A    Yes.

DOJ-0000020784

1         Q    So this report is dated October 15th of 2016.

2         A    Well, who, who filed this, Henok did.  But

3    just because he said he doesn't want to be the

4    treasurer doesn't exactly mean, like, he's, like, I

5    don't know, like he didn't or like, you know, from

6    what I understand, like he, there was nobody else.  I

7    don't know, like I, yeah, I'm, I'm very lost on the

8    dates, like I just don't recall any like specific

9    dates --

10        Q    Sure.

11        A    -- so I don't want to, like say something,

12   so.

13        Q    Understood.  And when you were saying it was

14   sort of a collective effort to keep this information

15   together, just to be clear.  Can you sort of specify

16   who the 'we' is in that collective?

17        A    I mean myself, Rob, I know Henok obviously

18   had, you know, intentions to, like make sure this

19   report's accurate, you know, and then Kyle.

20        Q    Okay.  Got it, thank you.  That's all I have

21   on this.  Jin, has a question.

22             MS. LEE:  With respect to the disbursement

23   sections, the disbursements reflect again payments

24   made to SmartCall Media and Signia Marketing.  And can

25   you just restate the, can you just describe the

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020785

1      purpose of, purpose of the disbursement for Signia

2      Marketing and SmartCall Media in these, in this

3      report?

4                   THE WITNESS:  For Signia Media it was the

5      call center and then for SmartCall was for the, for

6      the voice broadcasting, yes.

7                   MS. DI GIOVANNI:  So to the best of your,

8      your recollections, the purpose remained the same

9      between the April quarterly report and the October

10     quarterly report for Signia Marketing and SmartCall?

11                  THE WITNESS:  Oh, yes, yes.  I mean, the,

12     they, they provide the same services consistently.  It

13     wasn't, yes.

14                  MS. DI GIOVANNI:  Across this time period?

15                  THE WITNESS:  Correct.

16                  MS. ANDRADE:  Can I ask a clarifying

17     question?

18                  THE WITNESS:  Yes.

19                  MS. ANDRADE:  We've been using the term

20     voice broadcasting --

21                  THE WITNESS:  That means, that's robocall,

22     yes.

23                  MS. ANDRADE:  Okay, thank you.

24                  MS. DI GIOVANNI:  Thank you.  That's

25     helpful.  Now, I will take this back.  We'll actually

DOJ-0000020786

169

1    get a little bit more into that voice broadcasting

2    now.  So excellent segue of the clarifying question.

3    This is going to be Exhibit 16, okay.

4              (The document referred to was marked for

5    identification as Agency's Exhibit No. 16)

6              BY MS. DI GIOVANNI:

7       Q    So you've stated that, that part of

8    Progressive Priorities work involved sending

9    robocalls.  You produced an audio file to me with a,

10   one of these voice broadcasting disseminations.

11      A    Yes.

12      Q    To the best of your knowledge, does this

13   transcript reflect the substance of the file you

14   provided to me?

15      A    Yes.

16      Q    Okay.  So how did you obtain that audio file

17   that you sent to me?

18      A    This was on a video online that what I

19   believe to have been, like various --

20      Q    So, I mean, the file that you produced to

21   me, the audio file that you sent to me.

22      A    Uh-huh.

23      Q    How did you get that file, the, the

24   robocall?

25      A    I had, I had it, because I made those

DOJ-0000020787

170

1    myself.

2         Q    Okay.

3         A    Yeah.

4         Q    So you produced the robocall yourself?

5         A    Correct.

6         Q    Okay.  And then, you said that the, the clip

7    included a, a, well the voice of Hillary Clinton.

8         A    Correct.

9         Q    You're saying that that was a fair use video

10   that you found online, is that correct?

11        A    Correct.

12        Q    Got it, thank you.  So do you recall when

13   this robocall would have been distributed by

14   Progressive Priorities?

15        A    I believe over the time that we, that I was

16   providing, you know, that we were running campaigns

17   for Progressive Priorities.

18        Q    So throughout most of 2016, is that correct?

19        A    Correct, correct.

20        Q    Okay.  And how many robocalls do you, to the

21   best of your recollection, remember that Progressive

22   Priorities produced during this time period?

23        A    A lot, I can't speculate, but over a

24   million.

25        Q    So that's the number of people who are

DOJ-0000020788

171

1    reached, but how many different individual scripts
2    were there for these robocalls?  Do you recall?
3         A    There were, there were various, you know,
4    scripts, but they were, like variants.  And I actually
5    don't have those.  I only have this one that I
6    provided you.
7         Q    Do you know why you don't have the others?
8         A    We, we didn't make a lot.  We didn't do a
9    lot of testing with, with this, with, like, we, like,
10   we kind of, I, I understood it, like this message, you
11   know, this, this style works really well.  So we
12   didn't really do a ton of, like, like creating stuff.
13    And then, like any of these, like any of these, like
14   audio files, I just, I, like, don't have.  I just have
15   this one so.
16        Q    Okay.  And why don't you have them anymore?
17        A    I just, I like, don't have access to then.
18   I deleted them.
19        Q    Okay.
20        A    Yeah.
21        Q    And so, you know, since you made these audio
22   files, do you remember how many variations you might
23   have made?
24        A    Maybe, like, no, I don't, I don't recall the
25   exact number.

DOJ-0000020789

1          Q    Sure.  Do you have a ballpark, maybe?  You

2     know, was it 5 or was it 50?

3          A    It was definitely more like five.

4          Q    Okay.  And do you recall how much you

5     charged for producing these, since they would have

6     required some, some personal effort on your part.

