**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **V.** | § | **CAUSE NO.  1:21-CR-00223-LY** |
| | § | |
| | § | |
| **MATTHEW TUNSTALL** | § | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**TO THE HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS:**

Matthew Tunstall requests a below-guideline sentence of 24-months home confinement, followed by a 3-year period of supervised release. In support, he shows the following:

**I.**
**INTRODUCTION AND FACTUAL SUMMARY**

*Citizens United*[1] allowed the market to influence campaigns – and it effectively made a market for campaigns. Matthew Tunstall is a marketer. Whether he's marketing skincare products or a political movement, Mr. Tunstall honed ways to reach listeners

---

[1] *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010). *Citizens United* involved a nonprofit corporation that – much like the Tunstall/Reyes' PACs – produced media that was highly critical of then-Senator Hillary Clinton. The film was, "in essence, ... a feature-length negative advertisement that urges viewers to vote against Senator Clinton for President." *Citizens United,* 130 S.Ct. at 890. In that case, the Supreme Court declared an expenditure ban unconstitutional, holding that corporations may not be prohibited from spending money for express political advocacy when those expenditures are independent from candidates and uncoordinated with their campaigns. 130 S.Ct. at 913.

through robocalls and direct marketing – and he used those methods to connect with potential voters and donors through the PACs that are before the Court.

In the political ideal, Mr. Tunstall's scheme was likely valueless. But in the actual business of campaigns, Mr. Tunstall's methods reached millions of potential voters with his PACs' candidates' messaging – translating into the Tunstall/Reyes PACs delivering millions of minutes of direct canvassing to potential voters and donors.[2]



Direct Reach to Trump Voters: 23,720,192 Minutes

| Customer Name | Customer Id | Campaign | Date | Calls | Live | AM | Agents | >5m | Minutes |
|---|---|---|---|---|---|---|---|---|---|
| Liberty Action Group | 49364 | 1ObamacareSoftAsk-No25 | 2017-01-27 | 464,102 | 52,352 | 132,614 | 223 | 38 | 68708.4 |
| Liberty Action Group | 49364 | 1ObamacareSoftAsk-No25 | 2017-01-28 | 112,217 | 15,235 | 33,192 | 84 | 12 | 19488 |
| Liberty Action Group | 49364 | 1DT-TBAN-2 | 2017-02-20 | 1,501,327 | 187,271 | 415,698 | 1,367 | 256 | 246324.7 |
| Liberty Action Group | 49364 | 11DT-OC-0327 | 2017-03-28 | 54,786 | 7,293 | 16,749 | 122 | 6 | 9104.6 |
| Liberty Action Group | 49364 | 11DT-OC-844-886-1786 | 2017-03-28 | 9,624 | 1,395 | 3,025 | 12 | 1 | 1635 |
| Liberty Action Group | 49364 | 11DT-OC-844-886-1786 | 2017-03-29 | 422,018 | 51,030 | 130,300 | 574 | 24 | 63496.5 |
| Liberty Action Group | 49364 | 11DT-OC-844-886-1786 | 2017-03-30 | 123,237 | 15,697 | 37,404 | 197 | 11 | 18970.2 |
| Liberty Action Group | 49364 | 11DT-OC-0327 | 2017-04-03 | 152,733 | 17,823 | 44,670 | 231 | 17 | 22246.6 |
| Liberty Action Group | 49364 | 11DT-OC-0327 | 2017-04-05 | 90,344 | 9,521 | 25,333 | 81 | 4 | 11745.8 |
| | | | | | | | | | |
| | | | | 191,750,343 | 20,126,315 | 49,111,658 | 223,542 | 22,488 | 23,720,192 |

And that reach was valuable and cost the Tunstall/Reyes' PACs millions of dollars to achieve. In direct voter outreach alone (robocalls and direct marketing), the Tunstall/Reyes' PACs spent almost $2.5 million.[3]

---

[2] *See* Government's Sentencing Exhibit 28, excerpted in text.

[3] *See* Government's Sentencing Exhibits 68 and 69, excerpted in text.



