# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NUMBER 1:21-CR-00223 |
| | § | |
| MATTHEW NELSON TUNSTALL | § | |

## MOTION TO VACATE, SET ASIDE AND CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255 AND MEMORANDUM IN SUPPORT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now MATTHEW NELSON TUNSTALL, by and through his attorney of record in the above styled and numbered cause, and files this Motion to Vacate, Set Aside and Correct Sentence Pursuant to 298 U.S.C. §2255, as unconstitutional and in support would show the Court as follows:

## TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISITANCE OF COUNSEL BECAUSE HE FAILED TO ADVISE TUNSTALL OF HIS RIGHT TO PLEAD GUILTY WITHOUT A PLEA AGREEMENT, IN VIOLATION OF THE SIXH AMENDMENT TO THE UNITED STATES CONSTITUTION

### INTRODUCTION AND SUMMARY

Tunstall was indicted in an eight-count indictment with Conspiracy to Commit Wire Fraud, Wire Fraud and Money Laundering. Counsel for Tunstall was appointed to represent Tunstall. Tunstall, from the beginning, informed Counsel that he did not want to go to trial but would rather plead guilty. Although knowing this, Counsel discussed the merits of trial and pleading guilty *pursuant to a negotiated plea agreement with the government.* At no time did Counsel discuss with Tunstall his right to plead guilty to the indictment *sans* a negotiated plea

agreement. The issue at odds between the parties was primarily the calculation and basis for the loss amount according to the United States Sentencing Guidelines.

Tunstall entered a plea of guilty to two of the eight counts pursuant to a plea agreement wherein he waived his right to appeal the sentence. At the sentencing hearing, Counsel argued that the loss calculation was in error. The facts were not in dispute, simply the basis of loss. The Court denied Counsel's objection to the calculation and sentenced Tunstall in accordance with the presentence calculation. Because Tunstall waived his right to appeal, he had no recourse to appeal the legal basis for the loss calculation. Had he been advised of his right to plead to the indictment without a plea agreement and retain the right to appeal, he would have.

## STATEMENT OF THE CASE

Matthew Nelson Tunstall was indicted in cause number 1:21-CR-00233 and charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §371, three counts of wire fraud, in violation of 18 U.S.C. § §1343 and 2, two counts of money laundering, in violation 18 U.S.C. § §1956(a)(1)(B)(i), and 2, and two counts of money laundering, in violation of 18U.S.C. §§1957, and 2 on November 2, 2021. He was arrested on the indictment in Los Angeles, California on November 5, 2021, and released on November 15, 2021. Counsel Worth Carrol was appointed on November 15, 2021, and entered his appearance on November 16, 2021. On November 18, 2021, Tunstall waived personal appearance at arraignment and entered a plea of not guilty.

An agreed factual basis was filed by the government on December 7, 2022, On December 20, 2022, Tunstall entered pleas of guilty to counts one and five of the indictment, pursuant to a written plea agreement, which included waiver of right to appeal, before United States Magistrate Judge Dustin M. Howell. On April 13, 2023, a sealed presentence report was filed by the probation officer. The government filed its sentencing memorandum on April 14, 2023 and on April 18, 2023, Counsel filed a sentencing memorandum on behalf of Tunstall, and on April19, 2023, an advisory to the Court regarding unresolved sentencing issues.

A sentencing hearing was held on April 20, 2023, recessed, and continued on April 24,

2023. The Court sentenced Tunstall to confinement in the bureau of prisons for 60 months, and 3 years supervised release in count one, to run concurrently with 120 months confinement in the bureau of prisons, and 3 years supervised release in count 5. On April 24, 2023, the Judgment and Commitment was filed and on June 6, 2023, the Judgment and Commitment was returned executed. Tunstall is currently in custody pursuant to this judgment.

## STATEMENT OF F ACTS

**Factual Basis**

The agreed factual basis for the written plea agreement sets for the facts of the case. A redacted and edited statement is as follows:

Between January 2016 through April 2017, TUNSTALL conspired with ROBERT REYES JR. and KYLE GEORGE DAVIES to establish and operate several political action committees within the Western District of Texas and elsewhere. TUNSTALL owned and operated Supreme Dream Media LLC and Matte Media Creations Inc. REYES owned Modern Media Group, LLC.