7          A    I don't recall how much was charged.

8          Q    And might you have records of, of what you

9     charged?  I know we've talked about that a little bit,

10    but --

11         A    I, I don't.

12         Q    Okay.  But if you were able to gain access

13    to the Matte Media Creations closed bank account, will

14    you be able to provide that to us?

15         A    Yes, I can, yeah.

16         Q    Okay.

17         A    I'm just trying to think, because I'm not,

18    like, sure how long that's going to take or what

19    process, but I can --

20         Q    Sure.

21         A    -- attempt to, you know.

22         Q    Absolutely.

23         A    Okay.

24         Q    We understand these things can take a while.

25      But we would appreciate that if you, if you can get a

DOJ-0000020790

1    hold of that, that is responsive to the subpoena, so

2    we will --

3         A    Okay.

4         Q    -- we would like that.  And so you said that

5    you created, we'll use the number five, you know, with

6    the understanding that that is not an exact figure.

7    Did you actually disseminate all those variations or

8    were they sort of workshopped versions that you just

9    created internally?

10        A    They were, actually, I don't remember, like,

11   exactly how the structure of, of it, of it went, but

12   I, I was able to pull this when I searched for, like

13   the google drive so.

14        Q    Sure.  And do you recall, I know we, we just

15   moved on from this, but how much you would sort of

16   typically charge for producing a robocall like this?

17        A    Again, like I don't, I didn't charge, like a

18   specific amount, like I, when I said consulting, like

19   I, I, I don't want to, I, you know, like the, the

20   reason, the, the charges were based off of, like how,

21   how we were able to like, run the campaign.

22        Q    What did --

23        A    So, like we didn't have, I didn't have like

24   a fixed invoice amounts like I, like I probably should

25   have sent, but there were, like actual, you know, like

DOJ-0000020791

1    amounts that, that went from, like, you know,

2    Progressive Priorities to yeah, there were, there were

3    actual fixed amounts, like it wasn't just willy nilly

4    so.

5        Q    Would it be accurate to say that your

6    process for billing Progressive Priorities was perhaps

7    a little informal?

8        A    It was informal and yeah, it, it, it's

9    something that we, I, I no longer do with the PACs

10   that I represent.

11       Q    Sure, with the understanding that this was,

12   I mean, this was some time ago.  This was a relatively

13   new business for you, I totally understand.

14       A    Or it's, it's something that I try not to

15   do, yeah.

16       Q    And so when you did sort of communicate

17   with, with Rob about how much you needed to get paid

18   for the work you'd done, was it based at all on how

19   much Progressive Priorities had raised in the past

20   time period or was it based on the amount of work

21   you'd done.  Can you tell us sort of --

22       A    Yeah, this --

23       Q    -- how you kind of wiggled that in.

24       A    Right.  So again, we went by the, the method

25   of, you know, we wanted to, you know, help them

DOJ-0000020792

175

1       acquire as many donors as, as possible.

2           Q       Sure.

3           A       So we, we just used, I mean, from, from,

4       from the, even my background, you know, it wasn't

5       uncommon to see, you know, invoices from, from me to

6       companies that just invoiced for the, you know, the,

7       the donation amount with, with the, with the terms

8       that, you know, the PAC would, you know, have rights

9       to that name or be able to, like contact that person

10      again, that's just --

11          Q       Sure.

12          A       -- kind of like the donor lifetime and how

13      it works so.

14          Q       Sure.  So when you were talking with Rob

15      about saying, you know, I did this work for the PAC

16      this, say you're, you're billing him once a month.

17          A       Right.

18          Q       And, and do you recall how often you would

19      get paid at all?

20          A       We, we tried to do every week, but again,

21      you know, we were more focused on trying to, you know,

22      build the PAC versus --

23          Q       Sure.

24          A       -- trying to focus, you know, specifically

25      on, like, like, making sure the invoice was --

DOJ-0000020793

1      Q    Yeah, it was a, it was a continuing effort.

2      A    Correct.

3      Q    But so, let's say, every week when you

4    talked to Rob and you're determining how much you need

5    to get paid this week.  Are you sort of basing it on

6    the PAC's receipts or on the work you did or a

7    combination of both?

8      A    It's a combination of both.

9      Q    Okay.  And was it sort of a formal

10   percentage or sort of an eyeball, like okay, the PAC

11   made X, so pay me Y this week?

12     A    I paid, I paid, you know, to, to be honest,

13   like, I don't feel comfortable answering that, because

14   I'm not really sure, like --

15          MR. LAWYER:  And it varied every time.

16          THE WITNESS:  Right, like --

17          MR. LAWYER:  It wasn't --

18          MS. DI GIOVANNI:  Is that your testimony,

19   Mr. Tunstall?

20          THE WITNESS:  I was paid as, like a

21   consultant.

22          MS. DI GIOVANNI:  Sure.

23          THE WITNESS:  But mainly the, the objective

24   was to make sure that the campaign kept going and that

25   there was a, a healthy donor acquisition campaign, so

DOJ-0000020794

1        --

2                MS. DI GIOVANNI:  Sure.

3                THE WITNESS:  -- I wasn't solely paid as a

4        consultant or as media buys, it was more of, you know,

5        a growth factor, so.

6                MS. DI GIOVANNI:  Sure and just to, to, just

7        to be clear, I mean, you know, we're not, no one's

8        trying to get a gotcha at the moment.  What I'm, what

9        I'm trying to ask is sort of was there a formal

10       calculation that was, was sort of a mathematical

11       formula or was it sort of based on how the PAC was

12       doing and the work you'd done.  There was an informal

13       agreement as to how much you would be paid for your

14       services.