Combined Expenditures for Progressive Priorities and Progressive Properties

- SmartCall - $593,251 (69.7%)
- Signia Marketing - $104,242 (12.2%)
- Pre-paid Call Center - $37,000 (4.3%)
- National Research & Polling Group - $31,498 (3.7%)
- Bankcard & USMS - $16,575 (1.9%)
- Kyle Davies - $12,084 (1.4%)
- Paysafe - $7,816 (0.9%)
- Access Accounting - $2,320 (0.3%)
- Other - $46,527 (5.5%)

$765,991



Liberty Action Group Expenditures

- SmartCall - $1,005,564 (32.3%)
- InfoCision - $615,037 (19.8%)
- Modern Media Group - $539,000 (17.3%)
- Matte Media Creations - $492,700 (15.8%)
- Supreme Dream Media - $119,118 (3.8%)
- Advertising - $91,702 (2.9%)
- CC processing - $72,023 (2.3%)
- Kyle Davies - $45,212 (1.5%)
- Universal Marketing - $28,311 (0.9%)
- LAG PayPal - $20,607 (0.7%)
- Other - $79,448 (2.6%)

$1,712,303

Mr. Tunstall certainly deceived donors – he did not work for Donald Trump or Hillary Clinton, even though it purposefully appeared he did. He only worked for himself and Mr. Reyes. But his promise to donors was not that he would donate their funds directly to Trump's or Clinton's campaigns like the government's pleadings suggest – the Tunstall/Reyes PACs promised voters they would spend their donations getting their candidates' messages out.[4]



---

[4] Government's Sentencing Exhibits 1, 2, and 15, excerpted in text.

And, as promised, the Tunstall/Reyes' PACs got the candidates' messaging to voters through robocalls and by making and publishing radio and television ads – and by purchasing, and airing, tens of millions of minutes of campaign propaganda.[5]

| | | | | | | |
|---|---|---|---|---|---|---|
| | 4:34 PM | | | **SmartCall Media, Inc.** | | |
| | 10/06/22 | | | **Custom Transaction Detail Report** | | |
| | Accrual Basis | | | January 2016 through December 2017 | | |

| Type | Date | Num | Name | Memo | Qty | Amount |
|---|---|---|---|---|---|---|
| Invoice | 03/06/2017 | 8398 | Liberty Action Group | Republican Donor Data Interstate Broadcast Minutes | 610 | $ 11.59 |
| Invoice | 03/06/2017 | 8398 | Liberty Action Group | Republican Donor Misc/AK Broadcast Minutes | 1 | $ 5.31 |
| Invoice | 04/03/2017 | 8425 | Liberty Action Group | LAG Broadcast Minutes | 90,956 | $ 1,364.34 |
| Invoice | 04/03/2017 | 8425 | Liberty Action Group | LAG Interstate Broadcast Minutes | 2,249 | $ 39.36 |
| Invoice | 04/03/2017 | 8425 | Liberty Action Group | LAG Misc/AK Broadcast Minutes | 1 | $ 0.47 |
| Invoice | 04/10/2017 | 8436 | Liberty Action Group | LAG Broadcast Minutes | 32,800 | $ 492.00 |
| Invoice | 04/10/2017 | 8436 | Liberty Action Group | LAG Interstate Broadcast Minutes | 1,193 | $ 20.88 |
| | | | | | 63,061,646 | $ 1,044,895.64 |

Although Mr. Tunstall and Mr. Reyes unjustly enriched themselves[6] through their fraud (which they should be punished for), their PACs also marketed their donors' political candidates' ideology to an impressively-wide audience. They promised their donors they would deliver a message, and they delivered millions of minutes of that messaging.

**** 

---

[5] *See*, e.g., Government's Sentencing Exhibits 62, 30-60 (examples of the advertisements); *see also* Government's Sentencing Exhibit 26, excerpted in text.

[6] Mr. Tunstall personally profited **$789,818.00**, which he agreed to forfeit in Dkt. No. 110. Mr. Reyes personally profited **$809,920.40**, which he forfeited in Dkt. No. 106.

Currently, candidates and special interests spend billions on campaign cycles.[7] And since *Citizens United*, campaign spending has remained largely unfettered. As a result of this environment, PACs and schemes like Tunstall's and Reyes' are not unique – they are endemic to the nature of high-revenue campaigns in low-information environments.

Mr. Tunstall's and Mr. Reyes' PACs and cases are not exceptional. They deserve unremarkable sentences. As discussed below, a 24-month sentence of incarceration is an *average* sentence for fraud and money laundering defendants. A 24-month sentence also achieves relative parity with similarly situated defendants that have been sentenced for similar crimes.