TUNSTALL and REYES founded Liberty Action Group Political Action Committee and Progressive Priorities Political Action Committee. Along with other co-conspirators, used these PACs to obtain contributions from unwitting donors based on false and misleading representations, then laundered the proceeds of the scheme.

TUNSTALL and REYES were the principals responsible for managerial oversight of Liberty Action Group and Progressive Priorities and exercised decision-making authority over the 5 other individuals recruited to work for each PAC.

On or about January 13, 2016, TUNSTALL, REYES, and DAVIES opened Account -8156 for Liberty Action Group at a Financial Institution in the Western District of Texas. Progressive Priorities was a political action committee that claimed to raise political contributions. On or about May 9, 2016, TUNSTALL, REYES, and DAVIES opened or caused tc be opened Account -8111 for Progressive Priorities at a Financial Institution in the Western Dis:rict of Texas. On or about December 8, 2016, TUNSTALL, REYES, and DAVIES opened

3

or caused to be opened Account -6823 under the name Progressive Properties LLC at a Financial, which they used to conduct the activities of Progressive Priorities.

American Priority Political Action Committee ("American Priority") was a political action committee that claimed to raise political contributions. In and around 2016, REYES founded American Priority under TUNSTALL's guidance. In and around 2016, TUNSTALL and REYES created Liberty Action Group and Progressive Priorities to obtain money based on false and misleading representations about the PACs' activities. Specifically, through robocall solicitations, written solicitations, radio and television advertisements, and other means, Liberty Action Group and Progressive. Priorities falsely represented to donors that all of their donated funds would be used to support candidates for the Office of the President of the United States.

In total, Liberty Action Group received approximately $3.11 million in contributions into Account -8156 at Financial Institution. Progressive Priorities received approximately $400,426 in contributions into Account -8111 at Financial Institution, and approximately $456,387 in contributions into Account -6823 at Financial Institution.

TUNSTALL and REYES used some of the funds acquired through the scheme to enrich themselves directly, to support their independent, unrelated business ventures, and to pay for additional solicitations for money on behalf of Liberty Action Group and Progressive Priorities. These transfers included, but were not limited to, the below: Transfer of approximately $57,000 from Liberty Action Group PAC, Account -8156, to Modern Media on or about, December 23, 2017; Transfer of approximately $50,000 from Liberty Action Group PAC, Financial Institution A Account -8156, to TUNSTALL via Matte Media on or about December 27, 2016; and Transfer of approximately $2,000 from Liberty Action Group PAC, Financial Institution A Account -8156, to DAVIES on or about March 3, 2017. Each of the transfers were completed using the transmission of writings by means of wire communications in interstate commerce. During the operation of Liberty Action Group and Progressive Priorities, TUNSTALL caused the PACs to file reports containing materially false statements and representations with the FEC, an agency within the jurisdiction of the executive branch. During the operation of Liberty Action Group and Progressive Priorities, TUNSTALL, REYES, and DAVIES used the names of others without their knowledge or permission and forged names on filings to the FEC and on other

documents relating to the PACs to conceal and disguise their role in the fraudulent scheme.

TUNSTALL and REYES knowingly and intentionally overpaid and relied on refunds from these payments to launder the proceeds from their fraudulent activities in order to disguise and conceal from the FEC, the public, and donors the nature, source, and ownership of the proceeds of the money they made from contributions to Liberty Action Group and Progressive Priorities that they took for personal gain.

TUNSTALL and REYES were responsible for all decisions and retained supervisory control of the PAC's activities. TUNSTALL and REYES caused Liberty Action Group to file reports with the FEC. These reports contained materially false statements and representations. TUNSTALL, REYES, and DAVIES caused Liberty Action Group PAC to use robocalling platform to solicit money from the public through false and misleading representations.

TUNSTALL, REYES, and DAVIES also caused Liberty Action Group to solicit money online through its web site, created by TUNSTALL and REYES, which falsely described Liberty Action Group as "a federal political committee that makes contributions to federal and state candidates and committees." TUNSTALL and REYES were responsible for all decisions and retained supervisory control of the PAC's activities. TUNSTALL and REYES caused Progressive Priorities to file reports with the FEC.