15               THE WITNESS:  Correct.  There was more of

16       the latter, so the informal, looking back in

17       retrospect, it would have made sense to do something,

18       like a, an agreement, where, you know, I was paid for

19       access to experience, I was and then, I had, you know,

20       actual amounts, but we just, it was the first kind of

21       PACs that we did, like, so it was hard to understand

22       like the exact best practices.

23               BY MS. DI GIOVANNI:

24       Q    Understood, absolutely.  Let me make sure

25       I've covered everything about this transcript.  We're

DOJ-0000020795

1    having such a nice conversation, I'm getting off my

2    outline, okay.  So we've talked about how Signia and

3    SmartCall, Signia was the call center, SmartCall was

4    the robocalling operation.  Were there any costs,

5    other than your costs for, for making the robocall,

6    that are reflected in the reports we talked about or

7    was that pretty much the, the call center SmartCall

8    for distributing it and you?

9         A    Yeah, I believe, I believe that was it.

10   Yes, I do believe that's, I'm not, I'm not sure if

11   there were, like, other, like other charges, but the

12   way that Henok would do the filings is he would,

13   again, just, you know, request access for the bank

14   account and, and then, like take whatever expenses are

15   there and, and do the reports, so I just don't

16   remember the specifics.

17        Q    Sure.  Something that you mentioned, as, as

18   we discussed before, so everybody except possibly

19   Monique, I believe, was her name, got paid.  Was Reyes

20   paid individually or did he have a company or was he

21   paid through Matte Media Creations?  Do you recall?

22        A    Yes, I do recall, okay.  I believe he was

23   paid, I, I, like, does the record show that he was

24   paid at all?

25        Q    It's kind of hard to tell and we're trying

DOJ-0000020796

1    to figure out what you remember.  Was it a

2    possibility, I think you mentioned earlier, did he

3    have a Modern Media Creations?

4         A    Right.

5         Q    Was that Robert Reyes?

6         A    Right.

7         Q    And was that the company he was using at the

8    time he was working with, with Progressive Priorities

9    PAC?

10        A    Yes, it was.  I'm trying to think.  Okay,

11   can I go back and, like modify, because I'm

12   remembering --

13        Q    Oh, absolutely.

14        A    -- some stuff.

15        Q    No, please, we understand.

16        A    Okay.

17        Q    Memory is not perfect.

18        A    Okay, yeah.  So I remember, okay, so

19   actually, okay, yeah, so SmartCall, basically with

20   SmartCall, they were, they, we, we had everything,

21   like bundled for, for this particular client, like

22   with SmartCall.  So, like --

23        Q    Okay.

24        A    -- SmartCall would pay the, the people in,

25   like the data people, you know, because we set that up

DOJ-0000020797

180

1    and that was working.  To my knowledge, like there

2    wasn't any law that said you couldn't, you know, be

3    paid by somebody else.

4         Q    Sure.

5         A    So on the back end as well, you know, we had

6    SmartCall actually -- basically they would, we would,

7    we would be, like, okay, so they would be, we would

8    be, like wholesalers, I guess you could say.

9         Q    Okay.

10         A    So, like we, we brought the client, you

11    know, and then, we would get, like, I guess, they

12    would call them, like kickbacks so.

13         Q    So am I correct in understanding

14    functionally, you were paid through SmartCall, because

15    --

16         A    Yes, yes, as far as getting some

17    compensation, because I wanted to make sure this is

18    correct for the record.

19         Q    Sure.

20         A    We -- I was compensated.  I don't know how

21    it shows in the, like, I, I can't testify, like give

22    testament of, like how exactly it showed up, but I

23    know that we were compensated.  And when I said the

24    300,000 to, like, a million, that came in, in some way

25    either from, like SmartCall or, like invoices direct,

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020798

1    again, like it was a long time ago.  And, like I had

2    multiple PACs, LAG and, and Progressive Priorities, so

3    it was just hard, it's just hard for me to, like

4    recollect everything, but I was paid for my services.

5         Q    Yeah, absolutely.  And just to be clear when

6    you said the 300,000 to a million, what is that figure

7    exactly that you're talking --

8         A    That's the figure of, like how much I, like

9    -- so when I, when I go in, because I'm going to go

10   get the Matte Media Creation bank statement, right?

11   And it's going to show, and it's going to show, like

12   either it's going to show either payments coming from

13   SmartCall or Progressive Priorities.  I don't know

14   which one, but, like, because I don't remember, but

15   there's, there's going to be, like compensation.  And

16   I think the range is from, like 300,000 to a million.

17    I'm not sure exactly.

18        Q    Okay.  So and that was during the time

19   period of 2016?  That's sort of the ballpark of what

20   you remember that you received?

21        A    Correct.  And if Rob was paid, like he

22   might, he might have been paid that way.  I'm, I'm

23   fairly certain he was paid in the same aspect, because

24   we wanted to keep things simple, so.