The government has requested an exceptional 188-235 month sentence – which is disproportionate to the facts of the case and is substantially greater than necessary to address the sentencing factors outlined in 18 USC § 3553. The government's requested sentence would also be disproportionate to other defendants convicted of committing

---

[7] *See, e.g.,* FEC, "Statistical Summary of 24-Month Campaign Activity of the 2019-2020 Election Cycle," *available at* https://www.fec.gov/updates/statistical-summary-24-month-campaign-activity-2019-2020-election-cycle/.

similar frauds *via* political fundraising – which have resulted in sentences of 22,[8] 36,[9] and 46[10] month sentences of incarceration in other jurisdictions.

To achieve parity with other defendants and to achieve the goals outlined by the Sentencing Commission, Mr. Tunstall requests that the Court sentence him to 24-months home confinement, followed by a 3-year period of home confinement.

---

[8] U.S. Department of Justice, Press Release, "Former Louisiana State Senator and Chair of State Political Party, Sentenced to 22 Months Imprisonment for Role in Nearly Seven-Year Scheme to Defraud Campaign Entity, Donors, and Political Party Organization" (1/11/23), *available at* https://www.justice.gov/usao-edla/pr/former-louisiana-state-senator-and-chair-state-political-party-sentenced-22-months.

[9] U.S. Department of Justice, Press Release, "Nevada Man Sentenced to 46 Months in Prison for Scams Involving Election Fundraising and COVID Relief Loans Defendant Used Web of Fake PACs and Sham Companies to Cheat Donors and Taxpayers" (12/06/2021) *available at* https://www.justice.gov/usao-dc/pr/nevada-man-sentenced-46-months-prison-scams-involving-election-fundraising-and-covid.

[10] U.S. Department of Justice, Press Release, "Maryland Man Sentenced to Prison for Fraudulent Scheme to Solicit Hundreds of Thousands of Dollars in Contributions to Scam-Pacs" (1/17/20) *available at* https://www.justice.gov/opa/pr/maryland-man-sentenced-prison-fraudulent-scheme-solicit-hundreds-thousands-dollars.

# II.
# GUIDELINES CALCULATION

Mr. Tunstall's offense level is 29, based on the following analysis:

| Category | Level | Reasoning |
|---|---|---|
| **Base Offense Level** | + 6 | Mr. Tunstall's base offense level is 6, pursuant to USSG §§ 2S1.1 and 2B1.1(a)(2). The government's objection is contradicted by *United States v. Abdelsalam*, 311 F. App'x 832, 844–45 (6th Cir. 2009)[11] and the text of the Guidelines. |
| **Loss Amount** | + 16 | As discussed below, Mr. Tunstall's loss amount should be calculated between $1.5 and 3.5 million pursuant to §2B1.1(b)(1)(I) and USSG §2B1.1, comment (n.3(B). |
| **Vulnerable Victims** | n/a | Sec. 3A1.1 Application Note 2, instructs that: "[t]he adjustment . . . would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." Here, the Tunstall/Reyes' PACs marketed widely to both sides of the political spectrum – they did not specifically target a vulnerable group. |
| **Role** | + 2 | There were 3 knowing participants: Tunstall, Reyes, and Davies. The government stipulated that the Tunstall/Reyes PACs were not "otherwise extensive" when it stipulated that Reyes should be enhanced under U.S.S.G. 3B1.1(c), rather than 3B1.1(b). The size of the conspiracy does not change depending on the conspirator at the podium. |
| **Victims** | + 2 | 2B1.1(b)(2)(A)(i) and (ii). |
| **Sophisticated Means** | + 2 | USSG § 2B1.1(b)(10)(C). |
| **Laundering** | + 2 | USSG § 2S1.1(b)(2)(B). |
| **PAC** | + 2 | §2B1.1(b)(9)(A) |
| **Acceptance** | - 3 | |
| **Total** | **29** | |

---

[11] *See also United States v. Zaranek*, 428 F. Supp. 2d 697, 700 (E.D. Mich. 2006) (adopting the PSR's analysis).