TUNSTALL, REYES, and DAVIES also caused Progressive Priorities to solicit money online through its website, created by TUNSTALL and REYES, which falsely described Progressive Priorities as "a federal political committee that makes contributions to federal and state candidates and committees."

TUNSTALL and REYES wired the excess funds to bank accounts held by Supreme Dream and Matte Media, both companies owned or controlled by TUNSTALL, and Modern Media, a company owned or controlled by REYES. In total, they wired approximately $353,000 to these accounts controlled by TUNSTALL and REYES through approximately 22 separate transactions.

TUNSTALL and REYES used fraudulent means in furtherance of their scheme to defraud and obtain money through the operations of Liberty Action Group and Progressive Priorities. The transactions described affected interstate commerce involving the movement of

funds by wire or other means.

**<u>Counsel's Advice: Ineffective Assistance of Counsel</u>**

At no time did Counsel explain to Tunstall that he had three options: Trial; Negotiated plead; and *plead open and preserve his right to appeal the sentence.*

Tunstall and Counsel met several times to discuss the evidence and trial strategy. Tunstall communicated to Counsel that he had no desire to take his case trial. He thought it best to plead guilty. With that understanding, Counsel entered into plea negotiations with the government. Counsel's advice to Tunstall is set forth, primarily in two letters from Counsel to Tunstall.

In a correspondence dated May 3, 2022, Counsel set forth Tunstall's options going forward. His options, as presented to him twofold: First, go to trial, something Tunstall had dismissed as an option, and second, enter into a plea agreement. One of the conditions to the plea agreement was to waive his right to appeal the Court's decision as to the appropriate sentence. Counsel's letter does not mention the third option, namely, enter into a plea without a plea agreement. The letter goes through the various guideline calculations, but only if Tunstall pleaded guilty pursuant to a plea agreement or goes to trial. [Exhibit One]

In a second letter from Counsel to Tunstall, dated November 28, 2022, Counsel communicates the government's latest plea negotiation proposal. Again, Counsel goes to great lengths to outline various guideline calculations, either after trial or by way of negotiated plea. The differences were discussed, but again, no mention of Tunstall's right to plead guilty "open" and preserve his right to appeal the sentence. It is strikingly important that in the last correspondence, the loss amount was not agreed upon. The parties are free to argue each side's position as to the loss amount to be used in calculating the sentence. Without being aware of the third option, pleading open and reserving his right to appeal, Tunstall pleaded guilty pursuant to the plea agreement. [Exhibit Two]

In the sentencing memorandum filed on behalf of Tunstall, Counsel argued that the loss amount calculated by the PSR is incorrect, and that the loss amount could be calculated more appropriately two ways:

'(1) <u>Credits against loss</u>. "If the defendant returned any money or property to the victim

or rendered any services before the offense was detected, the loss amount is reduced by the fair market value of the money returned or the services rendered." United States v. Worley, 729 F. App'x 850, 851 (11th Cir. 2018) (citing § 2B1.1 cmt. n.3(E)(i)). "Actual loss" thus incorporates a "net loss approach." "This 'net loss approach' reflects the Sentencing Commission's position that an offender who transfers something of value to the victim is generally committing a less serious offense than one who does not." Id. (citing United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014)).

(2) Gain rather than loss. Loss can reasonably be determined if the Court segregates the value of services the Tunstall/Reyes PACs performed consistent with the government's sentencing submissions. However, counsel suggests that personal gain – rather than any other loss calculation – is an appropriate measure of loss in this case because it is easily determinable and is an appropriate analogue for relative blameworthiness. United States v. Randock, 330 F. 628, 629–30 (9th Cir. 2009) (holding that where the loss to victims in a fraudulent academic credential scheme could not reasonably be determined, gain was a reasonable alternative). As a result, the Court should calculate the Tunstall/Reyes PACs' loss as the amount that Tunstall, Reyes, and Davies personally benefitted from their actions – which is between $1,500,001 – $3,500,000.

Thus, the defensive strategy was set: challenge calculation of loss, not by disagreeing with the facts, but by positing a different method of calculating the loss.