25        Q    Got it.  And as far as you're aware, so both

DOJ-0000020799

```
 1    you and Rob, to the best of your recollection, were
 2    paid through SmartCall Media?
 3         A    Yes.
 4         Q    Okay.
 5         A    I'm, I'm, yes.
 6         Q    Got it.
 7         A    Correct.
 8              BY MS. ANDRADE:
 9         Q    Was anyone else paid through SmartCall
10    Media?
11         A    No.  I actually do remember that it was only
12    myself and Rob, because we were the ones who, you
13    know, brought this particular client to, you know, so.
14              MS. ANDRADE:  Got it, okay.
15              BY MS. LEE:
16         Q    When you say brought this client, what do
17    you mean?
18         A    Like, well, we, okay, I'm, yeah, brought
19    this client is probably not the best term, but, like,
20    I had an existing relationship with them, so, you
21    know, I, I wanted to, you know, dial in that platform
22    and basically, just, you know, so I, I had that
23    relationship.  Is that what you're asking?
24              BY MS. DI GIOVANNI:
25         Q    Them being SmartCall Media?
```

DOJ-0000020800

1      A    Yes.

2      Q    Just to clarify for the, the recording, them

3    being SmartCall Media?

4      A    Yes.

5      Q    Yes, okay.

6      A    Can you, can you rephrase or repeat the

7    question?

8      Q    You said, you brought this client to them.

9    And so we want to know who "this client" and who

10   "them" is.

11     A    Right.  So the, the client is Progressive

12   Priorities PAC, the service is SmartCall Media.

13          MS. ANDRADE:  Okay, thank you.

14          MS. DI GIOVANNI:  Got it, that makes sense.

15          BY MS. DI GIOVANNI:

16     Q    Okay, one last question about this specific

17   robocall.  So this call and Progressive Priorities PAC

18   generally supported Hillary Clinton.  Do you recall

19   whether Progressive Priorities used any contributions

20   it received to support Hillary Clinton's campaign?

21     A    I don't believe it did.  Simply because I

22   don't, I don't, I don't think that the actual PAC was

23   set up to even allow contributions to a candidate.

24   And typically, the way that this was explained to me

25   and was, was that, you know, with Super PACs that are

DOJ-0000020801

184

1      unauthorized, you're not allowed to contribute to the

2      candidate.  You have to have, like a Carry PAC or

3      something like that set up.  So I was, I was aware of,

4      of that and that it's, you know, typically with these

5      PACs, you're not supposed to donate to the candidate,

6      because, from the PAC, because then it might be

7      perceived as coordination, so.

8           Q    So was Progressive Priorities PAC a Super

9      PAC?

10          A    I don't know what the actual, you know, I

11     don't know what the actual PAC was.  I didn't set the

12     PAC up.

13          Q    Sure.  And then in terms of just it's

14     activities, did the PAC make any independent

15     expenditures sort of in support of Hillary Clinton?

16     Where it didn't give her the money directly, but it

17     put out ads on her behalf?

18          A    I'm not sure if, if it was filed or not as

19     an independent expenditure, but there was expressed

20     advocacy involved.

21          Q    Okay, okay.

22               MS. ANDRADE:  May I ask a few follow up

23     questions?

24               MS. DI GIOVANNI:  Please.

25               BY MS. ANDRADE:

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020802

1       Q    You said that you didn't set up the PAC.

2  Who did?

3       A    I, I believe, well, okay, when, okay, now my

4  words are getting mixed up, okay.  But okay, when I

5  say, like set up PAC, I mean, like the original, Henok

6  was the guy who was, you know, he, he, like, I believe

7  he filed, I'm not sure, but I think he did file with

8  the, to get the FEC ID Number and everything.  So when

9  I say setup the PAC, I mean, like, the person who's

10  actually setting up the ID.  So, like, and, like

11  registering with you guys at the FEC.

12      Q    Okay. So --

13      A    So, like the actual formation and things

14  like that, like, I did, I did assist with that, so

15  just to, just to clarify.

16      Q    And so, would I be, correct me if I'm wrong,

17  the PAC conceptually was sort of your idea or was it

18  you and Rob?

19      A    Forming the PAC?  It was a collective

20  effort.  It really was.

21      Q    Collective effort would mean?

22      A    It's, I mean, I, I already testified to

23  this, but basically, you know, I was, you know, I had

24  the experience, then, you know, Rob said he, you know,

25  might want to join, you know, Davies and then, we had,

Heritage Reporting Corporation
(202) 628-4888

1    you know, some interest from somebody who wanted to be

2    a director, kind of things, so.

3        Q    Right and then, and then, Henok Tedla was

4    the one who actually filed the paperwork --

5        A    Correct.

6        Q    -- to get the FEC Number and that's --

7        A    Correct.

8        Q    -- what you were referring to when you said

9    you --

10       A    Correct.

11       Q    -- didn't set up the PAC?

12       A    Correct and to my knowledge, he did get

13   that, correct.

14       Q    Correct.  And you mentioned Express Advocacy

15   in some of Progressive Priorities PAC's activities.

16   Can you clarify what types of activities would have

17   included Express Advocacy?

18       A    Yes.  Saying, like support, you know, get

19   out to vote, support X candidate, oppose X candidate,

20   things like that.

21       Q    And were those also robocalls?

22       A    The way it was explained to me by, by

23   counsel that I've previously, you know, contracted

24   with, you know, is, like -- and I actually even called

25   you guys, the FEC, I said, hey, look, like, you know,

DOJ-0000020804

1    is this expressed advocacy or not?  Is this

2    fundraising?  And they, they said, okay, well, if

3    there's expressed advocacy actually in the message,

4    then it's an independent expenditure.

5              So there were times that I was running

6    things that had expressed advocacy in it, but the way

7    that Henok filed, he filed to, I guess, the -- you

8    know, he had his technique of filing.  I didn't have,

9    like, you know, specificity on, like, how exactly and,

10   like, the breakdown of, like, operating expenditures

11   versus independent expenditures, like I, I have the

12   flexibility now with like the PACs that I have.