### A.  The base level is correctly calculated at 6.

Mr. Tunstall agrees with the Probation Department: his base offense level is 6, pursuant to USSG §§ 2S1.1 and 2B1.1(a)(2). The government's objection is contradicted by *United States v. Abdelsalam*, 311 F. App'x 832, 844–45 (6th Cir. 2009), *United States v. Zaranek*, 428 F. Supp. 2d 697, 700 (E.D. Mich. 2006) (explicitly adopting the PSR's analysis), and the text of the Guidelines – as U.S.S.G. § 2B1.1 is not the "applicable Chapter Two guideline specifically referenced in Appendix A" for money laundering. As such, the Probation Department is correct: the base level is + 6.

### B.  Mr. Tunstall should not be punished for the legitimate services he performed. His loss should be calculated at +16.

Mr. Tunstall objects to the Probation Department's loss calculation and suggests that the appropriate loss calculation is $1.5 - $3.5 million.

Although the Tunstall/Reyes PACs ultimately collected more $7.65 million dollars in donations between their Trump-focused PACs and Clinton-focused PACs, Mr. Tunstall personally gained $789,818 and Reyes personally gained $809,920.40. Most of the PACs' donations were used for extensive media campaigns and robocalls – where the PACs used their donors' funds to propagandize in a way that was virtually indistinguishable to the propaganda of the candidates they purportedly supported.

The Tunstall/Reyes PACs' propaganda was familiar: the Trump-focused PAC talked about building walls, locking Clinton up, and being tough-on-crime, while the Clinton-focused PAC had mirror-imaged themes.

The government's sentencing submissions suggest a scheme that largely mirrored that of the official campaigns of Hillary Clinton and Donald Trump – the PACs even using the candidates' voices and slogans to reach millions of donors/voters.[12]

| Jen please record today, thank you | Bo, please record |
|---|---|
| **From:** M Media Team <matt.mediateam@gmail.com><br>**To:** Jensvoiceovers <jen@jensvoiceovers.com><br>**Bcc:** Robert Reyes <robmediasource@gmail.com><br>**Date:** Fri, 16 Dec 2016 20:28:53 +0000 | **From:** M Media Team <matt.mediateam@gmail.com><br>**To:** BoBarkerVoiceovers <bo@bobarker.com><br>**Bcc:** Robert Reyes <robmediasource@gmail.com><br>**Date:** Fri, 16 Dec 2016 20:45:17 +0000 |
| Join President Obama in signing the petition demanding a revote after hard evidence was JUST discovered by the FBI that the election was hacked and turned in favor of Trump! If I have your permission to sign the petition demanding a revote of the presidential election of 2016, press 1. Again, if I have your permission to sign the petition demanding a revote, press 1. Press 9 to unsubscribe.<br><br>Thank you, before we complete your petition, here's an urgent update from President Obama.<br><br>President Obama along with the democratic party need your urgent support to fund our fax and email blasts to congress demanding a revote today! With less than 30 days until Trump's inauguration, we need to you and millions to help President Obama stop this illegal election and have a revote! So please, press 1 to make an emergency donation to help President Obama force a revote. Again, press 1 to donate to help President Obama force a revote. If not, press 2.<br><br>Can you help cover the cost of generating and rushing your petition to congress? For your generous support, we'll send you a free President Obama gift as a way of saying thank you. So please, press 1 to contribute to help President Obama force a revote. Again, press 1 to contribute to help President Obama now. If not, press 2. | President-Elect Trump needs your urgent action again! Why? Hillary and her team are now trying to push a revote of the presidential election after the FBI just announced that Russian intervened to help our campaign win! This is absolutely absurd, but we cannot afford to make any assumptions. That's why we must ask for your help to fund our fax blast to congress and electoral college demanding they keep their Trump votes and accept the election results! Now is not the time to listen to this message and hang up...we can't afford to let the democrats ruin our victory win! That's why we must ask you to please press 1 to make an emergency investment to help President-Elect Trump pressure congress to accept the results. For your quick and generous support, we'll send you a free President Trump gift as a way of saying thank you. Again, press 1 to make an emergency donation now! Press 9 to unsubscribe. |

And as the government's submissions prove and as is discussed above, the Tunstall/Reyes' PACs spent millions of dollars to reach thousands of voters with the candidates' respective campaign messaging – resulting in millions of minutes of direct voter outreach. The loss amount should thus be calculated at $1.5 – $3.5 million, rather than $3.5 – $9.5 million, because Mr. Tunstall is not criminally responsible for the work his PACs performed. There are two paths to this result:

(1) <u>Credits against loss</u>.