At the sentencing hearing, Counsel argued the law to determine the loss calculation, and not the facts. The argument was purely legal and not factual. Counsel's argued:

First, the Court has the authority to adopt this interpretation under Kisor, v. Wilkie, 588 U.S. ____, the Supreme Court case, and the most recent Fourth Court of Appeals case, Banks. And Judge, in U.S. v. Banks, 130 F.3d. 162, the Third Court held that the Supreme Court's reasoning in Kisor makes the commentary to the loss guidelines not subject to the district court's deference. And, specifically, using Kisor's analysis, the Banks court determined that the -- the application guidelines expand what the normal dictionary, commonly understood definition of loss is. And, specifically, the Fourth Court stated in their opinion that the -- the loss means loss the victim actually suffered, not intended loss or something else. And so one question for the

7

court, or an important question, I believe, is who is the victim in this case? Is it the individual voters? Is it the Trump campaigns? Is it something other intangible victim? But, regardless, we know that under the Banks definition of loss, it is victim dependent. And, specifically, the government needs to show what the particular loss is to each donor if the donor is the victim. It didn't do that in this case. And you heard from the agent that, of the thousands of voters and the thousands of donors that donated to Mr. Tunstall and Mr. Reyes's PACs, they talked to 40 but didn't analyze whether those -- what the loss amount particular to those 40 was. The other thousands we don't know about. Didn't ask them. Didn't bring them to court. We know that they took in millions of dollars, and we know that they spend millions of dollars promoting the candidates' messages.' (See Sentencing Hearing, Vol. 2 Pages 3-4)

      Counsel then argued:

      'I think that -- that gain is the more appropriate metric here for a couple of reasons, and if I might just briefly touch on them. 1 And first I think that the government would agree that, if Matt Tunstall didn't live lavishly and only took a reasonable salary, we likely wouldn't be here. But, you know, if he spent all of 7 million bucks on more Trump ads and more Hillary ads, it likely wouldn't be a federal case. And so, ultimately, the issue, the problem, the societal problem that we're dealing with here is Matt's lavish gain, and so we think that's an appropriate metric. And, third, using gain is simple, because we don't know whether the donors valued Mr. Tunstall's advocacy or his radio ads or his Fox News ads. We don't know that. But we do know that he profited a little more than $700,000. And we know Mr. Reyes profited somewhere to the tune of $800,000. It's definite, it's simple, it's certain. We'd ask that the court apply that guideline.' (See Sentencing Hearing, Vol. 2 PAGES 8-9).

      The arguments advanced by Counsel were not persuasive to the Court. The Court did however recognize the merit to the legal argument and acknowledged the Circuit case in light of the Supreme Court case. In other words, this is the very thing that an attorney would present to the trial court, as the immediate audience, yet have an eye on appealing the case in the event the Court ruled against him to yet another audience, the Fifth Circuit. In defense attorney parlance, called "talking to the circuit".

      Counsel Carroll is a fine attorney… but he sold himself short, and by doing so, his client.

The third option, one that was not discussed with Tunstall, and the best option, pleading open to the Court without waiving appeal was the correct choice. Tunstall, had he been made aware of this option, would have chosen.

**Argument**

"A defendant may plead not guilty, guilty, or (with the court's consent) nolo contender." It does not require that a guilty plea be pursuant to a plea agreement. Rule 11, FRCP

The two-prong test under Strickland v. Washington, 466 U.S. 668 (1984), requires the Defendant to prove that Counsel's performance was so defective as to violate his constitutional right to effective assistance of counsel. The Defendant must show that the performance fell below an objective standard of reasonableness. Then, he must show that there is a reasonable probability that, but for the defective performance, the result would be different.

Tunstall entered into a plea agreement waiving his appellate right for circuit court review. Thus, he could not challenge his conviction or sentence in a direct appeal. His only remedy left is by collateral review. This he had not waived. But is this issue of ineffective assistance of counsel cognizable under collateral review.