13             At the time, like Henok was just, he was

14   the, the resource that, that was supposed to be the

15   knowledge person that knew all of the requirements and

16   things like that.  So there might have been messages

17   that we put out, including this one.  Or there's,

18   like, other messages that might have, might have had

19   expressed advocacy that just weren't explicitly put in

20   the report as an independent expenditure.

21        Q    Yeah, I understand, I --

22        A    Okay.

23        Q    -- I think the question is just to

24   understand the kinds of activities that Progressive

25   Priorities PAC was doing.  We have here a transcript,

DOJ-0000020805

1    a robocall that you provided us with, thank you very

2    much and is this the kind of thing that you would say

3    this was expressed advocacy?

4         A    I'm not, again, I would have this reviewed

5    by an attorney to see if it's actually expressed

6    advocacy or not, but at the time, this, I didn't, I

7    didn't believe, I didn't even know about expressed

8    advocacy at the time.  I just knew that the advocacy

9    involved, reaching as many people as possible and

10   sharing a message of, that, that showed, you know, if

11   you support or oppose a candidate.  And so that's what

12   that message does.  So this message was -- the, the

13   advocacy that Progressive Priorities did was to reach

14   people, as kind of a, like a rebroadcast that

15   basically, hey, you know, this, this is, the

16   candidate, she's running, and then, you know, the, the

17   broadcast would actually reach as many people as

18   possible to create advocacy.

19        Q    I see what you're saying and I, I understand

20   you're not a campaign finance lawyer.

21        A    Right, right.

22        Q    I'm not trying to get you to express a legal

23   opinion about this document.

24        A    Okay.

25        Q    What I'm trying to understand is you

DOJ-0000020806

1    mentioned that you guys were doing expressed advocacy

2    and so what I'm curious about is, what form that took.

3    This is an advertisement that is promoting Hillary

4    Clinton arguably and also soliciting contributions.

5    Were there other advertisements that just advocated

6    say, for Hillary Clinton, but did not include a

7    fundraising component?

8        A    I'm not sure.  At times, we would run what

9    we call like a soft ask, to where we, instead of

10   having, press 1 to donate, we would press 1 to, you

11   know, pledge to support, things like that.  So there

12   was language of, you know, supporting the candidate.

13   And then, if they wanted to make the donation, they

14   could make a donation.  So there wasn't always this,

15   like, what we call, like a hard ask style, which is

16   where they're just, you know, asking directly for the,

17   the contribution.

18           So and again, you know, the, the, the PAC

19   was only around for eight months and it was just hard

20   to keep, you know, things in place, especially with

21   directors leaving and things like that.  In hindsight,

22   you know, if we had maybe a little more stability, we

23   could have branched out, because typically that's what

24   you want to do.  You want to, you know, have your

25   operating expenses, expenditures done in the very

DOJ-0000020807

1    beginning to, you know, raise a little amount of money

2    and then, once you do that, then, you know, start to

3    progress into like independent expenditures and things

4    like that.  So that was kind of the strategy that I

5    wanted to employ.

6            Q    I understand, I think.  So in this, in this

7    advertisement, there is a hard ask, correct?

8            A    Correct.

9            Q    In other advertisements, there was what you

10   called a soft ask, where you could say press 1 to show

11   your support.  What happened when someone would press

12   1?

13           A    Yes, it would be similar to where they would

14   press 1 and then they would say, it would say, okay,

15   thank you so much for pledging your support, you know,

16   can you help us, you know, get the message out to more

17   people by, you know, pressing 1 contribute, you know,

18   and then, obviously, that contribution would then go

19   back to the PAC.  So it could basically self-fund and

20   like rebroadcast more people to spread the message.

21           Q    Okay.  So and, for all of the robocalls that

22   you did, was there always this option to donate then?

23           A    I, from, from my collection, we ran this

24   message heavily.  I'm not exactly certain on, you

25   know, like how much the soft ask versus the hard ask

DOJ-0000020808

191

1    was ran, but and I don't have the soft ask files.   I

2    was only able to pull this one, because it was

3    majority of what we used.   So this is kind of like the

4    main message so.

5         Q    Okay.   The other thing and I, I think the

6    record might be a little bit unclear, just because I

7    didn't really follow.   You mentioned that you had a

8    number of other versions of this, were they

9    broadcasted or --

10        A    Not all of them were broadcasted.   You know,

11   basically, I, I was always, I wanted to make sure that

12   the, like the disclosures were in here, you know, who

13   it was paid for by, because I, I've called the FEC,

14   you know, before and just made sure that that was, you

15   know, like a requirement.   Does that answer your

16   question?

17        Q    I think, I, I think what would be helpful is

18   to have a record of all the various scripts that were

19   ever actually broadcast to potential contributors.   Is

20   that the kind of information you could obtain?

21        A    I don't have that information, simply

22   because I, I'm, I'm pulling this information from,

23   like 2016.   I don't have that account with SmartCall

24   anymore, because I haven't used them.   So I don't have

25   access to that and I no longer work with SmartCall

DOJ-0000020809

1    anymore, so.

2         Q    Understood, to the best of your

3    recollection, were the other versions of this ad,

4    materially different in any ways that you can

5    remember?

6         A    No, they weren't.

7         Q    Okay.

8              BY MS. DI GIOVANNI:

9         Q    And did you have any ads that used perhaps

10   other politicians in support of Hillary Clinton, maybe

11   Obama or, or other individuals?

12        A    I don't remember if we used, but we, we

13   didn't, the, the goal, the goal that Michelle and

14   Alexa had was, like Hillary.  So I know that it said

15   'Obama mailer' on that one document that I sent you,

16   but and when I was pulling documents for you, I was

17   just kind of looking for, like democratic key words,

18   because like I was a --

19        Q    Sure.

20        A    -- democratic back.  So again, like, I don't

21   really, like it could have been like a lead file that

22   I got or something, you know, so.

23             MS. DI GIOVANNI:  Okay, that is good.  We,

24   we, do you guys mind if we take a brief break?

25             THE WITNESS:  Yeah, sure.  That's fine.

DOJ-0000020810

1          (Whereupon, a brief recess was taken.)

2          BY MS. DI GIOVANNI:

3     Q    Okay, we are back on the record.  Before we

4    move on, do either of you have any other follow up

5    questions on the, the transcript?  Okay, I'll take

6    that back from you, thank you.  Now, onto Exhibit 17.

7     Can you, sorry about that, and then, you.  So with

8    the understanding that you may not have seen this

9    before can you, what do you recognize this document to

10   be?

11    A    These are checks that are made to

12   Progressive Priorities PAC.

13          (The document referred to was marked for

14   identification as Agency's Exhibit No. 17.)

15    Q    And take your time and take a moment to look

16   at these.  I know that there's ten.  Just take a look,

17   a moment to go over them --

18    A    Yes, okay.

19    Q    -- Okay.  So the last two, so looking at the

20   first check, could you just say for me what's written

21   in the memo line of that check?

22    A    Hillary Clinton.

23    Q    Okay.  And then, just going ahead to the

24   second to last check, the one that's numbered 1934,

25   second to last, so it should be the, the regions 1,

DOJ-0000020811

1    there you are.  Can you read the "pay to the order of"

2    line for me?

3         A    Oh, Hillary Clinton campaign.

4         Q    Yep.  So with the understanding that you,

5    you may or may not have the answer to this, what did

6    Progressive Priorities PAC do with checks that were

7    made out to Hillary Clinton?

8         A    To my understanding, Kyle Davies was the one

9    who was depositing.  So he was instructed just to

10   deposit them.  I, in hindsight, you know, it would

11   have been helpful to, you know, write these people

12   back and tell them, hey, like, this is, you can't make

13   this out to this candidate, but his, his job role was

14   to deposit the checks, if, if the bank accepted the

15   check, you know, like it was just not unreasonable for

16   him to think that, you know, it's, he's doing his job.

17        Q    Sure.  And you said he was instructed to do

18   that.  Who, who instructed to deposit checks?

19        A    Oh, I, I definitely told him that, you need

20   to deposit the checks and, like --

21        Q    Sure.

22        A    -- you know, take the information and so,

23   we, you know, we can give it to Henok and be

24   compliant, so.

25        Q    Okay.  So as far as you're aware, you know,

DOJ-0000020812

195

```
1      these checks were deposited into Progressive
2      Priorities account?
3           A    Correct.
4           Q    Okay.
5           A    I'm, I mean, I'm not, I didn't actually see
6      them get deposited, but yes.
7           Q    Okay.
8           A    That's, that's the order of things.
9           Q    And it would have gone into, would have been
10     used for the same purposes as all of the rest of
11     Progressive Priorities funds, is that correct?
12          A    Correct.
13          Q    Okay.
14               BY MS. LEE:
15          Q    So how did you first learn about
16     contributors making checks out to Hillary Clinton?
17          A    I've never, this is the first time that I've
18     seen this document.
19          Q    Okay.  So you, you didn't, before you saw
20     this document, you weren't aware that people were
21     making --
22          A    No, I wasn't aware.
23          Q    Okay, okay.  Well, then you just said that
24     you told Kyle that he had to deposit the checks.
25          A    Right, but I, I, I didn't see the actual
```

DOJ-0000020813

1     check image that said, Hillary Clinton Campaign.  I've

2     never --

3          Q    Okay.

4          A    -- seen that, this check.

5          Q    Oh, okay.  So you weren't aware until today

6     that people were --

7          A    Correct.

8          Q    Okay, okay.

9          MS. DI GIOVANNI:  So just to clarify, your,

10    your instruction to him to deposit the checks was just

11    to deposit the checks he received on behalf of --

12         THE WITNESS:  Right.

13         MS. DI GIOVANNI:  -- Progressive Priorities?

14         THE WITNESS:  Right.

15         MS. DI GIOVANNI:  Not the checks

16    specifically that said Hillary Clinton on them?

17         THE WITNESS:  Correct.

18         BY MS. ANDRADE:

19          Q    Who was, who was coordinating with Kyle

20    Davies, was it or was it Rob Reyes?

21          A    Rob mainly.  It was, you know, Rob, Henok

22    and Kyle were kind of like this whole check, you know,

23    process thing, was that was kind of the chain.  So it

24    was, like Kyle would go deposit.  Rob would, you know,

25    have communication with Henok and, you know, Rob would

DOJ-0000020814

197

1   have communication with Kyle.  So he was kind of the

2   intermediary.

3        Q    And it's been your testimony, as I

4   understand it, that you were not very involved in --

5        A    I --

6        Q    -- that aspect?

7        A    Right, correct.  I, I understood the process

8   of, of how, you know, logistics were set up, but I, I

9   don't have, like details on, like, I didn't have

10   details on, like every single check image and things

11   like that.

12        Q    Did you ever have group meetings or phone

13   calls about this?

14        A    About what in particular?

15        Q    About Kyle and Rob and Henok handling the

16   incoming funds?

17        A    We, we had, we just, they were, they just

18   had basic instructions.  I mean, the, to answer your

19   question, yes, we did have, like phone calls and

20   things like that.  There was communication, yes.

21        Q    And that's how you knew what everybody's

22   role was?

23        A    That's how I knew their role and then,

24   that's how I made sure things were getting done, like

25   Rob would have told me, like, hey, look, if Davies

DOJ-0000020815

198

1    just or Kyle Davies just, you know, stopped depositing

2    checks or something.  So I knew more broadly of, like

3    what was happening.

4         BY MS. DI GIOVANNI:

5         Q    So would it be accurate to say that you were

6    sort of managing the operations and they were the,

7    sort of the boots on the ground?

8         A    Rob was in charge of, like, the, the admin,

9    administrative tasks, along with Kyle and I was more

10   of the creative and making sure, like things are,

11   like, compliant on the messaging side with the FEC.

12        Q    Okay and I'll take that back from you. Thank

13   you.  Okay and this is Exhibit 18.  Here you are.  And

14   this is a double-sided document.  Could you tell me

15   what this document is?

16        A    This is a document that was sent by my

17   appointed registered agent for Progressive Priorities.

18    She had recommended that I, do you want me to say the

19   name of this or?

20             (The document referred to was marked for

21   identification as Agency's Exhibit No. 18.)

22        Q    Sure, tell me, tell me everything --

23        A    Okay.

24        Q    Tell me everything you remember about this

25   and what it is.

DOJ-0000020816

1        A     Yeah.  So this the document, so I, I'd

2   received a phone call from Justine di Giovanni and she

3   told me that there was a, the, the filing was late and

4   that there, you know, might have been some

5   inaccuracies and I reached out to Rob.  Rob, Rob

6   didn't want to handle this.  Kyle didn't want to

7   handle this.  Alexa, you know, I, I contacted her on

8   messenger briefly.  She responded back but didn't

9   respond to when I sent her this to sign it.  and then,

10  I tried to call Michelle and she was unavailable.

11        So going back to what I was saying.  This,

12  this document was given, given to me that was drawn up

13  by the accountant that I have now that was in charge

14  of doing the filings that brought Progressive

15  Priorities to good standing and she told me that I

16  needed to get this signed by Alexa, since Alexa was

17  the originating person on Progressive Priorities and

18  that if I didn't, you know, get this signed then, you

19  know, if Alexa doesn't respond in 30 days, then, you

20  know, somebody has to take over that was, you know,

21  affiliated with this and that, you know, I should, I

22  could, I could basically be under Progressive

23  Priorities and then, be able to handle this matter so.

24        Q     Okay.  And so you mentioned an accountant

25  that's working with you.  Who is that?

DOJ-0000020817

1          A     Amber Gormley (phonetic) or Amber Vaughn,

2     I'm not sure, I guess.

3          Q     And did she prepare this document or did

4     you?

5          A     She prepared this, yes.

6          Q     Okay.

7          A     And then she told me to get Alexa to sign

8     this per her, you know, her advice.  So again, like,

9     I, my, my, my strategy is always to, you know, hire

10    attorney and accounting expertise, whether there, you

11    know, where they would, like accurately, you know,

12    file or not, but at least, you know, I'm, I'm

13    attempting to, like, kind of delegate those tasks out.

14    That's kind of my and then focus on the campaigning,

15    so.

16         Q     Sure.  And is it correct to, to sort of

17    summarize what you've just told me about this document

18    that you sent this document to Alexa Roth, in an

19    attempt to sort of gain control over the PAC, so that

20    you could amend its filings?

21         A     Correct and bring it to good standing, yes.

22         Q     Okay.  And did Alexa ever sign this

23    document?

24         A     No and she also did not respond.

25         Q     Okay.  And do you know why she stopped

DOJ-0000020818

1    responding and didn't sign the document?

2         A    I mean, I don't want to speculate, but, you

3    know, I think, honestly, you know, she just, she just

4    doesn't want to be involved, you know, in anything,

5    so.

6         Q    And you have attempted to contact her since

7    August of 2019?

8         A    I'm not, I think I might have sent some

9    follow up texts, but I'm not, I'm not exactly sure.

10        Q    Sure.  So since this document represents

11   that you're sort of taking over the PAC, have you

12   filed an Amended Statement of Organization with the

13   FEC that lists you as the treasurer?

14        A    Yes.  I was able to get access, so I went,

15   the, the sheet that I sent you that had all the,

16   usernames and credentials, there was, like a backup

17   email, I think it was, like to Rob.  So I had asked

18   Rob if he could, you know, try to, like, send me a

19   code, you know, when it came.  So Google sent me, it,

20   like, it took like three or four days or something,

21   but they finally sent the code.  I got access.

22        Q    Okay.

23        A    And then I was able to, like, you know, get

24   in there and, and, you know, change it to, to make

25   myself treasurer, so I could handle this situation.

DOJ-0000020819

202

1          Q    Okay.  And then, so now that you're the
2     treasurer then, do you intend to amend the reports
3     we've talked about to include the missing information
4     to the best of your ability?
5          A    Yes, I do.
6          Q    Okay.  So what is PPP's status, Progressive
7     Priorities status now?
8          A    Progressive Priorities status is closed.  I
9     received a letter of good standing from the FEC and
10    they said that I have the option to open it or keep it
11    closed, but it said that the status is closed.  But if
12    you are recommending that I, that I get the name and
13    address and employer, I can, I can, you know, do those
14    things.
15         Q    Okay.  And is Progressive Priorities, do you
16    intend to sort of engage in any activities, like
17    robocalls or mailers for the 2020 election?
18         A    At this point, I'm not sure, no.  And, and
19    no, I don't, I don't think I, for, for Progressive
20    Priorities?
21         Q    For Progressive Priorities.
22         A    No, no, I, I, I want to close it and, you
23    know, make sure it's in good standing and leave it at
24    that.
25         Q    Okay.

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020820

203

1      A      If there's inconsistencies and inaccuracies,

2   I want to try to attempt to, you know, get those done,

3   fix those and rectify and even, I was, you know,

4   saying that, you know, possibly attending like a

5   training that you guys have, like a webinar to, to

6   show a good effort that I am, I'm, like educating

7   myself, so.

8      Q      Sure.

9             MS. DI GIOVANNI:  Jin, do you have any

10  follow up questions?

11            MS. LEE:  When you mean closed, do you mean

12  terminated or I'm not quite sure what you mean by --

13            THE WITNESS:  Basically, not raise any, any

14  more funds or keep it open, so just --

15            MS. LEE:  Okay.

16            THE WITNESS:  -- keep it closed.

17            MR. LAWYER:  And you said you haven't had

18  any activities for 19, 18, 17, correct?

19            THE WITNESS:  Correct.  The, the and just to

20  clarify, the letter that I received, I, I believe in

21  there it said that it's, it's closed, however you have

22  the option of opening it, it again, if you'd like.

23  But I, I think I've, you know, well, I want to keep it

24  closed.

25            MS. DI GIOVANNI:  Any follow up questions?

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020821

1    Okay, so I'll take that back from you.  And counsel,

2    if you have any redirect you'd like to ask at this

3    time, you can go ahead.

4              MR. LAWYER:  As far as my client is

5    concerned, will he or will he not have to come back

6    again or will I have to, will I be allowed to

7    represent him, because obviously, he's in school, he

8    doesn't live here.  He's all the way in Oklahoma, so -

9    -

10             THE WITNESS:  Texas.

11             MR. LAWYER:  I'm, I'm sorry, Texas.  So it's

12   expensive for him to come back and then miss school.

13   So I would like to know if it's possible that he

14   doesn't have to come again and if you should need any

15   more information, then I will come and represent him,

16   since I'm here in D.C.

17             MS. DI GIOVANNI:  Understood.  So since,

18   since Wednesday, you've been very helpful and sending

19   us many documents that were responsive to our

20   subpoena.  Of course, you know, there may be documents

21   outstanding that further efforts on your behalf may

22   uncover.  And there's a possibility that those

23   documents may require us to ask you further questions.

24    It's possible that we may be able to conduct this via

25   informal process, but we may need to get his

DOJ-0000020822

1    deposition.  We can't rule it out and it depends on

2    the information we have going forward.  At this

3    current time, no, we don't have, you know, sort of on

4    the calendar another date to, to speak with you.

5              MR. LAWYER:  Right.

6              MS. DI GIOVANNI:  But, but should more

7    information arise, that's, that is a possibility.

8              MR. LAWYER:  So it's, there's, there's a

9    chance that he may still have to come back at a later

10   date?

11             MS. DI GIOVANNI:  Yes.

12             MR. LAWYER:  Okay.

13             MS. LEE:  But I think for today, we've, you

14   know, you've answered all our questions.

15             MR. LAWYER:  Okay.

16             MS. DI GIOVANNI:  With what we've got now,

17   you've been very cooperative and we, we appreciate you

18   taking the time.  So for that, and just to, to

19   confirm, we've already talked about this, but should

20   you find further documents, can you confirm that you

21   will produce those to us?

22             THE WITNESS:  Yes, I can.

23             MS. DI GIOVANNI:  Absolutely, thank you.  I

24   think that is all today and we can close the record.

25   //

Heritage Reporting Corporation
(202) 628-4888

206

1                    (Whereupon, at 2:45 p.m., the deposition in

2       the above-entitled matter concluded.)

3       //

4       //

5       //

6       //

7       //

8       //

9       //

10      //

11      //

12      //

13      //

14      //

15      //

16      //

17      //

18      //

19      //

20      //

21      //

22      //

23      //

24      //

25      //

Heritage Reporting Corporation
(202) 628-4888

DOJ-0000020824

207

I have read the foregoing pages 1 through

206, and they are a true and accurate record

of my testimony therein recorded, and any

changes and/or corrections appear on the

attached errata sheet signed by me.

_____

Matthew Tunstall


Subscribed and sworn to before me

this _____ day of _____, 2019.


Notary Public

My Commission expires: _____

//

//

//

//

//

//

//

//

//

//

//

//


**Heritage Reporting Corporation**
**(202) 628-4888**

DOJ-0000020825

JURISDICTION:

Before me, the undersigned authority, personally

appeared <u>Matthew Tunstall</u> who, after being duly sworn

states that he/she has read the foregoing deposition

transcript, and states that he/she wishes to make the

following changes or corrections to this transcript

for the following reasons:

PAGE          LINE          CHANGE          REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The witness states that the deposition transcript,

pages <u>1</u> through <u>206</u>, is otherwise true and accurate.

                              _____
                              Matthew Tunstall


Subscribed and sworn to before me on
the _____ day of _____, 2019.


          Notary Public

My Commission Expires:_____

DOJ-0000020826

## CERTIFICATE OF COURT REPORTER/NOTARY PUBLIC

I, <u>David Jones</u>, the officer before whom the foregoing testimony was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto; nor am I financially or otherwise interested in the outcome of the action.

_____
Court Reporter/Notary Public