"If the defendant returned any money or property to the victim or rendered any services before the offense was detected, the loss amount is reduced by the fair market value of the money returned or the services rendered." *United States v. Worley*, 729 F.

---

[12] *See, e.g.,* Government's Sentencing Exhibits 21 and 22, excerpted in text. *See also* Government's Sentencing Exhibits 62, 30-60 (examples of the advertisements).

App'x 850, 851 (11th Cir. 2018) (citing § 2B1.1 cmt. n.3(E)(i)). "Actual loss" thus incorporates a "net loss approach." "This 'net loss approach' reflects the Sentencing Commission's position that an offender who transfers something of value to the victim is generally committing a less serious offense than one who does not." *Id.* (citing *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014)).

The Tunstall/Reyes' PACs promised donors they would spread the Trump and Clinton campaign messaging,[13] and they spread that messaging extensively. Mr. Tunstall's loss amount should reflect the value of the PACs' outreach.

(2) Gain rather than loss.

Loss can reasonably be determined if the Court segregates the value of services the Tunstall/Reyes PACs performed consistent with the government's sentencing submissions. However, counsel suggests that personal gain[14] – rather than any other loss calculation – is an appropriate measure of loss in this case because it is easily determinable and is an appropriate analogue for relative blameworthiness. As discussed by the PSR,[15] the Tunstall-Reyes PACs propagandized millions of potential voters *via*

---

[13] Government's Sentencing Exhibits 1 and 2.

[14] *See* USSG §2B1.1, comment. (n.3(B)). *United States v. Randock*, 330 F. App'x 628, 629–30 (9th Cir. 2009) (holding that where the loss to victims in a fraudulent academic credential scheme could not reasonably be determined, gain was a reasonable alternative).

[15] PSR at ¶ 56: "[T]he defendants obtained approximately $7.65 million from an undetermined number of unwitting donors across the country through Liberty Action Group and Progressive Priorities, and subsequently from Support American Leaders and Campaign to Support the President."

automated canvassing and media campaigns, which sought money to get candidates elected and the party-line to potential voters.

Given that the government and PSR concede that the number of potential victims has not been determined and possibly cannot be determined,[16] and due to the fact that the Tunstall-Reyes PACs spent a significant portion of the donated funds as promised expenditures for their respective candidates,[17] actual or intended loss is a less reliable metric than gain in calculating the harm caused by the fraud.

As a result, the Court should calculate the Tunstall/Reyes PACs' loss as the amount that Tunstall, Reyes, and Davies personally benefitted from their actions – which is between $1,500,001 – $3,500,000.[18]

### C. The vulnerable victim enhancement does not apply. The Tunstall/Reyes' PACs marketed to the entire political spectrum – they did not target a specific group.

Mr. Tunstall agrees with the Probation Department: U.S.S.G. § 3A1.1 does not apply. Especially pertinent, Application Note 2 instructs that: "[t]he adjustment . . . would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." Like the example in the Application, the Tunstall/Reyes' PACs marketed widely to both sides of the political spectrum – they did not specifically target a vulnerable group. Thus, this enhancement does not apply.

---

[16] *See* PSR at ¶ 56. The government has not determined with any the number of victims, or whether any of the donors have objected to the Tunstall/Reyes' PACs use of fund to propagandize voters.

[17] *See* PSR at ¶ 18.

[18] 2B1.1(b)(1)(I).

**D. The Tunstall/Reyes' PACs cannot be "otherwise extensive" to Tunstall, yet not "otherwise extensive" to his co-conspirator, Reyes.**

The government stipulated that the Tunstall/Reyes PAC was not "otherwise extensive" when it stipulated that Reyes should be enhanced under U.S.S.G. 3B1.1(c), rather than 3B1.1(b).[19] Had the government believed that the Tunstall/Reyes PACs constituted an "otherwise extensive" scheme, Mr. Reyes would have received a +3, rather than +2, enhancement. Mr. Tunstall should similarly receive a +2 enhancement under U.S.S.G. 3B1.1(c), since the two conspirators were involved in the same conspiracy.

**E.  Guidelines Calculation.**

Mr. Tunstall advocates for an Offense Level of 29, based upon the following:

| Category | Level |
|---|---|
| **Base Offense Level** | + 6 |
| **Loss Amount** | + 16 |
| **Vulnerable Victims** | + 0 |
| **Role** | + 2 |
| **Victims** | + 2 |
| **Sophisticated Means** | + 2 |
| **Laundering** | + 2 |
| **PAC** | + 2 |
| **Acceptance** | - 3 |
| **Total** | **29** |

---

[19] Government's Sentencing Memorandum, at p. 16.

## III.
## <u>THE SENTENCING FACTORS</u>

The guideline range – as calculated by the Probation Department or as advocated for by the government or the Defendant – is an imprecise tool in this case for determining a sentence that is sufficient, but not greater than necessary, to comply with the factors in 18 USC § 3553, because the guideline range:

- **Does not account for available sentences that are sufficient, but not greater than necessary, to adequately punish Mr. Tunstall for his crimes.** Given Mr. Tunstall's personal history, characteristics, and the types of sentences available, Mr. Tunstall should be sentenced to a 24-month period of home confinement and a 3-year period of supervised release.

- **Does not value that Mr. Tunstall has already been appropriately deterred from engaging in additional criminal conduct.** Mr. Tunstall's history does not suggest any further specific deterrence is needed to protect the public. Continued home confinement, which requires that Mr. Tunstall works to attempt to pay his fine, is sufficient to protect the community and to appropriately deter Mr. Tunstall.

- **Discourages repayment.** A financial punishment is appropriate for a financial crime. A substantial punishment to Mr. Tunstall would focus on the requirement that he work to make restitution. A high prison sentence discourages restitution and repayment, as it discourages employment.

- **Results in a disproportionate sentence to similarly situated individuals.** The government's suggestion that Mr. Tunstall is more culpable that Mr. Reyes is disingenuous. Reyes and Tunstall are similarly culpable and should receive a commensurate                                                                 sentence.

Instead, a 24-month period of home confinement followed by a 3-year period of supervised release, is sufficient, but not greater than necessary, to punish Mr. Tunstall for the following reasons:

1. **18 U.S.C. § 3553(A): The history and characteristics of the defendant suggest a mitigated sentence.**

Attached are six letters for the Court's consideration, which establish the history and character of Mr. Tunstall:

      i.    <u>Exhibit A</u>. Letter from Taylor Williford;

     ii.    <u>Exhibit B</u>. Letter from Thomas Tunstall;

    iii.    <u>Exhibit C</u>. Letter from Renee Tunstall;

    iv.    <u>Exhibit D</u>. Letter from John Tunstall;

     v.    <u>Exhibit E</u>. Letter from Jake Williford; and

    vi.    <u>Exhibit F</u>. Letter from Corey Tunstall.

**2. A period of home confinement will adequately deter Mr. Tunstall from future criminal behavior and will adequately protect the public.**

Since his arrest, Mr. Tunstall has been constantly supervised on pretrial release without issue. Home confinement has, thus, adequately deterred Mr. Tunstall from committing further crimes and has effectively protected the community. A sentence of confinement that is more restrictive than home confinement is greater than necessary to effectuate the sentencing goals established by Congress and the Sentencing Commission, because Mr. Tunstall's past period of supervision has proved that incarceration is a greater than necessary punishment for him.

**3. A period of home confinement will allow Mr. Tunstall to work to repay his debt.**

Mr. Tunstall has agreed to a money judgment to repay over $700,000 to the government. Many defendants do not view forfeiture – or a money judgment – as punishment – as it is something they will never seek to repay. But, as Mr. Tunstall's letters prove, and as the government has suggested, Mr. Tunstall has been a serial entrepreneur

since he was in cub scouts and is highly motivated by money. Plainly, working in business – and making money in business – has been Mr. Tunstall's focus for much of his life. As such, a punishment that requires Mr. Tunstall to work – for the foreseeable future – diligently to repay the government is appropriate, fitting, and should be central to his punishment.

**4. The government's proposed sentence is unreasonable – and it is disproportionate to the majority of wire fraud and money laundering defendants.**

The United States Sentencing Commission hosts a tool on its website that allows users to visualize data sets containing historical sentencing outcomes. Over the past 7 years for federal fraud and money laundering crimes,[20] the average sentence of imprisonment has been 18 (mean) and 28 (median) months.



**Average and Median Imprisonment Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

Imprisonment Length (Average Months)   Imprisonment Length (Median Months)

The figure includes the 25,801 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement,Money Laundering; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

---

[20] The dataset referenced here is for CY 2015 – CY2021. *See* United States Sentencing Commission Interactive Data Analyzer, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard.



An outcome equal to the sentence proposed by the government has only been achieved in 4.6% of cases. Similarly, a sentence equal to a guidelines' sentence (either proposed by Probation or the Defense) has occurred in merely 10.5% of cases across the country. In the vast majority of cases (59.4% of sentences), less-than 24-months was the appropriate sentence for cases like Mr. Tunstall's (defendants found guilty of fraud or money laundering offenses).

**5. The government's proposed sentence is unreasonable – and it is disproportionate to similarly situated defendants to Mr. Tunstall.**

Below are three cases similar to Mr. Tunstall's. The details are included[21] for the Court's convenience.

| Defendant | Date | Case Information | Sentence |
|---|---|---|---|
| James Kyle Bell[22] | May 2021 | U.S. District Court for the District of Columbia – Wire Fraud (created two fake PACs for Trump and Biden & created multiple shell companies to defraud the PPP). | 46 months + restitution |
| Kelley Rogers[23] | January 2020 | U.S. District Court for the Eastern District of Virginia – Wire Fraud (operated multiple PACs and donations for himself, his employees, and to fund the PACs). | 36 months + restitution |
| Karen Carter Peterson[24] | January 2023 | U.S. District Court for the Eastern District of Louisiana – Wire Fraud (used PAC money for personal expenses). | 22 months + restitution |

---

[21] Information collected from DOJ Press Releases.

[22] U.S. Department of Justice, Press Release, "Nevada Man Sentenced to 46 Months in Prison for Scams Involving Election Fundraising and COVID Relief Loans Defendant Used Web of Fake PACs and Sham Companies to Cheat Donors and Taxpayers" (12/06/2021) *available at* https://www.justice.gov/usao-dc/pr/nevada-man-sentenced-46-months-prison-scams-involving-election-fundraising-and-covid.

[23] U.S. Department of Justice, Press Release, "Maryland Man Sentenced to Prison for Fraudulent Scheme to Solicit Hundreds of Thousands of Dollars in Contributions to Scam-Pacs" (1/17/20) *available at* https://www.justice.gov/opa/pr/maryland-man-sentenced-prison-fraudulent-scheme-solicit-hundreds-thousands-dollars.

[24] U.S. Department of Justice, Press Release, "Former Louisiana State Senator and Chair of State Political Party, Sentenced to 22 Months Imprisonment for Role in Nearly Seven-Year Scheme to Defraud Campaign Entity, Donors, and Political Party Organization" (1/11/23), *available at* https://www.justice.gov/usao-edla/pr/former-louisiana-state-senator-and-chair-state-political-party-sentenced-22-months.

**James Kyle Bell:**[25] Between January 2020 and October 2020, James Kyle Bell's "PACs sent solicitations nationwide to more than 40,000 recipients[, and promised that the solicitations] would be '5x matched' by Bell's PACs. The solicitations also replicated the look and feel of marketing materials used by the presidential campaigns including official logos and slogans." "KAGC and BDLAC received no less than $346,000 in contributions from individuals and other groups during the months before the 2020 election." "Court documents also reflect that during the same time period, Bell applied for more than $1.6 million in loans from the Small Business Administration's Paycheck Protection Program on behalf of five shell companies that Bell owned and controlled." "Bell diverted almost all of the funds from PAC donors and the taxpayer-supported PPP loans to bank accounts where they could be used for Bell's personal benefit." "Bell's plea agreement requires that Bell make full restitution to his victims and agree to the entry of a money judgement of $862,000 against him."

| | |
|---|---|
| **Loss Amount:** | $1.946mm |
| **Personal Profit:** | $862,000 |
| **Sentence:** | 46 months |

---

[25] U.S. Department of Justice, Press Release, "Nevada Man Sentenced to 46 Months in Prison for Scams Involving Election Fundraising and COVID Relief Loans Defendant Used Web of Fake PACs and Sham Companies to Cheat Donors and Taxpayers" (12/06/2021) *available at* https://www.justice.gov/usao-dc/pr/nevada-man-sentenced-46-months-prison-scams-involving-election-fundraising-and-covid.

**Kelly Rogers**:[26] "A Maryland political consultant was sentenced to three years in prison . . . followed by three years of supervised release for fraudulently soliciting hundreds of thousands of dollars in political contributions through several scam political action committees (PACs) that he founded and advertised as supporting candidates for office and other political causes." "In addition to the prison sentence, Rogers was ordered to pay $491,299 in restitution and to forfeit at least $208,954 in proceeds obtained from his offense." "[The] defendant spent nearly all of the money raised from donors to benefit himself, his associates, and his PACs, including by pouring the majority of donor money into the solicitation of more donations."

|  |  |
|---|---|
| **Loss**: | "More than $20 million"[27] |
| **Forfeiture:** | $208,954 |
| **Restitution:** | $491,299 |
| **Sentence:** | 36 months |

The government's proposed sentence is disproportionate to the similarly situated defendants discussed above. A sentence of incarceration of 24-months is not.

---

[26] U.S. Department of Justice, Press Release, "Maryland Man Sentenced to Prison for Fraudulent Scheme to Solicit Hundreds of Thousands of Dollars in Contributions to Scam-Pacs" (1/17/20) *available at* https://www.justice.gov/opa/pr/maryland-man-sentenced-prison-fraudulent-scheme-solicit-hundreds-thousands-dollars.

[27] According to news outlets, Mr. Rogers' PACs raised more than $20 million over the course of his schemes. *See* "Political fundraiser gets 3-year prison sentence for fraud," Politico, *available at* https://www.politico.com/news/2020/01/17/kelley-rogers-fraud-prison-100715.

**6.  18 U.S.C. § 3553(a) -- The Court has discretion to sentence Mr. Tunstall to Home Confinement, Intermittent Confinement, or Probation.**

Mr. Tunstall asks the Court to consider the following alternatives to incarceration:

a.  <u>Home Detention.</u>

Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.

"Home detention 'means a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance for home detention. However, alternative means of surveillance may be used if appropriate."

b.  <u>Shock Incarceration Program.</u>

The Court, pursuant to 18 U.S.C. §§ 3582(a) and 3621(b)(4), may recommend that a defendant who meets the criteria set forth in 18 U.S.C. § 4046 participate in a shock incarceration program.

Section 4046 of title 18, United States Code, provides –

> (a) the Bureau of Prisons may place in a shock incarceration program any person who is sentenced to a term of more than 12, but not more than 30 months, if such person consents to that placement.

    (b) For such initial portion of the term of imprisonment as the Bureau of Prisons may determine, not to exceed six months, an inmate in the shock incarceration program shall be required to –

        1) adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training; and

        2) participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.

    (c) An inmate who in the judgment of the Director of the Bureau of Prisons has successfully completed the required period of shock incarceration shall remain in the custody of the Bureau for such period (not to exceed the remainder of the prison term otherwise required by law to be served by that inmate), and under such conditions, as the Bureau deems appropriate. 18 U.S.C. § 4046.

    c. <u>Intermittent Confinement</u>

Intermittent confinement may be imposed as a condition of probation during the first year of probation.  See 18 U.S.C. § 3563(b)(10).  It may be imposed as a condition of supervised release during the first year of supervised release, but only for a violation of a condition of supervised release in accordance with 18 U.S.C. § 3583(e)(2) and only when facilities are available.  See 18 U.S.C. § 3583(d).

"Intermittent confinement" means remaining in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.  See 18 U.S.C. § 3563(b)(10).

****

## IV.
## CONCLUSION AND PRAYER

Mr. Tunstall asks that the Court to exercise its discretion and sentence him to a below-guideline sentence of 24-months home confinement, followed by a 3-year period of supervised release.

Respectfully submitted,

**SUMPTER & GONZÁLEZ, L.L.P.**
3011 N. Lamar. Blvd, Ste. 200
Austin, Texas 78705
Telephone: (512) 381-9955
Facsimile:  (512) 485-3121

By: */s/ Worth D. Carroll*
Worth D. Carroll
State Bar No. 24091192
worth@sg-llp.com

**ATTORNEY FOR DEFENDANT**
**MATTHEW NELSON TUNSTALL**

## CERTIFICATE OF SERVICE

By my signature below, I do hereby certify that on the 18th day of April, 2023, a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing was served on the government via electronic mail.

*/s/ Worth D. Carroll*
Worth D. Carroll