In United States v. Cardenas, 2016 WL 7373810, The defendant challenged his conviction and sentence, pursuant to 28 U.S.C. §2255. The Court recognized the issue of ineffective assistance of counsel claim. In a guilty-plea context, the prejudice inquiry "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process" Hill v. Lockhart, 106 S. Ct. 366,370 (1985). Id Cardenas waived his right to pursue collateral review and such was knowing and voluntary, See United States v. Bond, 414 F.3d 542, 544(5th Cir.2005). The court noted that although Cardenas complained that he was not informed of the choice to plea open, he did not claim that he would have received a more favorable sentence, thus did not allege any harm. Because he failed to allege the prejudice from counsel's error, his petition was dismissed. Tunstall alleges both defective performance as well as prejudice.

In United States v. Essien, 2014 WL 7345714, the defendant chose to go to trial and not plead guilty. The defendant claimed that he would have opted to plead guilty rather than go to

9

trial, if only counsel would have told him of that option. In this case, the court found that it was reasonable for counsel to chose not to pursue a negotiated plea. "However, if trial counsel did indeed fail to inform Defendant that h could enter an open plea of guilty without a plea agreement with the government, and if counsel idd not discuss with Defendant the possibility and consequences of an open pea, then trial counsel was deficient in the regard." Id Given this, the court set the case for an evidentiary hearing to determine whether the deficient performance cause the requisite harm.

Tunstall was never advised that he could enter a plea of guilty without an agreement with the government. Counsel simply took it upon himself to negotiate a plea agreement with the government. In most circumstances, this is the preferred practice. However, in Tunstall's case, the government was seeking to argue for and achieve many of the adjustments upward. And in the agreed factual basis, the parties agreed to many of the elements that would support the enhancement. The sole issue of contention was to be the calculation of loss.

This is where the deficient performance occurs. Knowing that Tunstall had a legitimate legal argument for reducing the amount of loss, and thereby guideline calculations as well as restitution, Counsel entered into an agreement waiving the right to appeal.

The resulting harm is that, although a novel and imaginative argument for loss calculation, the argument stops in the District Court. By waiving the appeal, Tunstall could not advance, and win, the argument in the Circuit Court. An open plea would allow that.

Since Tunstall did not want to go to trial, he was left with two choices:

1. Plead guilty pursuant to a plea agreement.
2. Plead guilty open, without a plea agreement.

The agreed factual basis for the plea agreement was sufficient to establish role adjustment, along with other adjustments. By pleading without an agreement, He would be free to argue more vigorously the various adjustments as well as a valid argument for calculating loss, and thereby pursuing his right to appeal to the Circuit Court.

PRAYER WHEREFORE, Petitioner, Matthew Nelson Tunstall prays that this Court grant him the following relief:

1. That his conviction be vacated and that the matter be again set for trial.

2. That alternatively an evidentiary hearing be held on the issues raised in the Petition.

>Respectfully submitted,
>
>\_\_\_/S/_____
>Daniel H. Wannamaker
>Counsel for Tunstall
>13809 Research Blvd., ste 500
>Austin, Texas 78701
>TX Bar No. 20834300
>512.236.9929 office
>512.233.5979 fax
>dhw@wannamakerlaw.com

## **CERTIFICATE OF SERVICE**

I, Daniel H. Wannamaker, hereby certify that on May 8, 2024, 2024, I electronically filed the foregoing motion with the clerk for the U.S. District Court, Western District of Texas, using the electronic filing system for the court, which will provide service to all parties of record.

>\_\_\_/S/_____
>Daniel H. Wannamaker

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| **v.** § | **CRIMINAL NUMBER 1:21-CR-00233** |
| § | |
| **MATTHEW NELSON TUNSTALL** § | |

## ORDER SETTING HEARING

ORDER SETTING HEARING IT IS HEREBY ORDERED that this matter be set for an evidentiary hearing on: _____, _____, 2024 at ____ o'clock A.M. / P.M.

IT IS SO ORDERED this the _____ day of _____, 2024

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NUMBER 1:21-CR-00233 |
| | § | |
| MATTHEW NELSON TUNSTALL | § | |

### ORDER GRANTING PETITION

IT IS HEREBY ORDERED that Petitioner's Application under 28 U.S.C. §2255 is GRANTED.

IS SO ORDERED this the _____day of _____, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE